E-FILED
Tuesday, 08 August, 2017  04:46:05 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS - URBANA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| BOARD OF TRUSTEES OF THE | ) | |
| UNIVERSITY OF ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | JURY DEMANDED |
| | ) | |

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF AND JURY DEMAND**

NOW COMES Plaintiff, John Doe[1], by his attorneys, Mark Roth and Kenneth Hurst of Roth Fioretti, LLC, and for his cause of action against Defendant, Board of Trustees of the University of Illinois ("Board"). Through counsel, John Doe, states as follows:

**NATURE OF THE COMPLAINT**

1.      This is an action for an Injunctive[2] and Declaratory relief, in that Plaintiff, "John Doe" or "John," was expelled/dismissed from the University of Illinois at Urbana-Champaign (the "University") effective April 25, 2017, without, *inter alia*, proper notice and a hearing in violation of the Due Process afforded by Plaintiff's Fourteenth Amendment Right of the United States Constitution. The case arises out of the actions taken and procedures employed by Defendant, Board, concerning false allegations of nonconsensual sexual assault made against Plaintiff, a male sophomore student at the University.

---

[1] Plaintiff is contemporaneously filing a Motion for Permission to Proceed under Pseudonym. Plaintiff is entitled to proceed anonymously because of the highly sensitive nature of the disciplinary proceedings against him that form the basis for his Complaint, and the fact that the University is fully aware of his identity and will not be prejudiced in any way. Plaintiff also seeks to maintain the privacy of his accuser by requesting permission to identify her anonymously as "Jane Roe".

[2] A Motion for Preliminary Injunction will follow the filing of this Complaint.

2.      The allegations underlying the actions taken by Defendant concern an instance of consensual sexual activity that occurred during the early morning hours of December 4, 2016, between Plaintiff, a sophomore at the University, and a female senior student at the University, who is identified in this Complaint as "Jane Roe" or "Jane."

3.      After the Defendant had notified John of sexual assault charges against him on December 13, 2016, John was forced through a ninety-three (93) day investigative process. During the insufficient and unfair investigative process, John was interviewed only once. The Investigators were authorized by Defendant to have full control over the Investigative Report that would eventually go to the Panel established by the University for a decision. Although John was allowed to review the Initial Investigative Report, and the Revised Report, he was not able to review the Final Investigative Report. While reviewing the Investigative Report, John found numerous errors in his statements, misunderstandings of his statements, incorrect witness statements, and incorrectly reported events. There were approximately sixty-one (61) lines in the Initial Investigative Report that John commented on or corrected. The Initial Investigative Report did not convey John's testimony accurately. The Investigator further wrote the Investigatory Report giving her conclusions that witnesses, with no direct knowledge, were more credible than both of the persons who were personally involved in the alleged occurrence.  Except for emails from the University to view the Investigative Reports, John was left in the dark as to what was occurring in the investigative process.  John took every opportunity he could to correct the reports, but the Board's procedures were simply unfair. When John asked the Investigator if he could attend the hearing at which time a decision would be made on the false charges, the Investigator responded: "no honey, you just wait at home for the result email which will be sent

within twenty-four hours of the hearing." The Board's procedures, as alleged in this Complaint, trample over students' constitutional rights.

4.      John was notified on March 16, 2017, via email, that a hearing was to occur on March 28, 2017. The notice of John's hearing was constitutionally insufficient in that it did not provide the time or location of his hearing. Further, John was not invited or even allowed to provide testimony or evidence at the "hearing."   John's true, actual testimony was never provided to the Panel for adjudication of the charges against John. Further, John was never allowed to cross-examine his accuser, nor was he even allowed to cross-examine third parties named in the report.

5.      Immediately prior to the hearing, the University was preparing the entire campus for Sexual Assault Awareness Month ("SAAM"). SAAM was to occur approximately three days after John's closed-door hearing. All Panel members were aware of incoming SAAM and their decision was unfairly influenced by SAAM.

6.      Further, Defendant was unduly, and improperly, influenced by the "Dear Colleague Letter" issued by the Federal Office for Civil Rights issued on April 4. 2011.  The Dear Colleague Letter advances new rules and creates binding obligations under threat of severe penalties, including investigation and rescission of federal funding for non-compliant educational institutions. The Dear Colleague Letter has aggressively dictated how colleges and universities handle sexual assault on campus, by laying out specific requirements that schools must adopt and utilize, causing schools to brand more students as "rapists" based on the excessively low "preponderance" burden of proof, permitting a form of double jeopardy, and, perhaps most importantly, deprive accused persons (overwhelmingly males) of all elements of due process,

including the right to an attorney, the right of cross-examination, and a standard of evidence appropriate to the consequences of their being found "guilty."

7.    The Defendant, after viewing the Final Investigative Report of the Investigators made a determination that John violated the University Code and dismissed John for 2.5 years on March 28, 2017, two years for the alleged "rape" and another one-half year for violating a no-contact policy. The Defendant remarkably made findings related to John's credibility, although John was never even present before the Panel.  The Defendant's findings provided that John had "premeditated" his assault against Jane and issued a two-year dismissal for sexual assault. The Defendant also found that because both John and Jane had consumed alcohol earlier that night, Jane was incapacitated at the time of the sexual activity and so she could not consent.  However, at odds with incapacitation, the Defendant also found that prior to the sexual activity Jane and John had walked home together and that neither person had consumed any further alcohol after John and Jane walked home together. Moreover, the University found that John had violated its no contact directive when John sent Jane a text of the University's email charges against him. The Defendant, therefore, sanctioned John's dismissal for 2.5 years for failure to abide by the no contact directive. The additional half-year punishment was harsh where John had hastily texted Jane the University's email containing the charges against John without reading the entire email. After continuing to read the email, John noticed the no contact directive informing Jane that he was not supposed to contact Jane. John never contacted Jane, in any form, after the aforementioned.

