E-FILED
Tuesday, 10 October, 2017  03:18:04 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS - URBANA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-CV-02180 |
| | ) | |
| BOARD OF TRUSTEES OF THE | ) | Honorable Colin S. Bruce |
| UNIVERSITY OF ILLINOIS, | ) | Magistrate Eric I. Long |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS'
MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S
AMENDED COMPLAINT FOR
<u>INJUNCTIVE AND OTHER RELIEF AND JURY DEMAND</u>**

Plaintiff John Doe is an undergraduate student who was accused of sexual misconduct and dismissed from the University of Illinois Urbana Champaign ("the University") after being found responsible for nonconsensual sexual intercourse with a female student and violating a "no contact" order during the University's internal proceedings. Plaintiff claims that the University's internal proceedings violated the Due Process Clause merely because the University has adopted an "investigator model" rather than a "hearing model" to adjudicate sexual misconduct charges between students.  Under an "investigator model", investigators interview witnesses individually, collect documents and witness statements, share such information with both parties and seek their input, and recommend findings to a panel of trained personnel, who determine whether policies were violated and, if so, the appropriate sanction. It is well-established that both the "investigator model" and the "hearing model" for such internal proceedings can satisfy Due Process Clause interests as a matter of law. Despite this authority, and without asserting any failure to follow existing procedures, Plaintiff challenges the University's procedures themselves and seeks judicial intervention in the form of a directive by this Court that the University fundamentally and

completely change its internal procedures for adjudicating sexual misconduct charges between students. Plaintiff argues that the Due Process Clause requires the University not only to adopt a "hearing model," but also to provide students accused of sexual misconduct a "hearing" with evidentiary standards and procedural protections found in criminal proceedings (e.g., cross-examination, attorney advocacy, and exclusion of hearsay). He asks this Court to direct the University to nullify his dismissal, reinstate him, and re-adjudicate his case through a hearing with all the protections of a criminal court. Plaintiff's arguments and requests, however, are entirely unsupported by the law.

As a threshold matter, this Court lacks subject matter jurisdiction over Plaintiff's claims. Even if Plaintiff's claims were justiciable, the claims fail as a matter of law. Multiple courts have recently confirmed, that there is a complete absence of authority supporting Plaintiff's request for judicial intervention to reconfigure the University's internal proceedings, and that the University's investigation procedures satisfy Due Process concern. The Amended Complaint must therefore be dismissed.

## FACTS ALLEGED[1]

Plaintiff John Doe ("Plaintiff" or "John Doe") is an undergraduate who was a sophomore at the University of Illinois at Urbana Champaign (the "University") during the 2016-2017 school year. *See* Am. Compl. ¶1. He was accused of sexual assault in December 2017, proceeded through the University's investigation protocols, and, on April 25, 2017, was dismissed from the University for 2.5 years based on a determination that he was responsible for violations of the University's Student Code, including the Sexual Misconduct Policy. *See id.* ¶¶ 1, 129, 132, 137-138. The

---

[1] In the following section, the facts taken from Plaintiff's Amended Complaint for Injunctive and Other Relief and Jury Demand ("Amended Complaint" or "Am. Compl."), are taken as true solely for the purpose of this motion.

2

Amended Complaint alleges that the University followed its procedures for investigating and resolving allegations of sexual misconduct, referring to many specific documents and communications involved with that disciplinary process, but asserts that Plaintiff should have been afforded additional protections. *See id.* ¶¶ 39-82, 88, 95-112, 128-130, 156.[2]

## I.      The University's Policies and Procedures

Relevant portions of the University's Student Code, Sexual Misconduct Policy, and procedures are set forth below.

### A. The University's Sexual Misconduct Policy and Student Code

The University maintains and enforces a Sexual Misconduct Policy ("Policy"). *See* Am. Compl. ¶ 30. This Policy is set forth in the University's Student Code ("Code") and is also available online. *Id.* ¶ 31. The Policy contains definitions of key terms, including the following definitions of "sexual assault," and "consent":

> (2) Sexual assault is any sexual contact that does not involve the knowing consent of each person, including (A) any form of sexual penetration without consent; and (B) any intentional or knowing touching or fondling by either person, directly or through clothing, of the sex organs, buttocks, or breasts of the other person for the purpose of sexual gratification or arousal or either person without consent. Ex. 1, at § 1-111(c)(2); *see also* Am. Compl. ¶ 35.

---

[2] Although evaluation of a motion to dismiss for failure to state a claim is generally limited to review of the facts alleged in the pleadings, a court may consider documents attached to a motion to dismiss if they are referred to in the complaint and are central to the plaintiff's claim. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012); *see Lott v. Levitt*, 469 F. Supp. 2d 575, 577 n. 1 (N.D. Ill. 2007) (allegedly defamatory book is considered a part of the pleadings and properly considered on a motion to dismiss defamation claim). Further, to the extent that such a document conflicts with the allegations of the complaint, the document controls. *See, e.g.*, *Massey v. Merrill Lynch & Co.*, 464 F.3d 642, 645 (7th Cir. 2006). The Amended Complaint references the following documents from the internal process that are central to Plaintiff's due process claims and are attached here as Exhibits 1 -8: Relevant portions of the University's Student Code, including Sexual Misconduct Policy (Exhibit 1); Student Conduct Protocol for Allegations of Sexual Misconduct, Including Sexual Harassment, Sexual Assault, Sexual Exploitation, Stalking, Dating Violence, and Domestic Violence (Exhibit 2); December 13, 2017 Charge Notice (Exhibit 3); December 14, 2017 Updated Charge Notice (Exhibit 4); February 20, 2017 e-mail inviting Plaintiff to review Initial Investigative Report and attaching the TIPS document (Exhibit 5); the Initial Investigative Report and exhibits (Exhibit 6); the Revised Investigative Report and exhibits (Exhibit 7); and the March 28, 2017 decision letter (Exhibit 8).