8.    The Defendant dismissed John after a closed-door hearing without allowing John, Jane, or any witnesses to appear or to testify before the assigned University Panel. John was not afforded the opportunity to present his testimony or evidence to the Panel. John was not allowed

to confront and cross-examine his accuser, nor was he allowed to cross-examine any other persons listed in the report as having provided "evidence."  The Panel, after reviewing the 100% hearsay Final Investigative Report, made findings regarding John's credibility without his presence.

9.      Although the Defendant supposedly found that John had "premeditated" sexual assault against Jane, the University allowed John to continue campus life, attend classes, and interact with students. John remained on campus for an additional month. During this time, John appealed his decision, provided new information, and contested errors in the Reports. For instance, John provided new documented evidence that an adverse witnesses statements were inaccurate. The inaccurate statement was a basis for the Defendant's finding that Jane was incapacitated. However, the Defendant affirmed its decision and John was effectively dismissed from school on April 25, 2017.

10.     John, an exemplary student, involved in, on and off-campus activities, a member of the Board of the Taiwan Intercultural Association and soon to be President, double majoring with a 3.76 GPA, a committee member of the Minority Business Student Association, and a potential manager for a well-known Champaign Restaurant, will be forced to live the rest of his life with the Defendant's decision without even a fair opportunity to be heard. The Defendant violated John's minimum constitutional guarantees, at the expense of making an example out of John for SAAM. The only result from the imposition of the Defendant's punitive sanctions will be to severely harm John's future economic prospects and to destroy his reputation.

11.     The Defendant's actions resulted in a taking of John's right to an undergraduate education without a fair hearing, including the opportunity to be heard and the right to cross-examine adverse witnesses. There simply was no hearing provided to John by the Defendant, its

agents, and employees, or its promulgated rules and codes. The Defendant's violation of John's constitutional rights of Due Process will forever irreparably harm John for his lost years in college, delay in the completion of his degree, and the opportunity to begin his career. Further, John will have to "explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap". *Doe v. University of Notre Dame*, No. 3:17CV298-PPS/MGG, 2017 U.S. Dist. LEXIS 69645, at *38 (N.D. Ind. May 8, 2017). The Defendant's fundamentally unfair procedures did not allow for John to have a hearing before the Panel.

12.     For these reasons, John brings this action to obtain injunctive and declaratory relief, and attorney's fees and costs against the University for violating Due Process afforded by John's Fourteenth Amendment Right.

## JURISDICTION

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, 42 U.S.C. § 1983 and § 1988, and Fourteenth Amendment of the Constitution of the United States of America.

## VENUE

14.     Venue is appropriate under 28 U.S.C. § 1391(b).

## PARTIES

15.     Plaintiff, John Doe ("John"), is a natural person who resides in the state of California. During the events described herein, John was enrolled as a full-time, tuition-paying, undergraduate student at the University.

16.     Defendant, Board, is a body corporate and politic having power, *inter alia*, to plead and be impleaded, to make and establish by-laws, and to alter or repeal the same as they

shall deem necessary, for the management or government, in all its various departments and relations, of the University of Illinois, for the organization and endowment. *See,* 110 ILCS 305/1. The Board is sued in each and every cause of action, in any and all capacities.

## FACTUAL ALLEGATIONS

### A.  John's University Career, Employment Opportunities, and Relationships

17.     John is a University sophomore and a double major in Accounting and Finance. John holds a GPA of 3.76. John was placed on the University's Dean's list during his first semester.

18.     John has been an exemplary student, actively involved in academic and philanthropic endeavors both on and off campus and has received university grants and scholarships. During the relevant time, John was a member of the Alpha Phi Omega national coeducational service organization founded on the principles of Leadership, Friendship, and Service. Alpha Phi Omega is a volunteer fraternity that provides its members the opportunity to develop leadership skills as they volunteer on their campus, in their community, to the nation, and to the organization. John was also a committee member of the Minority Business Student Association (MBSA). Further, John was the vice president of Taiwan Intercultural Association ("TIA"). John was the next potential president of TIA and was in fact offered the position of president. John respectfully turned down the position of president after the Defendant initiated the student disciplinary action against him. In addition, Students Today Leaders Forever is a campus nonprofit organization that John participated in a week-long service road trip to volunteer in various projects in six different cities.

19.     Before the instant dispute, John possessed no student disciplinary record. In High School, John achieved the rank of Eagle Scout in the Boy Scouting program of the Boy Scouts of America. Only four percent of Boy Scouts are granted this rank after a lengthy review process.

20.     While enrolled in school John was employed at the well-known Ozu Ramen Restaurant located in Champaign, Illinois. John was praised by the management and ownership as being a hardworking, dedicated, and a respectful employee. John assisted in Ozu Ramen's events and was praised for his potential as a manager in the upcoming year.