(3) Consent is informed, freely and actively given, mutually understandable words or actions that indicate a willingness to participate in mutually agreed upon sexual activity. A person can withdraw consent at any time. There is no consent when there is force, threats, intimidation, or duress. A person's lack of verbal or physical resistance or manner of dress does not constitute consent. Consent to past sexual activity with another person does not constitute consent to future sexual activity with that person. Consent to engage in sexual activity with one person does not constitute to engage in sexual activity with another person. A person cannot consent to sexual activity if such person is unable to understand the nature, fact, or extent of the activity or give knowing consent due to circumstances including without limitation the following: (A) the person is incapacitated due to the use or influence of alcohol or drugs; (B) the person is asleep or unconscious; (C) the person is under the legal age to provide consent; or (D) the person has a disability that prevents such person from having the ability or capacity to give consent.

Ex. 1 at § 1-111(c)(3); *see also* Am. Compl. ¶ 36.

The Code informs students that they will be subject to discipline for conduct that violates the University's Sexual Misconduct Policy, including sexual assault, or conduct considered to be "[a]buse of the University system," including the "failure to obey directive of a disciplinary body or University officials in performance of their duties." Ex. 1 §§ 1-302, 1-302(b), 1-302(o); *see also* Am. Compl. ¶¶ 34, 38.

**B.  Procedures Applicable to Alleged Sexual Misconduct Policy Violations.**

When the University learns of alleged Policy violations, it investigates and resolves them pursuant to procedures contained in its Student Conduct Protocol for Allegations of Sexual Misconduct, Including Sexual Harassment, Sexual Assault, Sexual Exploitation, Stalking, Dating Violence, and Domestic Violence ("Protocol"). *See* Ex. 2; Am. Compl. ¶ 42. The Protocol requires that at least two investigators conduct individual witness interviews, collect documents, and offer multiple opportunities for each complainant and respondent to submit, review, and request additional information as part of the investigation, without any formal evidentiary hearing. Specific procedural steps of the University's process include the following:

4

**Intake and Review**. The Office for Student Conflict Resolution ("OSCR") oversees investigations of alleged sexual misconduct, which are conducted by at least two investigators. The Lead Investigator and at least one other investigator first interview any participating complainants to determine the precise nature of the allegations. Ex. 2 at Section 2(a); Am. Compl. ¶¶ 44-46.

**Charge Notice and Respondent Interview**. The Lead Investigator (1) issues a written charge notice informing the respondent of the approximate date, location, and type of incident, as well as the section(s) of the Student Code allegedly violated and (2) interviews the respondent (with a second investigator). Ex. 2 at Section 2(b), (c); Am. Compl. ¶¶ 46, 48.

**Information Collection and Witness Interviews**. The respondent and the complainant have opportunities to provide supporting information and documentation, to identify witnesses, and to offer questions for investigators to pose to other witnesses to help influence the scope of the investigation, which each is informed about during their interviews and in various communications OSCR has created that include a summary of "TIPS" addressing such aspects of the investigative procedures. Ex. 2 at Section 2(d); Ex.5; Am. Compl. ¶ 48.

**Follow-Up Interviews**. The Lead Investigator may request additional meetings with the respondent and the complainant to discuss any information gathered or questions accumulated during the investigation. Ex. 2 at Section 2(e); Am. Compl. ¶ 49.

**Initial Investigative Report and Review by Complainant and Respondent**. In addition to interviewing the respondent and complainant, the investigators compile all relevant information from all witness interviews and collected documents into an initial written report, which includes witness statements and key documents themselves, and provides complainant and respondent an opportunity to review and to submit a written response about any aspect of the initial report or attachments, including the opportunity to identify additional information, documents, or witnesses and to submit questions the investigators should pose to the other party. Ex. 2 at Section 3(a), (b); Ex. 5; Am. Compl. ¶¶ 53, 54.

**Additional Investigation**. After reviewing responses submitted by complainant and respondent, the investigators conduct any additional investigation they deem appropriate and revise the investigative report as necessary. Ex. 2 at Section 3(c); Am. Compl. ¶ 55.

**Final Review and Response**. Both the respondent and the complainant are allowed to review the revised report and to submit a final written response within five business days. Ex. 2 at Section 3(d); Am. Compl. ¶ 56.

**Final Investigative Report**. The investigators complete the final investigative report, which includes (i) the revised investigative report; (ii) any final responses from the complainant and respondent; (iii) a proposed statement of fact; (iv) proposed responsibility

determinations; and (v) a rational for the finding of fact and responsibility determinations. Ex. 2 at Section 3(e); Am. Compl. ¶ 57.

**Panel Review and Deliberation**. A three-member panel assembled from pool of the Subcommittee on Sexual Misconduct review the Final Investigative Report, meet at least five days thereafter to ask questions of the investigators, deliberate, and determine by simple majority vote applying a preponderance of the information standard whether a Policy violation(s) has occurred. Ex. 2 at Section 4(a)-(d); Am. Compl. ¶¶ 60-65. The Panel may: (i) accept the recommendations and rationale of the investigators set forth in the Final Investigative Report; (ii) reject the recommendations of the investigators and make its own determinations regarding the facts, responsibility, and rationale; or (iii) determine that additional information must be collected before a decision can be reached, in which case, a specific procedure for doing so is provided. Ex. 2 at Section 4(d); Am. Compl. ¶¶ 66-68. If the Panel finds that the respondent has violated the Code, the Panel decides upon an appropriate formal sanction. Ex. 2 at Section 4(e); Am. Compl. ¶ 69.

**Notice of Action Taken**. The OSCR will provide written notification of the Panel's decision, including rationales, to both the respondent and complainant by the end of the next business day. This notification includes information regarding both parties' right to appeal. Ex. 2 at Section 4(f); Am. Compl. ¶ 70.