21.     As a result of John's involvement in school, TIA, and Ozu Raman, John was well-liked and respected, often hosting BBQ events at his place, cooking for his friends, and was known for being kind and sociable among friends and classmates.

**B.  John's University Courses During Spring Semester 2017**

22.     During the spring semester of 2017, John was enrolled in five University classes, ACCY 301, ACCY 302, SPED 117, FIN 300, and ACES 161. These aforementioned classes amounted to 15 hours of semester course credit. After the Board had confirmed John's dismissal on April 25, 2017, John was forced to withdraw from all classes. The withdrawal occurred approximately one week prior to the University final examination week.

23.     ACCY 301 is "Atg Measurement & Disclosure" and a three-credit hour course. ACCY 301 is an "[i]ntroduction to measurement and reporting of organizational performance for strategic and operational purposes with a focus on a variety of financial and non-financial performance measures suitable for both internal and external decision-making. Projects, together with a series of practical workshops, facilitate self-discovery of knowledge and development of a variety of professional skills and attitudes." John completed all class work and group projects.

All that remained in John's ACCY 301 class was a quiz and a final examination that would have occurred approximately one week after John's dismissal was effective.

24.      ACCY 302 is "Decision Making for Atg" a three-credit hour course. ACCY 302 is a "[d]ecision making implications of information provided to organization managers and to external stakeholders such as investors, creditors, customers, and regulators. Concepts from economics, statistics, and psychology emphasize the use of quantitative techniques to comprehend uncertainty and risk. Projects, together with a series of practical workshops, facilitate self-discovery of knowledge and development of a variety of professional skills and attitudes."  John completed substantially all assignments and completed all group projects. All that remained in John's ACCY 301 class were a few assignments and the final examination that would have occurred approximately one week after John's dismissal was effective.

25.      SPED 117 is "Culture of Disability" a three-hour course. SPED 117 is "to provide an introduction to the culture of disability across the lifespan. The impact of disabilities on an individual across the lifespan will be explored, and the unique culture that is created by having a disability will be addressed. The historical basis for the disability movement and special education will be addressed, including legislation and litigation that has had a significant impact on the field. Students also will learn about the characteristics of individuals with diverse abilities as well as current trends in educational services." John had completed five weeks of the eight-week course before he was dismissed from the March 28, 2017, decision.

26.      FIN 300 is "Financial Markets" and a three-hour course. FIN 300 is "[t]heory and applications associated with the functioning of financial markets to include the conceptual foundations of portfolio theory, risk management, and asset valuation. The stock, money, bond, mortgage, and futures and options markets are examined." John completed substantially all

coursework.  All that remained in John's FIN 300 class was one homework assignment and the final examination that would have occurred approximately one week after John's dismissal was effective.

27.     ACES 161 is "Microcomputer Applications" and a three-hour course. ACES 161 is for "[i]nstruction and practice in solving data-related problems with microcomputers and general purpose software packages." John completed the entire ACES 161 course.

28.     As a result of the instant dispute, John was forced to receive a withdrawal from all 2017 spring semester courses.

**C. The University's Sexual Misconduct Policy and Student Conduct Protocol for Allegations of Sexual Misconduct**

    **1.  The University's Sexual Misconduct Policy**

29.     At the time of Jane Roe's complaint against John in December 2016, the Board's Policy on Sexual Misconduct ("Policy") supplied the definition of sexual assault, consent, and abuse of the University disciplinary system, which were applied to the charges against John.

30.     The Board incorporates definitions and terms of the Policy in its Student Code ("Code") found at studentcode.illinois.edu, contained in the University website. See true and correct copy of the relevant portions of the Student Code attached hereto as Exhibit "A." The Code notes that the rules apply to all undergraduate, graduate, and professional students enrolled at the University of Illinois at Urbana-Champaign.

31.     The Code includes the Board's basis for discipline, source, and jurisdiction. The Code details that the Board provides the authority to the Senate Committee on Student Discipline ("SCSD") to be "responsible for the administration of student discipline for acts involving violation of campus or University regulations." The regulations are formulated by a variety of sources, including, but not limited to the Board. The Board and SCSD will only accept

"jurisdiction only in those instances in which the University community's interest is substantially affected."

32. The Code further details "that the basis for discipline at this campus be clearly defined."

33. The Code provides for Rules of Conduct in which students are subject to discipline. Within the Rules of Conduct, Code 1-302.b.1, includes conduct that violates the University's Policy, including sexual assault.

34. The Policy defines "sexual misconduct" to include "sexual assault." The Policy further defines, under § 1-111(c)(2)(a-b), "sexual assault" as "any sexual contact that does not involve the knowing consent of each person, including any form of sexual penetration without consent; and any intentional or knowing touching or fondling by either person, directly or through clothing, of the sex organs, buttocks, or breasts of the other person for the purpose of sexual gratification or arousal of either person without consent."

35. The Policy defines "consent" as follows:

"(3) Consent is informed, freely and actively given, mutually understandable words or actions that indicate a willingness to participate in mutually agreed upon sexual activity. A person can withdraw consent at any time. There is no consent when there is force, threats, intimidation, or duress. A person's lack of verbal or physical resistance or manner of dress does not constitute consent. Consent to past sexual activity with another person does not constitute consent to future sexual activity with that person. Consent to engage in sexual activity with one person does not constitute consent to engage in sexual activity with another person. A

person cannot consent to sexual activity if such person is unable to understand the nature, fact, or extent of the activity or give knowing consent due to circumstances including without limitation the following:

   (A) the person is incapacitated due to the use or influence of alcohol or drugs;"

36.    The Policy fails to further define "incapacitated."

37.    The Code at 1-302.o.1 details "abuse of the University system" to include, but not limited to "failure to obey directive of a disciplinary body or University officials in performance of their duties."