## C. Investigation and Resolution of the Charges Against Plaintiff

On December 13, 2016, the University notified Plaintiff that he was accused of sexual assault relating to an instance of sexual activity that occurred on December 4, 2016 between Plaintiff and a female senior student at the University, Jane Roe ("Roe"). Am. Compl. ¶¶ 3. Specifically, Plaintiff received an email from January Boten ("Boten"), Assistant Dean and OSCR Lead Investigator, titled "UIUC Disciplinary Update: Charge Notice–IMPORTANT". *Id*. ¶ 95; Ex. 3. Boten's December 13 email informed Plaintiff that the OSCR had "received information in which it is alleged that on December 4, 2016, [you were] involved in an incident which may violate" the Code. Ex. 3; Am. Compl. ¶ 98. The email further informed Plaintiff of the approximate time, date, place, and type of incident, complainant's name, that he was charged with sexual assault and, specifically, sexual penetration without consent, which could constitute violations of Section 302(b)(1) of the Code, as defined by Sections 1-111(c)(2)(a) and 1-111(c)(2)(b). Ex. 3; Am. Compl. ¶ 99. The December 13 email directed Plaintiff to the Code, informed him how to access

6

it online, and notified him that he was to call Boten by January 27, 2017 to arrange an appointment with her. Ex. 3; Am. Compl. ¶¶ 100, 101.

Boten's December 13 e-mail further directed Plaintiff not to contact Jane Roe. Ex. 3. That same day, after receiving this email, Plaintiff text messaged a small snapshot of the e-mail to Roe and, shortly thereafter, text messaged Roe a second time informing her that he was not supposed to contact her. Am. Compl. ¶¶ 96, 97. The next day, Plaintiff received a December 14, 2016 e-mail titled "UIUC Disciplinary Update: Charge Notice — IMPORTANT" notifying Plaintiff that he had been accused of abusing the University disciplinary system by failing to obey the directive of a University official (i.e., the no contact order), which violated Section 1-302(o)(1) of the Code. Am. Compl. ¶¶ 102-104; Ex. 4; Ex. 1 at § 1-302(o)(1). Plaintiff met with Boten initially to discuss the alleged violation of the University's no contact directive. *See* Am. Compl. ¶ 107.

On January 19, 2017, Plaintiff met with Boten and a second investigator to discuss Roe's allegations of sexual assault. *Id*. ¶ 109. Plaintiff answered questions about what occurred on December 4, 2016 and whether Plaintiff had other witnesses he wanted the investigators to interview. *Id*; *see also id*. at ¶ 4. Later that day, Plaintiff received an email attaching a detailed summary of his statements from the interview for his review. *Id*. ¶ 109. Plaintiff reviewed the statement and offered written corrections and commentary. *Id*.

The investigators interviewed four other witnesses, including one of Plaintiff's friends with whom Plaintiff had texted and talked about Jane Roe the night of and day after the alleged incident. Am. Compl. ¶110; Ex. 6. Boten created an Initial Investigative Report that included copies of all witness statements and other documents collected from witnesses, including Jane Roe's entire statement. *See* Am. Compl. ¶ 110; Ex. 6. Plaintiff reviewed the Initial Investigative Report after receiving an e-mail offering him the opportunity to do so that included a link to a document entitled

7

"Tips for Reviewing and Responding to the Initial Investigative Report," ("TIPS document")

explaining Plaintiff's rights with respect to the review. Am. Compl. ¶ 110; Ex. 5; Ex 6 at p. 1.

Among other issues addressed, the TIPS document listed "Questions to Consider when Writing

Your Response" including:

- Is there anything you would like to correct, clarify, or add to your own interview summary?
- Is there anything you would like to correct, clarify, or respond to in the other party's or witness(es)' interview summaries?
- Is there anything you would like to correct, clarify, or respond to in the investigators' summary of the investigation or narrative?
- Are there any additional questions we should ask a witness or the other party in follow up?
- Are there any other witnesses we should speak to about the incident?  If so, are there any questions or topics you want to make sure we speak to them about?
- Do you have any additional documentation you would like to submit for consideration? (Examples may include phone records, screen shots of messages, social media exchanges, medical records, photographs, written witness statements, video recordings, security logs, additional reports, voicemail, or any other additional information believed relevant to the allegations)
- Do you have any other relevant information to include?

Ex. 5. On February 27, 2017, Plaintiff reviewed Jane Roe's witness statement, statements

from four other witnesses interviewed, documents collected, and the Initial Investigative Report.

Am. Compl. ¶¶ 4, 110, 111; Ex. 6 at p 1. Plaintiff offered corrections to the draft report addressing

approximately 61 lines in the initial report. Am. Compl. ¶¶ 4, 110; Ex. 7 at pp. 54-59.  Plaintiff did

not offer any questions for investigators to pose to Jane Roe or to any other witnesses.

Pursuant to the Protocol, after reviewing Plaintiff's and Roe's responses to the Initial

Investigative Report, the investigators prepared a Revised Investigation Report and invited

Plaintiff to review it. *See* Ex. 7. Plaintiff reviewed the Revised Investigative Report and provided

his response, which consisted of approximately 38 comments and corrections. Am. Compl. ¶¶ 4,

112. A Final Investigative Report, which included all witness statements and documents collected,

was then sent to the Panel appointed to determine Plaintiff's case. *See id.* ¶ 113.

8

The Panel convened on March 28, 2017, determined a resolution of the matter, and sent Plaintiff an email later that day notifying him of the Panel's decision. *Id*. ¶ 127; Ex. 8. The email notified Plaintiff that "[a]fter a complete examination of the information presented, the Subcommittee concluded the following":

> On December 3, 2016, you met the complainant and her friend at a local bar. The complainant had already been drinking when she met up with you, and she continued to drink in your presence. Later that evening, the complainant's friend was planning to walk the complainant home, but you convinced them to let you walk her home by saying that she was your best friend's girlfriend and that you wouldn't do anything to her. You then took her back to your apartment, where you had oral and vaginal sex with her. The complainant was incapacitated at the time of the sexual activity and so could not consent. After you received the charge letter and no contact directive from Dean Boten on December 13, you took a screen shot of the email and sent it in a text to the complainant.

Ex. 8; Am. Compl. ¶¶ 8, 128. Accordingly, the Panel determined that Plaintiff violated the three Code violations set forth in the December 13 and 14 emails and provided the following rational for its decision:

> In finding facts and determining responsibility, we relied upon statements from the complainant, statements form the respondent, the witness interviews, and the electronic evidence that was submitted by the complainant.