### 2. The University Student Conduct Protocol for Allegations of Sexual Misconduct

38.    When a student violates the community standards outlined in the Code, the Office for Student Conflict Resolution ("OSCR") has the responsibility of administering the "Student Disciplinary Procedures" as authored and authorized by the SCSD. The Board provided this aforementioned authority to SCSD.

39.    The Board's OSCR provides for "Student Disciplinary Procedures" on the website http://www.conflictresolution.illinois.edu/student_ discipline/. See attached true and correct copy of the relevant portions of the Student Disciplinary Procedures attached hereto as Exhibit "B."

40.    The OSCR addresses "all behavioral violations" of the Code committed by individuals.

41.    "Appendix D" provisions of the "Student Disciplinary Procedures" applies to cases that include an accusation of sexual misconduct, including sexual assault. Appendix D defines and also outlines the procedures and protocols for "Allegations of Sexual Misconduct,

Including Sexual Harassment, Sexual Assault, Sexual Exploitation, Stalking, Dating Violence, and Domestic Violence."

42.     Section 1 provides definitions for various terms within "Appendix D." For instance, Section 1 defines "Subcommittee on Sexual Misconduct" as, "[t]he group of faculty, staff, and students trained to adjudicate cases that include allegations of sexual misconduct, including sexual harassment, sexual assault, sexual exploitation, stalking, dating violence, and domestic violence. This group is selected by OSCR staff and approved by the SCSD."

43.     Section 2 provides for the investigation process and procedures.

44.     Section 2a provides for the "Intake and Review." Pursuant to Section 2a, the OSCR oversees the investigations of allegations against the students. Once notified of the allegations covered by "Appendix D," the Executive Director, Justine M. Brown, will appoint at least two investigators to conduct the investigation. The "Lead Investigator and at least one other investigator will first interview any participating complainants to determine the precise nature of the allegations."

45.     After the "Lead Investigator" determines "whether the allegations, if substantiated, would violate the Student Code," a "Charge Notice" is issued pursuant to Section 2b. The written "Charge Notice" informs the respondent of the approximate date, time, place, and type of incident, as well as of the section(s) of the Student Code that the respondent is alleged to have violated."

46.     After the written "Charge Notice" is issued, the "Lead Investigator" proceeds to interview the respondent pursuant to Section 2c.

47.     Section 2d provides for "Information Collection and Witness Interviews." Section 2d states, but not limited to, "The respondent and the complainant will be given the opportunity

to provide supporting information and documentation and to identify witnesses." The "Lead Investigator" is to review all submitted materials.

48.     Section 2e provides for "Follow-up Interviews."

49.     Section 2f provides for "Updates," which requires the OSCR to "provide both the respondent and the complainant with periodic status updates during the investigation, the adjudication process, and the appeals process."

50.     Section 2g provides for a "Timeline." This section anticipates a duration of an investigation to be approximately 45 calendar days following the "Charge Notice." Further, "If the duration of an investigation will substantially exceed this estimate, the Lead Investigator will provide written notice to both the respondent and the complainant of the delay and the reason for the delay."

51.     Section 3 provides for the "Investigative Report."

52.     Section 3a provides for the "Initial Investigative Report" initially stating, "[u]pon completion of the initial investigation, the investigators will compile all relevant information into a written report."

53.     Section 3b provides for "Report Review." This section allows for the respondent and complainant the opportunity to review the "Initial Investigative Report" in the OSCR "during normal business hours and to submit a written response."

54.     Section 3c provides for "Additional Investigation," stating "After reviewing the submitted responses, the investigators will conduct any additional investigation they deem appropriate and revise the investigative report as necessary." Therefore, the investigators have full control as to what is contained in the report.

55.     Section 3d provides for the "Final Review and Response," stating, but not limited to, "[b]oth the respondent and the complainant will be given the opportunity to review the revised report in the Office for Student Conflict Resolution during normal business hours and to submit a final written response, which may also include impact statements, character statements, statements of desired outcome, and any other information believed relevant for sanction determination."

56.     Section 3d provides for the "Final Investigative Report." The "Final Investigative Report" includes:

(1) The revised investigative report.
(2) Any final responses from the respondent and the complainant.
(3) A proposed statement of fact.
(4) Proposed responsibility determinations.
(5) A rationale for the finding of fact and responsibility determinations.

57.     The "Final Investigative Report" is controlled entirely by the investigators, contains hearsay, and unduly influences findings of fact and responsibility determinations by the Panel of members of the Subcommittee on Sexual Misconduct.

58.     Section 4 provides for "Panel Adjudication." The section does not provide for a hearing. Further, this section does not provide for presentment of student testimony or of evidence.

59.     Section 4a provides for the "Appointment of Panel." Section 4a provides, *inter alia*, for the Executive Director, Justine M. Brown, to appoint a "Panel" "composed of three members of the Subcommittee on Sexual Misconduct, a pool of trained university faculty, students, and staff members. Before the membership of this Panel is finalized, OSCR will provide both the respondent and the complainant with a list of all members of the Subcommittee on Sexual Misconduct." The respondent and complainant may challenge the objectivity of any

"Panel" person. "At least one faculty member and one student must be appointed to each Panel," and then the "voting Panel members will select a faculty member to serve as Chair."