> According to the complainant and her friend, the complainant was extremely intoxicated on December 3, 2017. Additionally, witness BK, who is friends with the respondent, said that the respondent told him that the complainant was "out of her mind completely drunk" on this night. The respondent also used the complainant's phone to send BK a text message, stating "she is freaking drunk." Furthermore, while at a restaurant but before the respondent took the complainant to his apartment, the complainant was falling asleep at the table, mumbling, and unable to walk on her own. For these reasons, we believe the complainant was incapacitated at the time of her departure from the restaurant and during the sexual activity that followed.

> Regarding penetration, the respondent claimed that he did not penetrate the complainant, but we do not find this statement to be credible. The complainant stated that she was penetrated in two different positions, and BK stated that the respondent told him that he had had sex with the complainant.

9

Ex. 8; *see also* Am. Compl. ¶¶ 8, 129. As the Subcommittee noted, its determination of responsibility was supported by the statements of third party witnesses and text messages Plaintiff sent to his friend "BK" the night of the incident and before walking Roe back to his dorm that stated "[Roe is] freaking drunk." Ex. 8. The Subcommittee imposed a 2.5 year dismissal and other sanctions. Ex. 8; *see also* Am. Compl. ¶¶ 8, 132.

Plaintiff filed a timely internal appeal. Am. Compl. ¶¶ 10, 134, 136. On April 25, 2017, the University notified Plaintiff that none of the criteria for pursing an appeal were met. *Id*. ¶ 137. Accordingly, Plaintiff was dismissed from the University effective April 25, 2017. *Id*. ¶¶ 1, 138. Plaintiff is permitted to request a petition hearing in spring 2019 for possible readmission in fall 2019. *Id*. ¶ 132.d.

In the Amended Complaint, Plaintiff asserts claims for violation of his due process rights, alleging that: (1) he received inadequate notice of the charges against him; (2) he was not afforded any "hearing"; (3) hearsay evidence was inappropriately used; (4) he was not allowed attorney representation during the process; and (5) he was not allowed to cross-examine any witnesses.

## ARGUMENT

### I.     Legal Standard.

Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of claims where the court lacks federal jurisdiction over the lawsuit. *See Scanlan v. Eisenberg,* 669 F.3d 838, 841 (7th Cir. 2012). The plaintiff bears the burden of establishing the elements necessary for jurisdiction have been met. *Id*. at 841-42. In evaluating a motion pursuant to Rule 12(b)(1), a court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff; however, in addition to pleadings and legal arguments, the court also considers evidence extrinsic to the pleadings. *See id. at* 841, 897; *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995).

A motion under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Mutter v. Madigan*, 17 F. Supp. 2d 752, 757 (N.D. Ill. 2014). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must be supported by allegations that, if taken as true, plausibly suggest that the plaintiff is entitled to relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). The court must accept the well-pleaded allegations in the complaint as true; however, legal conclusions and conclusory statements are not taken as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where the well-pleaded facts do not permit the court to infer more than the possibility of misconduct, the complaint has not shown that the pleader is entitled to relief as is required by Rule 8. *Id.* at 679.

## II. Plaintiff's Claims Must Be Dismissed Under Rule 12(b)(1) as Barred by the Eleventh Amendment.

The Eleventh Amendment "acts as a jurisdictional bar to suit against a state in federal court, absent the state's consent to the suit." *Cannon v. University of Health Sciences/The Chicago Medical School*, 710 F.2d 351, 356 (7th Cir. 1983). Further, Plaintiff asserts claims pursuant to 42 U.S.C. § 1983, which is not an exception to sovereign immunity. *See Mutter*, 17 F. Supp. 3d at 757. The only named defendant in this action is the University, which is an agency of the State of Illinois and has not waived its sovereign immunity.  Accordingly, the University is protected from suit under the Eleventh Amendment, and Plaintiff's claims must be dismissed for this threshold reason. *See id.* at 757-58; *Cannon*, 710 F.2d at 356 (the Board of Trustees of the University of Illinois is a state agency with Eleventh Amendment immunity).

## III. Plaintiff Fails to State a Claim under Rule 12(b)(6)

The Amended Complaint also must be dismissed under Rule 12(b)(6) because Plaintiff fails to state a claim that his suspension from the University violated his procedural due process rights as a matter of law. To state a procedural due process claim, Plaintiff must establish that he

11

had a cognizable property or liberty interest under the Fourteenth Amendment; that the University

deprived him of that interest; and that the deprivation was without due process. *See Sung Park v.*

*Indiana Univ. Sch. of Dentistry*, 692 F.3d 828, 831 (7th Cir. 2012); *O'Gorman v. City of Chicago*,

777 F.3d 885, 891 (7th Cir. 2015). Plaintiff's claim fails because he has not sufficiently alleged

any of these elements.

**A. Plaintiff has not identified a cognizable property or liberty interest.**

As an initial matter, Plaintiff's procedural due process claim fails because Plaintiff has not

identified a cognizable property or liberty interest that the University removed. Plaintiff asserts

that he has a protected property interest in his continued education at the University and a protected

liberty interest in his "good name and reputation." Am. Comp. ¶¶ 91, 142, 146, 150, 182. Neither

of these interests, however, is protected by the Fourteenth Amendment.

*1. Plaintiff fails to sufficiently allege a protected property interest.*

The Seventh Circuit has repeatedly rejected the proposition that an individual has a stand-

alone property interest to a continued education at a state university. *See Charleston v. Bd. of*

*Trustees of Univ. of Illinois at Chicago*, 741 F.3d 769, 772–73 (7th Cir. 2013) (citing *Bissessur v.*

*Ind. Univ. Bd. of Trs.,* 581 F.3d 599, 601 (7th Cir. 2009) and *Williams v. Wendler,* 530 F.3d 584,

589 (7th Cir. 2008)). An exception exists where the student can show that a contract existed

between himself and the University that entitled him to a specific right, such as the right to a

continuing education. *Bissessur,* 581 F.3d at 602; *Williams*, 530 F.3d at 589. To proceed under this

exception, a student must "establish an *entitlement* – an enforceable right, and not merely an

entitlement to fair procedure." *Williams*, 530 F.3d at 589-90 (emphasis in original). That is, "the

student must point to an identifiable contractual promise that the [university] failed to honor."