60.     Section 4a further provides, *inter alia*, that "[p]rior to serving on a Panel, all Panel members will have received appropriate annual training, developed in consultation with the university's Title IX Coordinator, on sexual harassment, sexual assault, sexual exploitation, stalking, dating violence, domestic violence, and the physiological and psychological effects of trauma."

61.     Section 4b provides for "Panel Review of Investigative Report." Section 4b states that "Panel members will have five business days to review the Final Investigative Report." This is the same "Final Investigative Report" over which the investigators have final control.

62.     No hearing is provided for the complainant and the respondent to present their testimony or evidence to the "Panel."

63.     Section 4c provides for "Panel Questioning." Section 4c states:

"After the Panel members have reviewed the Final Investigative Report, the Panel will meet with and question the investigators. The Panel will be advised by the Executive Director or her/his designee, who will not be allowed to vote. If the Chair determines that the Panel requires additional guidance, the Panel may consult with ODEA or the Office of University Counsel."

64.     Section 4d provides for "Panel Deliberation." Section 4d provides, *inter alia*, that after the Panel questions the investigators, the Panel will "excuse the investigators and enter into closed deliberation." Further, non-voting members, including the Executive Director, will remain for deliberation. Moreover, "The Panel will make its decisions by simple majority vote and will

apply the preponderance of the information standard when deciding on a statement of fact and determining responsibility."

65.     Section 4d1 provides that the Panel may "[a]ccept the recommendations and rationale of the investigators set forth in the Final Investigative Report." The Panel, therefore, may accept the hearsay report of the investigator who controls the hearsay testimony entered into the "Final Investigative Report."

66.     Section 4d2 also allows the Panel to reject the recommendations of the investigators.

67.     Section 4d3 also allows the Panel to collect additional information before reaching a decision.

68.     Section 4e provides for "Sanctions." Section 4e provides, *inter alia*, that the "Panel must provide a written rationale for all sanctions, conditions, and restrictions."

69.     Section 4f provides for "Notice of Action Taken." Section 4f states, "OSCR will provide written notification of the Panel's decision, including rationales, to both the respondent and the complainant by the end of the next business day. This notification will also include information regarding the respondent's and complainant's right to appeal the Panel's decision."

70.     Section 5 provides for "Appeal Procedures."

71.     Section 5a provides for "Who May Appeal."

72.     Section 5b provides for "Grounds for Appeal." Among the grounds for appeal, include, but are not limited to, inappropriate sanctions and new substantive information.

73.     Section 5c provides for "Notice of Appeal."

74.     Section 5d provides for "Content of Notice of Appeal."

75.     Section 5e provides for "Sanction Held in Abeyance Pending Appeal." Section 5e provides, *inter alia*, that the "effective date of any formal or educational sanction will be held in abeyance automatically during the period in which the appeal may be filed and, once an appeal is filed, until the committee reaches a decision on the appeal…"

76.     Section 5f provides for "Appellate Review."

77.     Section 5g provides for "Deliberations."

78.     Section 5h provides for "Authority of the Appeal Committee."

79.     Section 5i provides for "Notice of Decision."

80.     Section 6 provides for "Petitions to the Subcommittee on Sexual Misconduct."

81.     Section 7 provides for "Role of the Title IX Coordinator in the Student Discipline System."

### D.  The Investigation Conducted by the Defendant was Woefully Inadequate and Fundamentally Flawed

82.     On December 13, 2016, at 4:36 p.m., John received an email from January Boten, Assistant Dean, and Investigator from the University. The email was titled, "UIUC Disciplinary Update: Charge Notice – IMPORTANT" ("December 13 Email").

83.     Upon initially reading the December 13 Email at approximately 7:00 p.m., and without reading a majority of the email's content, John text messaged a small snapshot of the December 13 Email to Jane. John was shocked and surprised by the email.

84.     Then John continued to read the December 13 Email and came upon the second half of the email. John read the no contact provision and immediately sent a text to Jane approximately one to two minutes after his first text message. He informed Jane that he was not supposed to contact her. John never contacted Jane, in any form, after the aforementioned.

18

85.     The December 13 Email informed John that the OSCR "received information in which it is alleged that on December 4, 2016, you were involved in an incident which may violate" the Code. The email further informed John of the approximate time, date, place, and type of incident.

86.     The December 13 Email informed John of the following charges: Student Code/1-302.b.1 as defined by § 1-111(c)(2)(a), and Student Code/1-302.b.1 as defined by § 1-111(c)(2)(b)."

87.     The December 13 Email informed John of the Code and that the Code may be accessed on its website at: http://www.conflictresolution.illinois.edu.

88.     The December 13 Email noticed John to call the Assistant Dean "during normal business hours and no later than January 27, 2017, to arrange an appointment" with her.

89.     John received a subsequent email on December 14, 2016. The email was titled, "UIUC Disciplinary Update: Charge Notice – IMPORTANT" ("December 14 Email").

90.     The December 14 Email noticed John to call the Assistant Dean to arrange an immediate appointment at 300 Student Services Building, 610 E. John Street, Champaign, IL. During the appointment, discussions would be made regarding the nature of the alleged incident and the appropriate University response. The email further noticed that John may bring an advisor to the appointment, however, the "advisor may not actively participate in" the discussion.