*Bissessur,* 581 F.3d at 602 (citations and internal quotation marks omitted). Absent evidence of

12

such a specific promise, the court will not participate in second-guessing the university's professional judgment. *See id*. Plaintiff does not dispute the above standards; to the contrary, he advances them in his memorandum in support of his motion for a preliminary injunction. See Prelim. Injunct. Mem. at ¶ 66 (quoting *Bissessur* to argue that he may establish a property interest to a continuing education only by showing that a contract between him and the University "establishes an entitlement to a tangible continuing benefit"). Yet Plaintiff fails in the Amended Complaint to point to any contractual entitlement to a continuing education at the University.

While Plaintiff attempts to assert that the University breached an alleged agreement or contract with him in not providing him rights he maintained as a "citizen" to a full "hearing," see Am. Compl. ¶¶ 88, 175, 178, 180, this assertion is plainly unsupportable. Specifically, Plaintiff asserts that the Code states that students "have at least the rights and responsibilities common to all citizens," and the Student Disciplinary Procedures state that the "university disciplinary system shall be separate from, but coexistent with, general systems established by society to deal with the conduct of citizens of society." *Id*. ¶¶ 85-88. Plaintiff asserts that "the general systems established by society when being accused of rape is to provide a formal hearing" and related procedural protections. *Id*. ¶ 88. He attempts to assert that the Code and Student Disciplinary Procedures therefore constitute a contractual promise by the University to employ criminal procedures, including a formal hearing and related procedural protections, in adjudicating claims of sexual misconduct.

It is obvious and cannot be disputed, however, that the University made no such contractual promise. Indeed, the very premise of Plaintiff's Amended Complaint and Motion for Preliminary Injunction is that the University's Policy, Protocol and Code explicitly *do not* promise either a "hearing" generally or a hearing with all the specific procedural protections of a criminal trial. *See*

Prelim. Injunct. Mem. at ¶ 32.  The Policy, Protocol, and Code do not even mention criminal procedures or protections, and Plaintiff points to no language to the contrary. Because the unambiguous language of the policies at issue establish no entitlement to a "hearing," the Amended Complaint's bare assertions to the contrary must be disregarded. *See, e.g.*, *Massey v. Merrill Lynch & Co.,* 464 F.3d 642, 645 (7th Cir. 2006) (to the extent that a document attached to the complaint conflicts with the allegations of the complaint, the document controls). Moreover, as explained below, the University is not obligated to promise students a "hearing", and such a promise thus cannot be inferred or implied. *See, e.g.*, *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 604 (S.D. Ohio 2016) ("universities are not required to conduct disciplinary proceedings like criminal trials in order to satisfy the Due Process Clause"). Plaintiff himself has argued that to sustain a due process claim based on a property interest established by a contractual promise by the University he must first "point to an identifiable contractual promise that the University failed to honor." Prelim. Injunct. Mem. ¶ 66 (quoting *Bissessur*, 581 F. 3d at 602). Plaintiff has failed to do so, and has accordingly failed to demonstrate a property interest in his continuing education at the University. *See, e.g., O'Gorman*, 777 F.3d at 890 (affirming dismissal of procedural due process claims where plaintiff failed to demonstrate a property interest in future employment by failing to point to any state law, ordinance, or contract creating such interest). Because Plaintiff has no protected property interest, his due process claim must be dismissed.

### 2. *Plaintiff fails to sufficiently allege a liberty interest.*

In addition, Plaintiff has failed to assert a cognizable liberty interest in his good name and reputation. The Seventh Circuit has held that an individual does not, as a general matter, have a cognizable liberty interest in his reputation. *O'Gorman*, 777 F.3d at 891. Damage to an individual's "good name, reputation, honor, or integrity" may implicate due process rights only when such

14

"stigmatic" harm takes "concrete forms and extend[s] beyond mere reputational interests." *Omosegbon v. Wells*, 335 F.3d 668, 675 (7th Cir. 2003) (citing *Paul v. Davis,* 424 U.S. 693, 711– 12 (1976)) (internal quotation marks and citation omitted); *see also O'Gorman*, 777 F.3d at 891. In other words, reputation alone, apart from some more tangible interests such as employment, is not either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause. *Paul*, 424 U.S. at 701. Here, Plaintiff has not pled the existence of a tangible interest, aside from his reputation, that was infringed by the University. Because Plaintiff has no separate interest at stake, he cannot allege a due process claim based solely on stigmatic harm. *See Park*, 781 F. Supp. 2d 783, 789 (S.D. Ind. 2011).

In sum, because Plaintiff has failed to identify a protected property or liberty interest that was infringed by the University, the Amended Complaint must be dismissed in its entirety because it is not based on any protectable right.

**B.  The University's procedures afforded Plaintiff all process required by law.**

Even assuming that Plaintiff had a cognizable property or liberty interest, Plaintiff fails to allege a viable due process theory. Plaintiff's allegations concede that the University followed its existing procedures but complain that such procedures are inadequate because they rely on "hearsay," lack sufficient direct, confrontational cross-examination opportunities, and call for investigator interviews of witnesses instead of requiring a full-fledged evidentiary hearing. See Am. Compl. ¶¶ 5, 9, 12, 58, 59, 63, 66, 88, 90,114, 116, 122,126, 130, 134.

As such, the alleged due process violations are squarely rejected by the standards established for such claims in the student disciplinary context by the United States Supreme Court established decades ago that require only that students facing suspension or dismissal receive "some kind of notice" and "some kind of hearing." *See Goss v. Lopez*, 419 U.S. 565, 581 (1975).

15

A formal hearing is not required; rather, the "hearing" requirement amounts to "an explanation of the evidence the authorities have and an opportunity to present [one's] side of the story." *Goss*, 419 U.S. at 581.