91.     The December 14 Email noticed an additional charge of, "Student Code/1-302.o.1."

92.     The remaining parts of the December 14 Email are substantially similar to the December 13 Email.

93.     Soon after the December 14 Email, John contacted the Investigator to setup an appointment. John arrived at the appointment at the Assistant Dean/Investigator's office.

94.     At the appointment, the Investigator addressed the no contact policy issue with John. John informed the Investigator as to what occurred on December 13, 2016. After informing the Investigator of his hastiness, the Investigator did not request the text messages at issue. Further, John was told virtually nothing about the accusations Jane had made so that he could prepare a defense and suggest sources of information for Investigators to pursue.  Rather, the Investigator informed John that they would resume discussions, however, as soon as possible.

95.     During the first few weeks of January 2017, John called the Investigator to set an appointment. The Investigator informed John of the next available date of January 19, 2017. The Investigator told John to come to her office and prepare to tell his side of the story. The Investigator further asked if John had told anyone about his story.  John responded "No." The Investigator told John not to tell anyone, however she did not provide a reason.

96.     On January 19, 2017, John was first interviewed regarding the allegations of December 4, 2016. During this interview, the Investigator, asked John questions regarding what occurred. Another individual was present taking notes of the interview. Using, in part, the notes of the other person in the room, the Investigator created the Initial Investigative Report. That same day, subsequent to meeting with the Investigator, an email was sent to John regarding the interview content. John reviewed the interview content and made corrections.

97.     Further on February 27, 2017, John met with the Investigator to view the Initial Investigative Report. While reviewing the Initial Investigative Report, John discovered errors that included, but not limited to, typing errors, content errors, and some misunderstandings between John and the Investigator. John corrected and made comments to approximately sixty-

one (61) lines in the initial report. The report caused grave concern and confusion for John. The hearsay report was not sufficient to provide an accurate representation of John's true testimony.

98.     On February 27, 2017, John was allowed to view the complainant's initial report and the other witnesses' reports.

99.     On March 8, 0217, John was allowed to review a revised Investigative Report before sending the Investigative Report to the Subcommittee. Again, John discovered errors that included, but not limited to, typing errors, content errors, and some misunderstandings between John and the Investigator. John provided his revisions to the Revised Report which he made approximately thirty-eight (38) comments and corrections. Therefore, the Revised Report continued not to represent John's true testimony.

100.    On information and belief, John did not view Final Investigative Report that was sent to the Panel for adjudication. Further, on information and belief, the Panel was allowed to view the Initial Investigative Report and the Revised Report causing further confusion to the Panel's adjudication.

101.    "Appendix D" provisions of the "Student Disciplinary Procedures" does not allow for students to attend hearings. When John requested whether he could attend the hearing, the Investigator responded, "no honey, you just wait at home for the result email which will be sent within twenty-four hours of the hearing."

102.    The Investigator further wrote the Investigatory Report giving her conclusions that witnesses with no direct knowledge were more credible than both John and Jane.

103.    John is not aware of what corrections were made to the Investigative Report before it was sent to the Subcommittee. John was not provided a fair opportunity to provide his testimony to a hearing.

104.    During the interview process, the Investigators neglected John's expression and emotions while he was being interviewed. John felt as if he was speaking to a machine. These expressions and emotions were never conveyed in the Investigative Report.

105.    At no point in time, from the December 14 Email to March 28, 2017, did the Board provide John with email updates regarding the investigation, other than emails regarding viewing the initial and revised Investigative Report. John was otherwise left in the dark throughout the investigation.

106.    On March 16, 2017, ninety-three (93) days subsequent to the December 13, 2016 "Charge Notice," and forty-eight (48) days after the duration contained in Section 2g of "Appendix D," John was provided inadequate notice of his hearing. The March 16, 2017, email was sent by January Boten, Assistant Dean/Investigator at 11:58 p.m. The email was titled "UIUC Disciplinary Update: Subcommittee Hearing Notice Announcement Notice – IMPORTANT" ("March 16 Email").

107.    The March 16 Email informed John that his case was scheduled to appear before the Subcommittee on Sexual Misconduct.

108.    The March 16 Email further informed John that, "Your hearing is scheduled for March 28, 2017." The notice was inadequate as it did not provide a time or place of the hearing.

109.    John was not allowed to attend his hearing to provide testimony or cross-examine witnesses.

110.    The March 16 Email did inform John that he was allowed to appeal the decision that would be received by John the following day of the "hearing."

111.    April is designated as Sexual Assault Awareness Month (SAAM). The goal of SAAM is to raise public awareness about sexual violence and to educate communities and

22

individuals on how to prevent sexual violence. The University and the community annually plan a host of events. The University plans concerts, drives, talks, workshops, campaigns, meetings, walks, and more. The University plans to have as many individuals aware of the month and its SAAM goals.

112.    The Panel was aware of SAAM which was to occur three days after the closed-door hearing on Jane's allegations against John.

113.    Neither John, Jane, nor any other witness were allowed to attend the closed-door hearing. The Panel made its decision solely on the hearsay Final Investigative Report and the Investigators.

114.    On March 28, 2017, John received an email from the Executive Director, Justine M. Brown. The email was titled "UIUC Disciplinary Update: Subcommittee Decision Notification" ("March 28 Email").