Additionally, there is no precedent for allowing a due process claim that seeks, as Plaintiff's does, affirmative injunctive relief in the form of judicial directives for a higher education institution to change its policies to require entirely different procedural and evidentiary standards. Doing so here would place the University in the untenable position of having informed potential sexual assault complaint participants that one procedural approach will apply and then changing to an entirely different approach based solely on a dismissed student's preferences.

As explained below, courts afford higher education institutions far more deference for establishing internal processes that satisfy fundamental procedural fairness concepts, with which the University's procedure clearly comply.

### 1. The University's investigator model satisfies applicable due process requirements.

Following *Goss* and its progeny, recent court decisions considering due process claims in the sexual misconduct setting on various college campuses continue to embrace the *Goss* standards in the specific context at issue in this case. Courts generally allow schools to use a variety of procedural approaches to satisfy due process. *See, e.g., Doe v. Cummins,* No. 16-3334, 2016 WL 7093996 (6th Cir. Dec. 6, 2016) (due process claim dismissed because full evidentiary hearing not required, no need to "mirror criminal trial," hearsay evidence properly considered ,and no direct cross-examination allowed, but respondent allowed to submit written questions); *See Doe v. Baum*, 227 F. Supp. 3d 784, 800 (E.D. Mich. Jan. 5, 2017) (finding that university's "investigator model" process provided plaintiff a "hearing" that satisfied due process standards where, during the two live interviews the investigator conducted, the plaintiff, *inter alia*, was allowed multiple

16

opportunities to ask questions and present additional information and clarifications; provided copies of the complainant's statement, other evidence, and the investigator's draft report; and allowed to submit additional information and comments in response to this evidence; and the plaintiff's feedback and clarifications were incorporated into the final report). As explained recently by the Sixth Circuit:

> In the school-disciplinary context, an accused student must at least receive the following pre-expulsion:  (1) notice of the charges; (2) an explanation of the evidence against him; and (3) an opportunity to present his side of the story before unbiased decisionmaker.  We have recognized, however, that disciplinary hearings against students . . . are not criminal trials, and therefore need not take on many of those formalities. Although a university student must be afforded a meaningful opportunity to present his side, a full-scale adversarial proceeding is not required.  The focus, rather, should be on whether the student had an opportunity to "respond, explain, and defend," and not on whether the hearing mirrored a criminal trial.

*Cummins,* 2016 WL 7093996 at *8. Indeed, a recent decision addressing Seventh Circuit standards for due process allegations in the sexual misconduct context ruled that "due process rights of students facing discipline in an educational setting are not the same as those afforded to defendants in a criminal or quasi-criminal setting" and that "the only process that was required was 'some kind of notice' and 'some kind of hearing'" that amounts to "informal give-and-take between the student and the administrative body dismissing him that would, at least, give the student the opportunity to characterize his conduct and put it in what he deems the proper context." *Marshall v. Indiana University,* 170 F. Supp. 3d 1201, 1207 (S.D. Ind. 2016) (internal quotations and citations omitted).

In addition to such general statements supporting academic discretion in establishing procedures, many decisions squarely reject students' entitlement to the specific protections the Amended Complaint asserts that Plaintiff was unfairly denied. For instance, courts have repeatedly supported schools' ability to use of "hearsay" evidence collected by investigators that are reported

17

to panels of ultimate decisionmakers, with limited attorney involvement during any proceeding other than mere attendance in a support role. *See, e.g., Doe v. Univ. of Cincinnat*i, No. 16-4693, p. 16 (6th Cir. Sept. 25, 2017) (noting that "nothing in our decision jeopardizes UC's ability to rely on hearsay statements" in a student disciplinary proceeding, as schools are not required to "transform [their] classrooms into courtrooms" to provide constitutionally adequate due process) (citation omitted)[3]; *Marshall,* 170 F. Supp. 3d at 1206 (no attorney advocacy required to satisfy due process); *Osteen v. Henley*, 13 F.3d 221, 225-26 (7th Cir. 1993) ("the Constitution does not confer [the right of counsel] on student with regard to disciplinary proceeding).

Similarly, the opportunity for direct confrontation and cross-examination has repeatedly and consistently been rejected as a due-process requirement for internal proceedings, especially when respondents are allowed indirect cross-examination alternatives, such as the option of submitting questions for institutional personnel to pose to particular witnesses, including the complainant. *See Doe v. Penn. State Univ.*, No. 17-cv-01315, 2017 WL 3581672, at *7 (M.D. Pa. Aug. 18, 2017) ("[d]ue process in disciplinary proceedings does not, in itself, require that the accused be afforded the right to cross examin[e] witnesses supporting a charge"); *Univ. of Cincinnati*, at p. 15 (a University is "not required to facilitate witness questioning at every nonacademic misconduct hearing"); *Brown v. Plainfield Cmty. Consol. Dist. 202*, 522 F. Supp. 2d 1068, 1073-76 (N.D. Ill. 2007) (finding student expelled from high school had no federal due process right to cross-examine student witnesses at his disciplinary hearing). Any procedural mechanism that allows an accused student to cross-examine witnesses by submitting questions to the investigators or a hearing panel to ask such witnesses satisfies a university's obligations regarding cross-examination in this context. *See Penn. State Univ.*, 2017 WL 3581672, at *7

---

[3] Attached as Exhibit 9.

(university's procedure sufficiently provided for cross examination as a general matter through the submission of questions to a hearing panel subject to a screening for relevance); *see also Univ. of Cincinnati*, at p. 17 (emphasizing that a school's obligations with regard to cross-examination and witness questioning "are narrow," and it must simply "provide a means for the [panel] to evaluate an alleged victim's credibility, and not for the accused to physically confront his accuser"). These decisions recognize the enduring judicial interest in allowing academic institutions to establish their own procedures, to function less like courts themselves, and to manage students involved in disciplinary matters not as litigants but as students enrolled at the institution. *See, e.g., Univ. of Cincinnat*i, at p. 16 (schools are not required to "transform [their] classrooms into courtrooms").