115.    Based on the Investigator's deeply skewed and incomplete findings, the Subcommittee concluded facts regarding John and Jane's December 4, 2016, night. The Subcommittee further concluded that after John walked Jane back to his apartment, Jane "was incapacitated at the time of the sexual activity and so could not consent." This is at odds with Jane walking with John back to his apartment. No further findings of alcohol consumption were made. The Subcommittee further concluded that John had received oral sex from Jane, vaginal sex with Jane and that Jane was "incapacitated at the time of the sexual activity and so could not consent." Additionally, the Subcommittee concluded that after John had received the "charge letter and no contact directive from Dean Boten on December 13, you took a screen shot of the email and sent it in a text to the complainant."

116.    Based on the findings the Subcommittee determined that John violated all alleged Codes from the December 14 Email.

117.    The Subcommittee further provided its rationale for the decision.  The rationale provided, *inter alia*, that the Subcommittee relied on the hearsay statements contained in the "Final Investigative Report."

118.    The rationale also made credibility determinations of John that his statements were not credible.  The credibility determinations were made without the presence and testimony of John to the Subcommittee.

119.    The Subcommittee assigned the following sanctions:

a.    Dismissal. Start Date: Tuesday, March 28, 2017. Dismissal records are maintained indefinitely and are noted on John's transcript. John is prohibited from attending or receiving a degree from the University until John successfully petitions the Subcommittee to pursue readmission. To be eligible for a petition hearing, John must complete the following:

  i.    Petition Letter, Academic/Work History, Mandated Service of 250 hours, and a Research Paper of 3,000 words.

b.    Trespass Notification to be excluded from the property.

c.    No Contact Directive with Jane until John's degree is conferred.

d.    John may request a petition hearing in Spring 2019 for possible readmission in Fall 2019.

e.    The Subcommittee found that the sexual assault was premeditated and because the case also includes a violation of the no contact directive, the Subcommittee

issued a 2.5-year dismissal. The SCSD provided guidance to the Subcommittee to

consider a two-year dismissal.

120.    The March 28 Email further provided that John may appeal to the SCSD no later

than 5 p.m. on April 4, 2017.

121.    John appealed the Subcommittee decision by the required date of April 4, 2017.

John also typed an Appeal Report that provided new information that witnesses' reports were

incorrect. John's Appeal Report indicated multiple errors with the purported facts, statements

that were made by others, and statements made by John. For instance, John provided new

documented evidence that an adverse witnesses statements were inaccurate. The inaccurate

statement was a basis for the Board's finding that Jane was incapacitated. John also provided new

documented text message evidence demonstrating his hastiness in texting Jane and immediately

correcting his action. The new text message evidence demonstrated the excessive sanction issued

to John.  John was not provided a fair opportunity to be heard where the hearsay statements

provided to the Panel were incorrect.

122.    The six-month violation for the No Contact Directive was overly harsh. John's

hasty contact was not willful, and John never contacted Jane after the incident.

123.    After the March 28, 2017, findings of Johns "premeditated" sexual assault, John

was allowed to be on campus, go to classes, and interact with students. John was part of the

University community and no further allegations or issues occurred while John continued

campus life.

124.    On April 25, 2017, the University sent John an email titled, "UIUC Disciplinary

Update – Appeal Decision Letter." After providing new information and corrections in his

Appeal Report, the SCSD found that none of the criteria for the appeal were substantially met. The SCSD reaffirmed the March 28, 2017, decision.

125.     John was suddenly dismissed from the University on April 25, 2017.

**COUNT I**
**DEPRIVATION OF PLAINTIFF'S FOURTEENTH AMENDMENT RIGHTS (Due Process and Equal Protection); UNDER COLOR OF LAW, 42 USC Sec.'s 1983, 1985, 1988**

126.     Plaintiff repeats, re-alleges and incorporates by reference, the allegations in aforementioned paragraphs with the same force and effect as if herein set forth.

127.     The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

128.     A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

129.     A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

130.     Plaintiff's constitutionally protected property interest in his continued enrollment at the University and to be free from arbitrary dismissal arises from the policies, courses of conduct, practices, and understandings established by the Defendant.

131.     Plaintiff's constitutionally protected property interest further arises from the express and implied contractual relationship between Defendant and Plaintiff.

132.     It is well established that Fourteenth Amendment due process protections are required in the higher education disciplinary proceedings.

133.     Thus, a person who has been admitted to a university, and who has paid tuition to that university, has a protected property interest in continuing his education at that university

until he has completed his course of study. The state cannot deprive a person of this interest without due process.

134.    As a result, if Plaintiff as a University student faced disciplinary action that included the possibility of suspension or dismissal, if found responsible for alleged sexual misconduct, then the Due Process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process Defendant used.

135.    Defendant, as a public university, has an absolute duty to provide its students equal protection and due process of law by and through any and all policies and procedures set forth by the Defendant.

136.    Plaintiff had made exceptional academic progress and had obeyed all institutional rules when he was wrongly suspended from Defendant.

137.    Under both federal and state law, Plaintiff had a constitutionally protected property interest in continuing his education at the University.

138.    Plaintiff was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations, in this case, resulted in a sanction that will have lifelong ramifications for Plaintiff, and are quasi-criminal in nature.

139.    Plaintiff was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct.

140.    In the course of such investigation and adjudication, Defendant flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through Defendant's repeated acts of deprivation of the minimal requirements of procedural fairness, due in part to undue influence by the Defendants.