Indeed, judicial deference to academic procedural flexibility is so pervasive that cases finding due process problems exist or are sufficient to support injunctive relief on at least a preliminary basis stem not from how internal procedures are structured but from situations where the institution failed to follow its own procedures in material and unfair ways. For example, in *Penn. State Univ.*, 2017 WL 3581672, at *7-9, 12, the institution's procedures were sufficient but allegations of multiple deviations from them allowed plaintiff's claims to support injunctive relief (failure to consider questions plaintiff submitted, to provide packet to panel in timely manner, and redaction of material information from report asserted "deviation from [institution's] own policies). Similarly, in *Gulyas v. Appalachian State University,* No. 5:16-CV-00225-RLV-DCK, 2017 WL 3710083, at *4 (W.D. N.C. Aug. 28, 2017), the court supported a presumption of honesty and impartiality for academic disciplinary boards and highlighted that Due Process concerns allow institutional procedures to consider hearsay, not allow attorney participation, and avoid procedures "afforded to criminal defendants." The court also ruled that allegations that the institution ignored evidence and denied accused student's opportunity to present evidence prevented the student a

19

"meaningful opportunity to be heard" and supported a due process claim. *Id*. at *5. At the same time, not all procedure-related errors constitute due process violations, and many courts reject due process claims based solely on minor mistakes. *See also Doe v. University of Southern California*, 246 Cal. App. 4th 221 (2016) (investigator model not questioned but fairness of process undermined because notice of charges against accused student did not include theory on which he was found responsible and witness notes were provided only to one party, not the accused).

In accordance with this clear line of authority, the University need only adhere to its internal procedures and provide "some notice" and "some kind of hearing" process that allows students accused of sexual misconduct an opportunity to respond and provide responsive information to defend themselves.

### 2. The University followed the Policy, Code, and Protocol and afforded Plaintiff all protections required under Due Process.

Here, Plaintiff's own allegations establish that he received both "some kind of notice" and "some kind of hearing" as contemplated in *Goss* and its progeny. The Amended Complaint presents the University's internal procedural requirements in exhaustive fashion and refers to documents and communications demonstrating that all steps were followed for Plaintiff's case. The allegations and documents referenced within them clarify exactly why Plaintiff's due process claims must be dismissed for failing to state a claim, as highlighted below.

#### a. Plaintiff received sufficient and repeated notice of the charges against him.

First, Plaintiff's allegations establish that he received sufficient written notice of the charges that led to his dismissal, of the procedural protections available to him, and of each opportunity he had to explain himself and respond to all allegations and evidence asserted against him. As called for by the Protocol, Plaintiff received the "Charge Notice" in an initial December

20

13, 2016 email that informed him: that OSCR had received an allegation that he was "involved in an incident which may violate" the Code; "of the approximate time, date, place, and type of incident;" the complainant's name; of the specific sections of the Code he was alleged to have violated; and how to access the code online. Ex. 3; Am. Compl. ¶¶ 95, 98-100. Plaintiff then received an "Updated" charge email on December 14, 2016 that reiterated the initial charge information and notified him that he was also being charged with an alleged violation of a third section of the Code relating to the "no contact" directive. Ex. 4; Am. Compl. ¶¶ 102-105.

While reviewing the Initial Investigative Report, Plaintiff was also permitted to review Roe's initial report, the reports of other witnesses, and all evidence provided by such witnesses, and he was notified in very specific fashion of his options for reacting to such information, including the "TIPS" document. Exs. 5-6; Am. Compl. ¶¶ 110-111. Such "notice" of the details of the process and opportunities Plaintiff had to defend himself, delivered in repeated fashion, complied with University procedures and provided further detail regarding the factual bases for the charges against Plaintiff and exceeded any "notice" required by due process concerns under the law.

Plaintiff has inexplicably argued that he did not receive proper notice of a "hearing" at which he could present evidence, but that is a red herring because Plaintiff also acknowledges that, under University policy, no "hearing" was required or held. Am. Compl. ¶¶ 59, 63, 114. In sum, the investigation report review process, in which Plaintiff was allowed to review and respond to all evidence accumulated in the case, provided the type of "hearing" required by *Goss* and its progeny. The University's sanction was then based on its conclusion that Plaintiff had violated the three Code provisions that Plaintiff had been notified were at issue as of the University's first communications with him on December 13 and 14, 2016. Ex. 8. *See, e.g., Doe v. Rector and*

21

*Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 616-18 (E.D. Va. 2016) (respondent did not receive adequate notice of the charges against him where he was notified that only one specific sexual encounter with complainant was at issue but was expelled based on a finding that he was responsible for sexual misconduct that occurred on other dates). Plaintiff's own allegations, in short, establish he received all the notice he was entitled to under *Goss*.

### b. *The University offered Plaintiff numerous and informed opportunities to defend himself.*

In addition to ample notice of the charges against him, Plaintiff received a sufficient "hearing" as that term is well-understood to apply to student disciplinary proceedings and as called for under applicable University procedures:  he was given multiple opportunities to review the evidence against him and tell his side of the story. *See Goss*, 419 U.S. at 581; *Horowitz*, 435 U.S. at 98. As required by the Policy, Protocol, and Code, Plaintiff was initially interviewed regarding Roe's allegations and allowed to explain his perspective about what happened on the night in question and informed he could identify other witnesses to be interviewed. Am. Compl. ¶109; *see also* Ex. 4.

Next, once the investigators had gathered evidence and statements from other witnesses, Plaintiff had the opportunity to review the Initial Investigative Report that summarized such evidence as well as the evidence itself, including witness statements and documents from himself, Roe, and other witnesses. Exs. 4-5. This served the purpose of a hearing in the sense that Plaintiff could learn about all evidence and respond to it in numerous ways, including the options of asking that other witnesses be interviewed or that specific questions be directed to any witness involved, including Roe. If he wanted to submit cross-examination type questions about Roe's account of their experiences or counter third-party witness statements, he had every opportunity to do so, as described in the TIPS document delivered with the e-mail inviting Plaintiff to review the materials.