141.    Upon information and belief, Defendant was pressured by the Department of Education into complying with the Title IX investigative and adjudicatory process mandated by the 2011 Dear Colleague Letter and by subsequent federal actions, statements, and directives.

142.    Upon information and belief, Defendant was further pressured to make an example out of Plaintiff for the upcoming Sexual Assault Awareness Month (SAAM) that occurred days after the "sham" hearing occurring outside the presence of Plaintiff.

143.    The Defendant deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to, his right to a fair adjudication, to a meaningful opportunity to be heard, to adequate notice, time, and place of a hearing, to a hearing, to secure counsel for the hearing, to question his accuser, to challenge the credibility of other adverse witnesses, and to present evidence and witnesses in support of his defense. Rather than investigate what occurred on December 4, 2016, Defendant conducted a superficial investigation while having full control as what is presented to the Panel for adjudication of the charges against Plaintiff.

144.    In attempting to demonstrate Defendant's compliance with the 2011 Dear Colleague Letter, the Defendant subjected Plaintiff to an insufficient process when they failed to provide Plaintiff with a fair and reasonable opportunity to defend himself and arrived at a predetermined, arbitrary and unwarranted decision tainted by SAAM.

145.    As a result, Defendant failed to provide Plaintiff with the basic due process protections that Defendant is required to provide students accused of sexual misconduct and faced with expulsion.

146.     Defendant, as well as other agents, representatives, and employees of the University were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

147.     Defendant, as well as other agents, representatives, and employees of the University agreed to, approved, and ratified this unconstitutional conduct.

148.     As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages. Plaintiff is unable to transfer to a comparable undergraduate institution because of the erroneous disciplinary finding. His lifelong goal of becoming of pursuing accounting and finance has been shattered.

149.     As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages to his person and reputation, including, without limitation, emotional distress, loss of educational, academic and career opportunities, economic injuries and other direct and consequential damages.

150.     Plaintiff is entitled to injunctive relief as a result of the depravation of his due process and equal protection rights.  Preliminary injunctive relief should return the *status quo* before the controversy at issue, with Plaintiff being enrolled at the University.

151.     Further, injunctive relief to provide Plaintiff with a hearing conforming with his due process and equal protection rights is proper.  Plaintiff is entitled to have a hearing affording him his rights under the law.  In contrast, the University can have no legitimate interest in failing to provide an impartial hearing, confirming to the law and the rights that are afforded to persons under the law.

152.     In addition, however, money damages are inadequate in that money damages will not adequately and fully compensate the Plaintiff for the loss of time in obtaining his education, the inability to enroll in a comparable university and he damage to his reputation, among other things. Further, money damages may not be available due to the Eleventh Amendement to the Constitution.

153.     Further, the harm to Plaintiff is irreparable.  Without injunctive relief, for example, the Plaintiff will always have a black mark on his record and the need to explain his at least two and one-half year absence from the University.

<u>COUNT II</u>
**DECLARATORY JUDGMENT**

154.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

155.     Defendant has committed numerous violations of Plaintiff's rights as alleged herein.

156.     Plaintiff's future educational and career prospects have been severely damaged. Without appropriate redress, the unfair outcome will continue to cause irreversible damages to Plaintiff's future educational and employment prospects, with no end in sight.

157.     As a result of the foregoing, there exists a justiciable controversy between the Plaintiff and Defendant with respect to the outcome, permanency, and future handling of Plaintiff's formal student record at the University.

158.     By reason of the foregoing, Plaintiff requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by Defendant be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's suspension from University be removed from his education file; (v) any record of the

complaint against Plaintiff be permanently destroyed; (vi) Plaintiff be readmitted to the University for the Fall 2017 semester; (vii) Plaintiff be allowed to complete his Spring 2017 classes; and (viii) Defendant's rules, regulations, and guidelines are unconstitutional as applied.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests judgment against Defendant as follows:

(i)  A preliminary and subsequent permanent injunction fully reinstating Plaintiff to the University, allowing him to enroll in classes, and allowing him to take the final examinations to complete his sophomore semester, as he would have had he not been unjustly barred from the University;

(ii)  Injunctive relief requiring the University to hold a proper hearing, with notice, allowing Plaintiff to be present at the hearing, to be represented by counsel, to present witnesses and other evidence, to cross-examine his accuser and to cross-examine any and all witnesses;

(iii)  On the second cause of action for declaratory judgment against the Defendant, a judicial declaration that (i) the outcome and findings made by Defendant be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's suspension from University be removed from his education file; (v) any record of the complaint against Plaintiff be permanently destroyed; (vi) Plaintiff be readmitted to the University for the Fall 2017 semester; (vii) Plaintiff be allowed to complete his Spring 2017 classes; and (viii) Defendant's rules, regulations, and guidelines are unconstitutional as applied;

(iv)  An award of Plaintiff's attorney's fees and costs; and

(v)  Awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

Dated this 3rd day of August, 2017.

/s/ Mark D. Roth _____
Mark D. Roth
Ken Hurst
Roth Fioretti, LLC
311 South Wacker Drive, Suite 2470
Chicago, Illinois 60606
PH: (312) 922-6262
FX: (312) 922-7747
mark@rothfioreti.com
ken@rothfioretti.com
Counsel for Plaintiff