22

*See* Ex. 5. Plaintiff chose to provide extensive commentary and feedback on the Initial Investigative Report but did not submit any questions for Roe, or anyone else, including his friend BK who had offered extremely meaningful statements about Plaintiff's own comments about the night in question. *See* Ex. 7 at pp. 54-59; Am. Compl. ¶ 110. Third, Plaintiff reviewed the Revised Investigative Report and again provided extensive commentary. Am. Compl. ¶ 112. All of these opportunities complied with the University's procedures, and Plaintiff has not identified any procedural step outlined in the Policy, Protocol, or Code that was not provided.

By his own allegations, therefore, Plaintiff acknowledges that the University complied with its own procedures and that he received repeated opportunities to be heard and to respond to evidence compiled about the accusations against him, which is all or even more than Due Process requires. Plaintiff can point to no legal support for his argument that the University was instead required under the Due Process Clause to conduct either a formal hearing or a formal hearing with all the protections of a criminal proceeding. To the contrary, the law is clear that even if additional procedural safeguards may be preferable in a particular case, "[t]he Due Process Clause... sets only the floor or lowest level of procedures acceptable." *Univ. of Cincinnati*, 173 F. Supp. 3d at 604 (citation omitted).

> ### c. No "heightened" level of due process was required to resolve any credibility issues in Plaintiff's case because third-party statements, Plaintiff's own statements to third-party witnesses, and Plaintiff's own written communications contradicted Plaintiff's statements during the disciplinary process.

Finally, even though Plaintiff was dismissed from the University, this case does not involve factual circumstances that other courts have recognized may require heightened focus on the importance of cross-examination options. *See, e.g., Univ. of Cincinnati,* at p. 16; *Penn. State Univ.,* 2017 WL 3581672, at *2.* Courts generally recognize that the importance of cross-examination is

23

heightened "when the outcome of a disciplinary [proceeding] is ultimately dependent on credibility-based determinations." *Penn. State Univ.*, 2017 WL 3581672, at *7; *Univ. of Cincinnati*, at pp. 9-10, 15-16 (cross-examination is "essential" only in cases that "resolve[] into a problem of credibility").

The circumstances described in the *Penn State* and *University of Cincinnati* cases were not present here: Plaintiff's case definitively did not hinge on determining whether to believe Plaintiff or Jane Roe as to what happened during their sexual encounter and whether Jane Roe consented. Instead, multiple independent sources of evidence confirmed that Jane Roe lacked capacity to consent, that Plaintiff was aware of that at the time of the sexual activity, and that he nonetheless engaged in sexual penetration. Specifically, Roe's friend ("RZ") independently confirmed Roe's assertions that she was extremely intoxicated on the night in question and before walking home with Plaintiff.  Plaintiff himself wrote a text to his own friend ("BK") in which Plaintiff wrote that Roe was "freaking drunk" a matter of minutes before he took Roe back to his dorm. Plaintiff's friend ("BK") stated that Plaintiff told BK that Plaintiff had sex with Roe that night. Ex. 6 at pp. 21-22. The March 28, 2017 determination letter specifically relied on all of this additional evidence besides Roe's statements – in particular the text messages *written by Plaintiff* confirming that he understood Roe was severely intoxicated shortly before he attempted to engage in sexual activity with her – which confirms that this case was not "ultimately dependent on credibility-based determinations" as to whether Jane Roe consented. She was not capable of doing so. The cross-examination mechanism afforded to Plaintiff was thus sufficient to satisfy due process. *See Univ. of Cincinnati*, at p. 16 (noting that cross-examination "may be unnecessary" where the case does not hinge on testimonial evidence from the complainant); *Plummer v. Univ. of Houston,* 860 F.3d 767 (5th Cir. 2017) (existence of objective evidence unrelated to comparisons of complainant's

and respondent's relative credibility resulted in minimal risk of erroneously depriving students of benefits of additional procedures and similarly limited probable value of additional procedures such that due process claim lacked merit).

## CONCLUSION

Plaintiff's Amended Complaint ultimately boils down to a disagreement with the outcome of the proceedings against him and the University's suspension decision. Plaintiff's disagreement with his suspension, however, does not provide this Court with a reason to overturn the University's decision. *See Pugel v. Board of Trustees of University of Illinois*, 378 F.3d 659, 666 (7th Cir. 2004) (due process did not entitle student to a favorable result). Similarly, Plaintiff's belief that he should have been given more process than he was due under the law is irrelevant. The Court "is bound by what the law is and not by what [Plaintiff] believes the law ought to be." *Marshall*, 170 F. Supp. 3d at 1208. The law is clear that the University was not required to give Plaintiff any more process than he received, and the facts alleged establish Plaintiff received all procedure due under the Protocol. Accordingly, for the reasons set forth herein and in the accompanying Motion, the University respectfully requests that this Court dismiss Plaintiff's Amended Complaint for Injunctive and Other Relief and Jury Demand.

Respectfully submitted,

BOARD OF TRUSTEES OF THE
UNIVERSITY OF ILLINOIS,

By: /s/ Peter G. Land
     One of Its Attorneys

2068071.1

Peter G. Land
pgl@franczek.com
Gwendolyn B. Morales
gbm@franczek.com
FRANCZEK RADELET P.C.
300 South Wacker Drive, Suite 3400
Chicago, Illinois 60606
(312) 986-0300

Dated:  October 10, 2017

2068071.1

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he caused the foregoing Defendant Board of

Trustees of the University of Illinois' Memorandum in Support of Its Motion to Dismiss Plaintiff's

Amended Complaint for Injunctive and Other Relief and Jury Demand to be filed with the Clerk

of the Court using the CM/ECF system, which will send electronic notification to the following

counsel of record this 10th day of October, 2017:

> Mark D. Roth
> Ken Hurst
> Roth Fioretti, LLC
> 311 South Wacker Drive, Suite 2470
> Chicago, IL 60606
> Phone: (312) 922-6262
> Fax:    (312) 922-7747
> mark@rothfiorett.com
> ken@rothfioretti.com
> Counsel for Plaintiff

> /s/ Peter G. Land
> Peter G. Land