E-FILED
Tuesday, 10 October, 2017  03:54:24 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS - URBANA**

JOHN DOE,                 )
                           )
          Plaintiff,     )
                           )
v.                      )     Case No. 17-CV-02180
                           )
BOARD OF TRUSTEES OF THE  )     Honorable Colin S. Bruce
UNIVERSITY OF ILLINOIS,    )     Magistrate Eric I. Long
                           )
         Defendant.   )

**DEFENDANT BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS'**
**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR**
**PRELIMINARY INJUNCTION**

Plaintiff was a second-year student at the University of Illinois at Urbana Champaign when the University determined pursuant to its internal procedures that he was responsible for violating the University's policy against sexual misconduct. As a result, in April 2017, the University suspended Plaintiff for two and a half years, giving him the opportunity to petition for reinstatement for the 2019-2020 school year. Plaintiff disagreed with this outcome, filed the Amended Complaint, and now brings a motion for preliminary injunction arguing that the University's internal procedure that led to his suspension violated his constitutional due process rights. In his motion, Plaintiff seeks affirmative injunctive relief by asking this Court to order the University to reinstate him, nullify its finding and sanctions against him, and re-adjudicate the charges against him through a full-blown hearing not provided for under the University's procedures and not required by law. As such, Plaintiff ignores the University's interests in adhering to its own procedures and the rights of his accuser, Jane Roe, to both rely on those procedures and not have to participate in a second adjudicatory process. Plaintiff's motion asks, without acknowledging decades of precedent stemming from standards established by the United States

Supreme Court, for this Court to create a new due process right to a formal hearing with all the protections of a criminal proceeding in the student disciplinary context.

Plaintiff's motion suffers from several fundamental flaws and must be denied. As a threshold matter, this Court lacks the jurisdiction to order the relief that Plaintiff requests because the University is immune from all of his claims. Even if Plaintiff's claims were justiciable, his allegations so severely lack any likelihood of success on the merits that no injunction could issue; in fact, the entire Amended Complaint should be dismissed.[1]  Plaintiff also fails to meet other standards required to obtain preliminary injunctive relief. Plaintiff's attempt to depict his suspension as a constitutional violation and his request that this Court establish a new constitutional right for a criminal hearing in the student disciplinary context is devoid of support in the facts or law. Plaintiff's motion must be denied.

## FACTS

Plaintiff John Doe ("Plaintiff" or "Doe") was a sophomore at the University of Illinois at Urbana Champaign (the "University") during the 2016-2017 school year. *See* Am. Compl. ¶ 1; Prelim. Injunct. Mem. ¶ 20. He was accused of sexual assault in December 2016, proceeded through the University's investigation protocols, and, on April 25, 2017, was suspended from the University for 2.5 years based on a determination that he was responsible for violations of the University's Student Code, including the Sexual Misconduct Policy. *See* Am. Compl. ¶¶ 1, 129, 132, 137-138. Plaintiff alleges that the University followed its procedures for investigating and resolving allegations of sexual misconduct, but asserts that Plaintiff should have been afforded additional protections. *See id.* ¶¶ 39-82, 88, 95-112, 128-130, 156.

## I.       The University's Policies and Procedures

---

[1] Defendant has concurrently filed a Motion to Dismiss the Amended Complaint under Rule 12(b)(1) and Rule 12(b)(6).

2067608.1

Relevant portions of the University's Student Code, Sexual Misconduct Policy, and procedures are set forth below.

## A. The University's Sexual Misconduct Policy and Student Code

The University maintains and enforces a Sexual Misconduct Policy ("Policy"). Boten Aff. ¶ 2;[2] *see* Am. Compl. ¶ 30. This Policy is set forth in the University's Student Code ("Code") and is also available online. Boten Aff. ¶2; Am. Compl. ¶ 31. The Policy contains definitions of key terms, including the following definitions of "sexual assault," and "consent":

> (2) Sexual assault is any sexual contact that does not involve the knowing consent of each person, including (A) any form of sexual penetration without consent; and (B) any intentional or knowing touching or fondling by either person, directly or through clothing, of the sex organs, buttocks, or breasts of the other person for the purpose of sexual gratification or arousal or either person without consent.
> Boten Aff. Ex. A at § 1-111(c)(2).

> (3) Consent is informed, freely and actively given, mutually understandable words or actions that indicate a willingness to participate in mutually agreed upon sexual activity. A person can withdraw consent at any time. There is not consent when there is force, threats, intimidation, or duress. A person's lack of verbal or physical resistance or manner of dress does not constitute consent. Consent to past sexual activity with another person does not constitute consent to future sexual activity with that person. Consent to engage in sexual activity with one person does not constitute to engage in sexual activity with another person. A person cannot consent to sexual activity if such person is unable to understand the nature, fact, or extent of the activity or give knowing consent due to circumstances including without limitation the following: (A) the person is incapacitated due to the use or influence of alcohol or drugs; (B) the person is asleep or unconscious; (C) the person is under the legal age to provide consent; or (D) the person has a disability that prevents such person from having the ability or capacity to give consent.
> Boten Aff. Ex. A at § 1-111(c)(3).

The Code informs students that they will be subject to discipline for conduct that violates the Policy, including sexual assault, or conduct considered to be "[a]buse of the University

---

[2] The Affidavit of January Boten is attached hereto as Exhibit 1.

system," including the "failure to obey directive of a disciplinary body or University officials in performance of their duties." Boten Aff. Ex. A at §§ 1-302, 1-302(b), 1-302(o).

## B. Procedures Applicable to Alleged Sexual Misconduct Policy Violations

When the University learns of alleged Policy violations, it investigates and resolves them pursuant to procedures contained in its Student Conduct Protocol for Allegations of Sexual Misconduct, Including Sexual Harassment, Sexual Assault, Sexual Exploitation, Stalking, Dating Violence, and Domestic Violence ("Protocol"). Boten Aff. ¶ 2 & Ex. B; Am. Compl. ¶ 42. The Protocol requires that at least two investigators conduct individual witness interviews, collect documents, and offer multiple opportunities for each complainant and respondent to submit, review, and request additional information as part of the investigation, without any formal evidentiary hearing. *See* Boten Aff. Ex. B. Specific procedural steps of the University's process include the following:

**Intake and Review**. The Office for Student Conflict Resolution ("OSCR") oversees investigations of alleged sexual misconduct, which are conducted by at least two investigators. The Lead Investigator and at least one other investigator first interview any participating complainants to determine the precise nature of the allegations. Boten Aff. Ex. B at Section 2(a).

**Charge Notice and Respondent Interview**. The Lead Investigator (1) issues a written charge notice informing the respondent of the approximate date, location, and type of incident, as well as the section(s) of the Student Code allegedly violated and (2) interviews the respondent (with a second investigator). *Id*. at Section 2(b), (c).

**Information Collection and Witness Interviews**. The respondent and the complainant have opportunities to provide supporting information and documentation, to identify witnesses, and to offer questions for investigators to pose to other witnesses to help influence the scope of the investigation, which each is informed about during their interviews and in various communications OSCR has created that include a summary of "TIPS" addressing such aspects of the investigative procedures. Boten Aff. Ex. B at Section 2(d); *id*. at ¶ 9 & Ex. G.

**Follow-Up Interviews**. The Lead Investigator may request additional meetings with the respondent and the complainant to discuss any information gathered or questions accumulated during the investigation. Boten Aff. Ex. B at at Section 2(e).

4

**Initial Investigative Report and Review by Complainant and Respondent**. In addition to interviewing the respondent and complainant, the investigators compile all relevant information from all witness interviews and collected documents into an initial written report, which includes witness statements and key documents themselves, and provides complainant and respondent an opportunity to review and to submit a written response about any aspect of the initial report or attachments, including the opportunity to identify additional information, documents, or witnesses and to submit questions the investigators should pose to the other party. Boten Aff. Ex. B at Section 3(a), (b); *id*. at ¶ 9 & Ex. G.

**Additional Investigation**. After reviewing responses submitted by complainant and respondent, the investigators conduct any additional investigation they deem appropriate and revise the investigative report as necessary. Boten Aff. B at Section 3(c).

**Final Review and Response**. Both the respondent and the complainant are allowed to review the revised report and to submit a final written response within five business days. *Id*. at Section 3(d).

**Final Investigative Report**. The investigators complete the final investigative report, which includes (i) the revised investigative report; (ii) any final responses from the complainant and respondent; (iii) a proposed statement of fact; (iv) proposed responsibility determinations; and (v) a rational for the finding of fact and responsibility determinations. *Id*. at Section 3(e)).

**Panel Review and Deliberation**. A three-member panel assembled from pool of the Subcommittee on Sexual Misconduct review the Final Investigative Report, meet at least five days thereafter to ask questions of the investigators, deliberate, and determine by simple majority vote applying a preponderance of the information standard whether a Policy violation(s) has occurred. *Id*. atSection 4(a)-(d). The Panel may: (i) accept the recommendations and rationale of the investigators set forth in the Final Investigative Report; (ii) reject the recommendations of the investigators and make its own determinations regarding the facts, responsibility, and rationale; or (iii) determine that additional information must be collected before a decision can be reached, in which case, a specific procedure for doing so is provided. *Id*. at Section 4(d). If the Panel finds that the respondent has violated the Code, the Panel decides upon an appropriate formal sanction. *Id*. at Section 4(e).

**Notice of Action Taken**. The OSCR will provide written notification of the Panel's decision, including rationales, to both the respondent and complainant by the end of the next business day. This notification includes information regarding both parties' right to appeal. *Id*. at Section 4(f).

## C.  Investigation and Resolution of the Charges Against Plaintiff

On December 13, 2016, the University notified Plaintiff that he was accused of sexual assault relating to an instance of sexual activity that occurred on December 4, 2016 between

5

Plaintiff and a female senior student at the University, Jane Roe ("Roe"). Boten Aff. ¶ 4 & Ex. D. Specifically, Plaintiff received an email from January Boten ("Boten"), Assistant Dean and OSCR Lead Investigator, titled "UIUC Disciplinary Update: Charge Notice–IMPORTANT." *Id.* at Ex. D. Boten's December 13 email informed Plaintiff that the OSCR had "received information in which it is alleged that on December 4, 2016, you were involved in an incident which may violate" the Code. *Id.* The email further informed Plaintiff of the approximate time, date, place, and type of incident, complainant's name, that he was charged with sexual assault and, specifically, sexual penetration without consent, which could constitute violations of Section 302(b)(1) of the Code, as defined by Sections 1-111(c)(2)(a) and 1-111(c)(2)(b). *Id.* The December 13 email directed Plaintiff to the Code, informed him how to access it online, and notified him that he was to call Boten by January 27, 2017 to arrange an appointment with her. *Id.*

Boten's December 13 e-mail further directed Plaintiff not to contact Jane Roe. *Id.* That same day after receiving this email, Plaintiff text messaged a small snapshot of the e-mail to Roe and, shortly thereafter, text messaged Roe a second time informing her that he was not supposed to contact her. Am. Compl. ¶¶ 96, 97. The next day, on December 14, 2016, Plaintiff received an e-mail titled "UIUC Disciplinary Update: Charge Notice — IMPORTANT" notifying Plaintiff that he had been accused of abusing the University disciplinary system by failing to obey the directive of a University official (i.e., the no contact order), which violated Section 1-302(o)(1) of the Code. Boten Aff. ¶ 5 & Ex. E; *id.* at Ex. 1 § 1-302(o)(1). Plaintiff met with Boten initially to discuss the alleged violation of the University's no contact directive. *See* Am. Compl. ¶ 107.

On January 19, 2017, Plaintiff met with Boten and a second investigator to discuss Roe's allegations of sexual assault. Boten Aff. ¶ 6. Plaintiff answered questions about what occurred on December 4, 2016 and whether Plaintiff had other witnesses he wanted the investigators to

6

interview. *Id*. The investigators explained how the University's process works, including the opportunities Plaintiff had to explain his side of the story and to review statements from other witnesses once gathered. *Id*. Plaintiff did not identify any witnesses for the investigators to interview. *Id*. Later that day, Plaintiff received an email attaching a detailed summary of his statements from the interview for his review. Boten Aff. ¶ 7 & Ex. C at pp. 16-22. Plaintiff reviewed the statement and offered written corrections and commentary. *Se*e Boten Aff. ¶ 8 & Ex. F at pp. 15-20.

The investigators interviewed four other witnesses, including one of Plaintiff's friends with whom Plaintiff had texted and talked about Jane Roe the night of and day after the alleged incident. Boten Aff. ¶ 8 & Ex. F. Boten created an Initial Investigative Report that included copies of all witness statements and other documents collected from witnesses, including Jane Roe's entire statement. *Id*. Plaintiff reviewed the Initial Investigative Report after receiving an e-mail offering him the opportunity to do so that included a link to a document entitled "Tips for Reviewing and Responding to the Initial Investigative Report," ("TIPS document") explaining Plaintiff's rights with respect to the review.  Boten Aff. ¶¶ 9-10 & Exs. F-G. Among other issues addressed, the TIPS document listed "Questions to Consider when Writing Your Response" including:

- Is there anything you would like to correct, clarify, or add to your own interview summary?
- Is there anything you would like to correct, clarify, or respond to in the other party's or witness(es)' interview summaries?
- Is there anything you would like to correct, clarify, or respond to in the investigators' summary of the investigation or narrative?
- Are there any additional questions we should ask a witness or the other party in follow up?
- Are there any other witnesses we should speak to about the incident?  If so, are there any questions or topics you want to make sure we speak to them about?
- Do you have any additional documentation you would like to submit for consideration? (Examples may include phone records, screen shots of messages, social media exchanges, medical records, photographs, written witness statements,

7

> video recordings, security logs, additional reports, voicemail, or any other additional information believed relevant to the allegations)
>
> - Do you have any other relevant information to include?

Boten Aff. Ex. G. On February 27, 2017, Plaintiff reviewed Jane Roe's witness statement, statements from four other witnesses interviewed, documents collected, and the Initial Investigative Report. Boten Aff. ¶ 10 & Ex. F. Jane Roe and other witnesses reported that: (1) Jane Roe consumed excessive amounts of alcohol the night of the incident; (2) Plaintiff texted his friend that Jane Roe was "freaking drunk" shortly before he took her to his apartment; and (3) Plaintiff told a friend the next day that Jane Roe was drunk and that they had sex the night in question. Boten Aff. Ex. F. Plaintiff also signed a "Verification" confirming he reviewed such materials, that he had the opportunity to submit a final written response to the investigative report, and that he understood the next steps in the University's procedures. *Id*. at p. 1. Plaintiff offered corrections to the initial investigative report addressing approximately 61 lines in the initial report. Boten Aff. ¶¶ 11-12 & Ex. H at pp. 54-59.  Plaintiff did not offer any questions for investigators to pose to Jane Roe or to any other witnesses. Boten Aff. ¶ 11.

Pursuant to the Protocol, after reviewing Plaintiff's and Roe's responses to the Initial Investigative Report, the investigators prepared a Revised Investigation Report and invited Plaintiff to review it. Boten Aff. ¶¶ 12-13 & Ex. I. Plaintiff reviewed the Revised Investigative Report and provided his response, which consisted of approximately 38 comments and corrections. Boten Aff. ¶¶ 14-15 & Ex. H at p. 1, Ex. J at pp. 64-68. A Final Investigative Report, which included all witness statements and documents collected, was then sent to the Panel appointed to determine Plaintiff's case. Boten Aff. ¶ 15 & J.

The Panel convened on March 28, 2017, determined a resolution of the matter, and sent Plaintiff an email later that day notifying him of the Panel's decision. Boten Aff. ¶ 16 & Ex. C at

pp. 34-39. The email notified Plaintiff that "[a]fter a complete examination of the information

presented, the Subcommittee concluded the following":

> On December 3, 2016, you met the complainant and her friend at a local bar. The
> complainant had already been drinking when she met up with you, and she
> continued to drink in your presence. Later that evening, the complainant's friend
> was planning to walk the complainant home, but you convinced them to let you
> walk her home by saying that she was your best friend's girlfriend and that you
> wouldn't do anything to her. You then took her back to your apartment, where you
> had oral and vaginal sex with her. The complainant was incapacitated at the time
> of the sexual activity and so could not consent. After you received the charge letter
> and no contact directive from Dean Boten on December 13, you took a screen shot
> of the email and sent it in a text to the complainant.

*Id*. Accordingly, the Panel determined that Plaintiff violated the three Code violations set forth in

the December 13 and 14 emails and provided the following rational for its decision:

> In finding facts and determining responsibility, we relied upon statements from the
> complainant, statements from the respondent, the witness interviews, and the
> electronic evidence that was submitted by the complainant.
>
> According to the complainant and her friend, the complainant was extremely
> intoxicated on December 3, 2017. Additionally, witness BK, who is friends with
> the respondent, said that the respondent told him that the complainant was "out of
> her mind completely drunk" on this night. The respondent also used the
> complainant's phone to send BK a text message, stating "she is freaking drunk."
> Furthermore, while at a restaurant but before the respondent took the complainant
> to his apartment, the complainant was falling asleep at the table, mumbling, and
> unable to walk on her own. For these reasons, we believe the complainant was
> incapacitated at the time of her departure from the restaurant and during the sexual
> activity that followed.
>
> Regarding penetration, the respondent claimed that he did not penetrate the
> complainant, but we do not find this statement to be credible. The complainant
> stated that she was penetrated in two different positions, and BK stated that the
> respondent told him that he had had sex with the complainant.

*Id*. As the Panel noted, its determination of responsibility was supported by the statements of third

party witnesses and text messages Plaintiff sent to his friend "BK" the night of the incident and

before walking Roe back to his dorm that stated "[Roe is] freaking drunk." *Id*.; Boten Aff. Ex. J at

pp. 21-50. The Panel imposed a 2.5 year suspension and other sanctions. Boten Aff. Ex. C at pp. 34-39.

Plaintiff filed a timely internal appeal. Boten Aff. ¶ 17. On April 25, 2017, the University notified Plaintiff that none of the criteria for pursing an appeal were met. Boten Aff. ¶ 17 & Ex. C at 39-40. Accordingly, Plaintiff was suspended from the University effective April 25, 2017. *Id.* Plaintiff is permitted to request a petition hearing in spring 2019 for possible readmission in fall 2019. *Id.*

## ARGUMENT

Plaintiff's Motion for Preliminary Injunction recognizes that the University followed its existing procedures in deciding to suspend him but nevertheless argues that this Court should nullify the consequences of that process, reinstate Plaintiff as a student, and require the University and Jane Roe to participate in a formal hearing with procedural protections akin to criminal proceedings. In other words, he wants the Court to retroactively require the University to convert from an "investigator model" to a "hearing model" and re-adjudicate Plaintiff's case. As set forth below, there is no legal or factual support for such affirmative injunctive relief, and Plaintiff's motion should be denied.

**I.     The Eleventh Amendment Bars Plaintiff's Claims for Injunctive Relief Against the University.**

As an initial matter, Plaintiff's motion must be denied because the University of Illinois and its governing body are arms of the State of Illinois and have not waived their Eleventh Amendment immunity from suit in federal court. *See Cannon v. Univ. of Health Sciences/Chi. Med. Sch.,* 710 F.2d 351, 356 (7th Cir. 1983) (Southern Illinois University and the Board of Trustees of the University of Illinois are state agencies with Eleventh Amendment immunity); *Mutter v. Madigan,* 17 F. Supp. 3d 752, 757–58 (N.D. Ill. 2014), *aff'd as modified sub nom. Mutter*

10

*v. Rodriguez*, No. 14-2130, 2017 WL 3588306 (7th Cir. Aug. 21, 2017). Plaintiff's Motion requests injunctive relief under 42 U.S.C. § 1983, but such relief may only be obtained from a proper University official sued in his official capacity, not the University or its governing body. *See Whittaker v. Northern Ill. Univ.*, 2002 WL 992660, at *1 (N.D. Ill. May 14, 2002); *Kaimowitz v. Bd. of Trs. of Univ. of Ill.*, 951 F.2d 765, 767 (7th Cir. 1991). Accordingly, because the University has not waived its Eleventh Amendment immunity from suit in federal court and Plaintiff does not request relief from any individual defendant, Plaintiff's claims cannot prevail and his request for injunctive relief must be denied.

## II.     Standard for Entry of a Preliminary Injunction.

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Goodman v. Ill. Dept. Fin. & Prof. Reg.*, 430 F.3d 432, 437 (7th Cir. 2005). A plaintiff seeking preliminary injunctive relief must establish by a "clear showing" that: "(1) his case has a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) he will suffer irreparable harm if the injunction is not granted." *Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001). The movant bears the burden of persuasion as to each of these factors. If the movant fails to meet just one of the requirements, the injunction must be denied. *Cox v. City of Chicago*, 868 F.2d 217, 222 (7th Cir. 1989).

"Once a moving party has met its burden of establishing the threshold requirements for a preliminary injunction, the court must balance the harms faced by both parties and the public as a whole." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, (7th Cir. May 30, 2017). This analysis uses a "sliding scale" that measures the relative harms against the moving party's likelihood of success on the merits. *Id.* "The more likely [a plaintiff] is

11

to succeed on the merits, the less the scale must tip in his favor. … The converse, however, also is true: the less likely he is to win, the more the balance of harms must weigh in his favor for an injunction to issue." *Id.* Last, because "a preliminary injunction is an extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved," courts tend to disfavor a request for an "affirmative injunction" seeking to alter rather than maintain the status quo, such as Plaintiff requests here. *See Long v. Brown*, No. 2:14-cv-00381-JMS-WGH, 2015 WL 4162809, at * 1 (S.D. Ind. July 9, 2015) (citing *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir. 2001).

### III.     Doe Has Not Established the Basic Elements for Entry of a Preliminary Injunction

Plaintiff cannot satisfy any of the elements required to obtain the drastic injunctive relief he seeks: a judicial directive for the University to adopt procedures akin to a criminal proceeding and apply them retroactively to his case.  The lack of any support for the relief Plaintiff seeks is magnified by his delay in requesting it more than four months after his suspension has been in place because he now seeks affirmative injunctive relief designed to change, not preserve, the status quo that has existed since April 2017. *See Long*, 2015 WL 4162809, at *1. As explained below, and amplified in Defendant's Motion to Dismiss, no Due Process concerns are implicated by the University's adherence to its procedures as a matter of law and fact, and Plaintiff's motion must be denied.

#### A.   Plaintiff Does Not Have a Reasonable Likelihood of Success on the Merits of His Due Process Claims

Plaintiff's claims for injunctive relief against the University fail at the outset for the reason set forth in Section I, above. In addition, Plaintiff's claims that the University's internal procedure violated his due process rights have no chance of succeeding on their merits; indeed, they fail to

12

state a viable claim and thus must be dismissed under Rule 12(b)(6) for the reasons addressed in Defendant's Motion to Dismiss filed concurrently with this response.

As explained in that separate motion to dismiss, to state a procedural due process claim, Plaintiff must establish that he had a cognizable property or liberty interest under the Fourteenth Amendment; that the University deprived him of that interest; and that the deprivation was without due process. *See Sung Park v. Indiana Univ. Sch. of Dentistry*, 692 F.3d 828, 831 (7th Cir. 2012); *O'Gorman v. City of Chicago*, 777 F.3d 885, 891 (7th Cir. 2015). Plaintiff's due process claims are not likely to succeed because he has not sufficiently established any of these elements.

### 1.  Plaintiff has not identified a cognizable property or liberty interest

As an initial matter, Plaintiff has not identified a cognizable property or liberty interest that the University removed. Plaintiff asserts that he has a protected property interest in his continuing education and a protected liberty interest in his good name and reputation. Prelim. Injunct. Mem. ¶¶ 12, 14, 16-18. Neither of these interests, however, is protected by the Fourteenth Amendment.

#### a.  Plaintiff fails to establish a protected property interest

The Seventh Circuit has repeatedly rejected the proposition that an individual has a standalone property interest to a continued education at a state university. *See Charleston v. Bd. of Trustees of Univ. of Illinois at Chicago*, 741 F.3d 769, 772–73 (7th Cir. 2013); *Foulks v. William Rainey Harper Cmty. Coll.*, No. 15 C 5130, at p. 5 (N.D. Ill. Mar. 22, 2016).[3] Plaintiff's motion generally acknowledges the existence of this meaningful precedent, but ignores its significance, and then relies upon cases that actually reinforce the well-established principal that he has no such interest. In particular, *Foo v. Trustees of Indiana University*, 88 F. Supp. 2d 937, 947 (S.D. Ind. 1999), does not support Plaintiff's argument that he has stand-alone interest in his continuing

---

[3] A copy of this decision is attached as Exhibit 2.

education. To the contrary, the *Foo* court specifically noted that the Seventh Circuit had *not* recognized the right of a college student, as distinct from an elementary or high school student, to continued attendance at a college or university. *Foo*, 88 F. Supp. 2d at 947, n.7 (citing *Osteen,* 13 F.3d at 223). In *Foo*, the defendants had not challenged the plaintiff's contention that he (as a college student) had such a property right, and the *Foo* court therefore assumed without deciding the truth of this contention solely for the purpose of that case. *Id*. Similarly, *Dunn v. Fairfield Community High School District No. 225*, 158 F.3d 962 (7th Cir. 1998) does not support Plaintiff's argument that a university student has a protected property right to a continued education. In *Dunn,* the plaintiffs were high school students arguing that their failing grades in band class violated their substantive due process rights; they did not bring a procedural due process claim. The court simply noted that if they had, it would have needed to "delve into the nature of the property interest Illinois law creates in a public education." *Dunn*, 158 F.3d at 964. It is undisputed that Illinois law does not, however, create a similar property interest in a post-secondary education, *see Doe v. Board of Trustees of the Univ. of Illinois*, 429 F. Supp. 2d 930, 942 (N.D. Ill. 2006), and the *Dunn* court's observation does not apply here.

Plaintiff also attempts to rely upon an exception to the general rule that allows a university student with specific contractual rights to continued education to constitute a property interest subject to constitutional protection, *see* Prelim. Injunct. Mem. ¶ 66 (citing *Bissessur,* 581 F.3d at 602), which cannot apply here. To proceed under this exception, a student must show that the contract "establishes an entitlement to a tangible continuing benefit" by pointing to "an identifiable contractual promise that the [university] failed to honor." *Id*. (quoting *Bissessur,* 581 F.3d at 602). The fact that the University adhered to its existing procedures, as Plaintiff's motion itself agrees the University did, is the opposite of failing to honor a promise.  Plaintiff's entire case addresses

14

procedural challenges without ever identifying any procedural promise the University did not fulfill, which dooms his due process claim. *Bissessur*, 581 F.3d at 602.

Faced with that reality, Plaintiff attempts to conjure a "promise" of criminal-justice procedures that the University failed to provide from vague fairness language incapable of supporting the weight of Plaintiff's argument.  Specifically, Plaintiff points to sections of the Code providing generally that students "have at least the rights and responsibilities common to all citizens," and the Student Disciplinary Procedures stating that the "university disciplinary system shall be separate from, but coexistent with, general systems established by society to deal with the conduct of citizens of society." Prelim. Injunct. Mem. ¶¶ 10, 13, 68-69. Form these general statements, Plaintiff casts the University's process as one that "brands a student as a criminal" and "find[s] a student guilty of a crime."  *Id.* ¶ 13; *see also id.* at ¶ 69. As a result, Plaintiff argues, adjudication of sexual misconduct claims must follow "the general systems established by society when being accused of assault" of providing a "formal hearing" akin to the criminal procedures. *Id.* ¶ 13; *see also id.* at ¶ 69.

But, at the same time, the very premise of Plaintiff's motion and this entire lawsuit is that the University's Policy, Protocol and Code explicitly *do not* promise either a "hearing" generally or a hearing with all the specific procedural protections of a criminal trial. *See* Prelim. Injunct. Mem. ¶¶ 32, 69.  The Policy and Protocol do not even mention criminal procedures or protections, and Plaintiff points to no language to the contrary. Moreover, as explained below and in the University's Motion to Dismiss, courts unanimously agree that the University is not obligated to promise students a "hearing," and such a promise thus cannot be inferred or implied. *See, e.g.*, *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 604 (S.D. Ohio 2016) ("universities are not required to conduct disciplinary proceedings like criminal trials in order to satisfy the Due Process Clause").

2067608.1

Accordingly, Plaintiff's inability to point to any "identifiable contractual promise that the University failed to honor" establishes his failure to demonstrate a property interest in his continuing education at the University. Prelim. Injunct. Mem. ¶ 66 (quoting *Bissessur*, 581 F. 3d at 602); *see also O'Gorman*, 777 F.3d at 890 (affirming dismissal of procedural due process claims where plaintiff failed to demonstrate a property interest in future employment by failing to point to any state law, ordinance, or contract creating such interest). In sum, Plaintiff has identified no protected property interest, and his due process claims thus lack any likelihood of success on the merits.

### b.   *Plaintiff fails to establish a protected liberty interest.*

In addition, Plaintiff has failed to establish a cognizable liberty interest in his good name and reputation. The Seventh Circuit has held that an individual does not, as a general matter, have a cognizable liberty interest in his reputation. *O'Gorman*, 777 F.3d at 891. Damage to an individual's good name or reputation may implicate due process rights only when such "stigmatic" harm takes "concrete forms and extend[s] beyond mere reputational interests." *Omosegbon v. Wells*, 335 F.3d 668, 675 (7th Cir. 2003) (citing *Paul v. Davis,* 424 U.S. 693, 711–12 (1976)) (internal quotation marks and citation omitted); *see also O'Gorman*, 777 F.3d at 891. In other words, reputation alone, apart from some more tangible interests such as employment, is not either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause. *Paul*, 424 U.S. at 701. Here, Plaintiff has not identified a tangible interest aside from his reputation that he claims was infringed by the University. Because Plaintiff has no separate interest at stake, he cannot maintain a due process claim based solely on stigmatic harm. *See Park*, 781 F. Supp. 2d 783, 789 (S.D. Ind. 2011).

### 2.   **Plaintiff received all process required by law with regard to his suspension.**

16

Even assuming that Plaintiff had a cognizable property or liberty interest, Plaintiff's motion cannot establish any likelihood of success on his efforts to assert that Plaintiff failed to receive "notice" or procedural protections required under long-standing due process jurisprudence.  The United States Supreme Court established decades ago that students facing suspension or dismissal need only receive "some kind of notice" and "some kind of hearing." *See Goss v. Lopez*, 419 U.S. 565, 581 (1975). A formal hearing is not required; rather, the "hearing" requirement amounts to "an explanation of the evidence the authorities have and an opportunity to present [one's] side of the story." *Goss*, 419 U.S. at 581.

Plaintiff's motion does not acknowledge the *Goss* standards or recent court decisions applying them in the context of university internal sexual misconduct proceedings. Instead, it argues that the University's existing "investigator model" of procedures violated Plaintiff's due process rights because he did not receive a "formal hearing" or "notice" of such a hearing such that he could present evidence, testify, cross-examine other witnesses, and have the benefit of active legal representation.  But Plaintiff offers no legal authority for such claims, and there is none. To the contrary, it is well-established that student disciplinary proceedings are not criminal or quasi-criminal hearings, and the rights afforded to criminal defendants in criminal trials do not apply. *See Marshall v. Indiana Univ.*, 170 F. Supp. 3d 1201, 1206, 1209 (S.D. Ind. 2016); *see also Univ. of Cincinnati*, 173 F. Supp. 3d at 604 ("universities are not required to conduct disciplinary proceedings like criminal trials in order to satisfy the Due Process Clause"); *see also Bd. of Curators of the Univ. of Missouri v. Horowitz*, 435 U.S. 78, 98 (1978) ("[a]ll that *Goss* required was an informal give-and-take between the student and the administrative body dismissing him that would, at least, give the student the opportunity to characterize his conduct and put it in what he deems the proper context") (internal punctuation omitted).

17

Even a cursory review of the University's efforts to comply with its existing procedures demonstrates that Plaintiff received more than sufficient "notice" of the charges against him and ample opportunity to "characterize his conduct" in what he considered the "proper context" and tell his "side of the story."  It just was not a good story.

### a.  The notice provided Plaintiff was more than sufficient

Plaintiff's motion starts by arguing that "notice" was lacking because he did not receive notice of the "time and place of the hearing on the charges against him," referring to the Panel's review of the Final Investigative Report. Prelim. Injunct. Mem. ¶ 74. But the Panel's meeting is not intended to be the "hearing" at which Plaintiff would have the chance to tell his story. Under the University's procedures, Plaintiff's opportunity to offer evidence, learn of evidence against him, and defend himself took the form of his initial interview and then his review of and options for contesting and challenging the evidence summarized in the Initial Investigative Report (and all supporting witness statements and documents). Boten Aff. ¶¶ 6-7, 9-11, 13-15 & Ex. F.  Not even Plaintiff claims to have lacked "notice" of those opportunities or of the nature of the charges against him.

Indeed, communications from the disciplinary process reveal that Plaintiff was notified repeatedly of the charges against him. He was informed of the specific charges against him twice before he was interviewed to tell his side of the story:  (1) the December 13, 2016 Charge Notice; and (2) December 14, 2017 Updated Charge Notice. Boten Aff. ¶¶ 4-5 & Exs. D-E. He was then notified of each of his opportunities to provide his own account of what happened, review all evidence gathered in the case, and offer any rebuttals or requests for more interviews or questions four separate times:  (1) a January 19, 2017 e-mail inviting him to meet for his initial interview to tell his story; (2) a February 20, 2017 e-mail inviting him to review the Initial Investigative Report

2067608.1

that attached the TIPS document explaining all options available to offer rebuttals; (3) a Verification page he signed and reviewed on February 27, 2017 while reviewing the Initial Investigative Report reiterating options available to him to contribute to the investigative process; and (4) a March 1, 2017 e-mail inviting him to review the Revised Investigative Report that attached a second TIPS document about that step of the process. Boten Aff. ¶¶ 6, 9, 10, 13 & Exs. C, F, G, I. Moreover, each version of the report also contained descriptions of the charges under review, offering Plaintiff further notice of the accusations against him. *See id.* at Exs. F & H. Finally, the University's decision and sanction letter articulated conclusions that Plaintiff violated the three Code provisions that Plaintiff had been repeatedly notified were at issue in each and everyone one of the University's communications. *See id.* at ¶ 16 & Ex. C at pp. 34-39. These facts and allegations establish that Plaintiff received more than ample notice he was entitled to under *Goss* and its progeny.

### b.  Plaintiff had repeated and ample opportunities to be heard.

Plaintiff also received a sufficient "hearing" as that term is well-understood to apply to student disciplinary proceedings:  he was given multiple opportunities to review the evidence against him and tell his side of the story. *See Goss*, 419 U.S. at 581; *Horowitz*, 435 U.S. at 98. Specifically, Plaintiff was able to give "testimony" during his initial interview with Boten, to offer corrections, rebuttals, and requests for further investigation upon reviewing the Initial Investigative Report, and to offer further corrections and rebuttals upon reviewing the Revised Investigative Report, as well as to provide his view of mitigating circumstances that could influence the degree of sanctions imposed. Boten Aff. ¶¶ 6-15 & Exs. F-J.  His entire initial statement was reduced to writing and subject to his review, with his corrections noted in the record. *Id.* ¶ 7 & Ex. C at pp. 16-22, Ex. F at pp. 15-20. His numerous comments and corrections of statements in the various

19

Investigative Report versions were also included in the record. *Id*. at Ex. F at pp. 15-20; Ex. H at pp. 15-20, 53-61; Ex. J at pp. 15-20, 54-59, 64-68. Any challenge he raised to other witness statements or documentary evidence was considered by the investigators and referenced in the report considered by the Panel.  His "story" and the "context" he provided for all facts at issue were heard and reflected in the rationale supporting the final conclusions reached by the Panel.  *Id*. at Ex. C at pp. 34-39. This type of "hearing" is typical of any process using the "investigator model," and it clearly satisfies due process standards. *See Doe v. Baum*, 227 F. Supp. 3d 784, 800 (E.D. Mich. Jan. 5, 2017) (finding that university's "investigator model" process provided plaintiff a "hearing" that satisfied due process standards where, during the two live interviews the investigator conducted, the plaintiff, *inter alia*, was allowed multiple opportunities to ask questions and present additional information and clarifications; provided copies of the complainant's statement, other evidence, and the investigator's draft report; and allowed to submit additional information and comments in response to this evidence: and the plaintiff's feedback and clarifications were incorporated into the final report).

Plaintiff's only attempts to argue any lack of opportunity to be heard rely on technical procedural standards he believes were lacking, which courts have repeatedly found unnecessary as a matter of law in other due process cases involving sexual misconduct proceedings. Specifically, Plaintiff's motion complains that the University failed to conduct a "formal hearing," considered "hearsay" in the investigative reports, did not allow him active legal representation, and failed to allow direct cross-examination of Jane Roe and other witnesses.  None of these issues offers Plaintiff any likelihood of success on his due process claim under directly applicable law.

For instance, courts have repeatedly supported schools' ability to use "hearsay" evidence collected by investigators that are reported to panels of ultimate decisionmakers, with limited

20

attorney involvement during any proceeding other than mere attendance in a support role. *See,*
*e.g., Doe v. Univ. of Cincinnat*i, -- F.3d ---, 2017 WL 4228791, at *9 (6th Cir. Sept. 25, 2017)
(noting that "nothing in our decision jeopardizes UC's ability to rely on hearsay statements" in a
student disciplinary proceeding, as schools are not required to "transform [their] classrooms into
courtrooms" to provide constitutionally adequate due process) (citation omitted); *Marshall,* 170 F.
Supp. 3d at 1206 (no attorney advocacy required to satisfy due process); *Osteen v. Henley*, 13 F.3d
221, 225-26 (7th Cir. 1993) ("the Constitution does not confer [the right of counsel] on student
with regard to disciplinary proceeding). Direct cross-examination is also not required, particularly
when accused students have options for reviewing other witness statements, offering rebuttal
evidence, and submitting questions for investigators to pose to other witnesses. *Doe v. Univ. of
Cincinnati*, 173 F. Supp. 3d at 603 (S.D. Ohio 2016) ("Inasmuch as students do not have a general
right to cross-examine adverse witnesses in school disciplinary proceedings, it follows that
Plaintiffs' due process rights were not violated because they were required to submit written
questions to the panel chair.") (internal citation omitted); *Doe v. Pennsylvania State Univ.*, No. 17-
cv-01315, 2017 WL 3581672, at *7 (M.D. Pa. Aug. 18, 2017) ("[d]ue process in disciplinary
proceedings does not, in itself, require that the accused be afforded the right to cross examin[e]
witnesses supporting a charge"); *Brown v. Plainfield Cmty. Consol. Dist. 202*, 522 F. Supp. 2d
1068, 1073-76 (N.D. Ill. 2007) (finding student expelled from high school had no federal due
process right to cross-examine student witnesses at his disciplinary hearing). Plaintiff was
informed he could rebut other witness statements in various ways, including by posing cross-
examination type questions of any witnesses through the investigators, but he chose not to do so.
Boten Aff. ¶¶ 6, 9 & Ex G. The University's procedures, which were directly applied to Plaintiff's
case, comply with all of these decisions and thus afforded him ample due process.

Moreover, as recently clarified by the Sixth Circuit: "a full-scale adversarial proceeding is not required. The focus, rather, should be on whether the student had an opportunity to 'respond, explain, and defend,' and not on whether the hearing mirrored a criminal trial." *Cummins,* 2016 WL 7093996 at *8. *See Marshall v. Indiana University,* 170 F. Supp. 3d 1201, 1207 (S.D. Ind. 2016) (reaching same result applying Seventh Circuit precedent). Consistent with these decisions, the University afforded Plaintiff more than ample opportunity to be heard and convey his story, which leaves Plaintiff with no likelihood of success on the merits of his claims and requires denial of the motion for preliminary injunctive relief. *See Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 ("the less likely [plaintiff] is to win, the more the balance of harms must weigh in his favor for an injunction to issue").

### B.  Plaintiff Cannot Establish Irreparable Harm.

Plaintiff asserts that if this Court does not issue an order reinstating him at the University and directing the University to re-investigate and retry the allegations of sexual assault against him through a full-blown criminal hearing, he will suffer irreparable injury because: (1) he will be unable to continue or complete his education; (2) he will face "substantial social and personal repercussions" due to the finding that he was responsible for sexual misconduct; and (3) his permanent academic record will include a gap in his education. Prelim. Injunct. Mem. ¶¶ 77-79.

Plaintiff cannot show irreparable harm. Unlike the plaintiffs in *Ritter v. State of Oklahoma*, No. CIV-16-0438-HE, 2016 WL 2659620 (W.D. Okla. May 6, 2016) and *Tully v. Orr*, 608 F. Supp. 1222, 1225 (E.D.N.Y. 1985), Plaintiff has not been expelled and is free to reapply to the University to continue his education in fall 2019. Further, as many courts have noted, a suspension does not *per se* constitute irreparable harm. *See Medlock v. Trustees of Indiana Univ.*, No. 1:11-CV-00977-TWP, 2011 WL 4068453, at *9 (S.D. Ind. Sept. 13, 2011) (no irreparable harm where

student suspended from Indiana University declined an offer to transfer to another university and would later be eligible for re-admission to IU); *Ben-Yonatan v. Concordia College*, 863 F. Supp. 983 (D. Minn. 1994) (no irreparable harm where student suspended for one year alleged that she would either be delayed in entering medical school or might not be admitted into medical school due to the gap in her academic record). Indeed, courts have found the absence of irreparable harm even in cases involving expulsion or dismissal. *See Preston v. Chicago State*, 120 F. Supp. 3d 801, 806 (N.D. Ill. 2015) (no irreparable harm where expelled student did not timely move for a preliminary injunction, had continued his education at another institution, and provided "no authority that a student's ambitions in a particular future employment path warrant the entry of a mandatory interlocutory injunction"); *Caiola v. Saddlemire*, No. 3:12-CV-00624, 2013 WL 1310002, at *2 (D. Conn. Mar. 27, 2013) (no irreparable harm for college student who was expelled "on the verge of graduation" after having been admitted into a Masters program where the student offered no evidence that the stigma of his expulsion would interfere with his career or that his expulsion did or was even likely to result in a rescission of his admission to the Masters program); *Bilut v. Northwestern Univ.,* 645 N.E. 2d 536 (Ill App. Ct. 1994) (no irreparable injury even though plaintiff had been dismissed because plaintiff could use work toward degree at other institution).

Other case law Plaintiff relies upon is inapposite. Neither *Doe v. Brandeis University*, 177 F. Supp. 3d 561 (D. Mass. 2016) nor *Doe v. Rector and Visitors of George Mason University*, 149 F. Supp. 3d 602 (E.D. Va. 2016) involved a preliminary injunction or a finding of irreparable harm. In *King v. DePauw University*, the court's finding that a preliminary injunction was warranted was based heavily on its determination that the plaintiff demonstrated some likelihood of success on the merits of his breach of contract claim. No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at *10-

23

11 (S.D. Ind. Aug. 22, 2014) (noting that the court's task was to "first determine whether [the plaintiff had] any likelihood of success [on the merits of his claim] and, if so, [to determine] whether he will suffer irreparable harm if he does not receive the injunction he seeks"). In *Doe v. Middlebury*, No. 1:15-cv-192-jgm, 2015 WL 5488109 (D. Vt. Sept. 16, 2015), the plaintiff not only demonstrated a likelihood of success on the merits, but also established concrete harm he would suffer if his suspension was withheld:  he had in hand an offer to begin a job in spring 2016 that was contingent on the successful completion of his degree at Middlebury in spring 2016, and would lose that job if not permitted to begin his senior year in September 2015. *Id.* at * 3. Unlike the plaintiff in *Middlebury*, Plaintiff has not claimed that he has lost job opportunities due to the finding that he was responsible for sexual assault. Moreover, assuming Plaintiff is readmitted to the University for the 2019-2020 school year, his transcript will not reveal the reasons for the gap in his education and will not inform potential employers that Plaintiff was found responsible for sexual misconduct. Boten Aff. ¶ 19. Any claim that he will lose job opportunities in the future as a result of either this finding or the fact that there was a gap in his education is purely speculative. Plaintiff is also free to pursue other educational opportunities during the time that he will be suspended from the University or pursue a transfer to another institution so as to mitigate any speculative harm he fears may be caused by such a gap.

Further, Plaintiff's claim that he will suffer irreparable harm due to his alleged "inability" to continue his education is undermined by Plaintiff's delay in seeking injunctive relief. The University suspended Plaintiff on April 25, 2017. Boten Aff. ¶ 17. Plaintiff filed this Motion approximately four months later, on August 31, 2017, approximately three weeks after the lawsuit was initiated. Plaintiff could have filed a request for a temporary restraining order or preliminary injunction at any time after his suspension was affirmed by the University, but he chose not to do

24

so. While Plaintiff does not specify in his Motion when he is seeking to be reinstated to the University, at this point the fall 2017 semester is well underway, and the earliest Plaintiff could potentially be reinstated would be the beginning of the spring 2018 semester. Martensen Aff. ¶ 2.[4] By Plaintiff's own delay, then, the injunctive relief he seeks is reinstatement after serving over eight months of his suspension. Thus, at this point, if this Court were to enter a preliminary injunction, it would in fact alter the status quo rather than maintain it to prevent harm to the parties. *See, e.g.*, *Vienna Beef, Ltd. v. Red Hot Chicago, Inc.*, 833 F. Supp. 2d 870, 877 (N.D. Ill. 2011).

Finally, it is significant that the University's finding that Plaintiff was responsible for sexual assault was based on undisputed and objective evidence – including text messages written by Plaintiff – that Plaintiff understood Roe was too intoxicated to consent to sexual activity, and was reached after a fair proceeding pursuant to its internal procedures. None of the cases Plaintiff relies upon stand for the proposition that where a University's finding that a student is responsible for sexual assault is supported with objective evidence and reached pursuant to a fair process, without any procedural flaws or mistakes, the regular and legitimate disciplinary consequences for that student constitute irreparable harm justifying the extraordinary remedy of a preliminary injunction.

### C.  The Balance of Harms Strongly Favors the University and the Public

Finally, even if this Court were to find that Plaintiff's suspension constituted irreparable harm, Plaintiff is not entitled to injunctive relief because the balance of harms strongly favors the University and the interests of the public. Plaintiff's request for judicial intervention to interfere with the University's internal investigations would harm the University's interest and contravene significant public interest in the effectiveness and autonomy of on-campus sexual misconduct

---

[4] Kathryn Martensen's Affidavit is attached as Exhibit 3.

investigation procedures. Courts must balance such equitable considerations when considering the "drastic" remedy of a preliminary injunction, rendered under time pressures and without a full evidentiary record, and these factors weigh heavily in the University's favor and against Plaintiff's requested relief.  *See Lawson Products, Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1440 (7th Cir. 1986).

Like all higher education institutions, the University has an obligation to develop, distribute, and administer investigation procedures for adjudicating sexual misconduct complaints from its students. See *Doe v. Ohio State University*, 136 F. Supp. 3d 854, 871 (S.D. Ohio 2016). Jane Roe's interests would also be compromised by re-adjudicating her claims through a hearing process the University has not actually adopted and that is directly contrary to its existing procedures.  Students are entitled to rely on the University's promise to apply certain procedures, which Plaintiff's requested relief would violate. For these and other reasons, courts have long sought to respect institutional autonomy in internal proceedings, including in this context. *See id*. Plaintiff's request for judicial intervention seeks to undermine that autonomy and harm Jane Roe and the University.

Here, the University afforded a fair process to Plaintiff, as well as to Roe. That Plaintiff disagrees with the outcome of that process is not a basis for granting the extraordinary relief he seeks. Plaintiff has not been expelled, and he can apply to resume his studies after the period of suspension has elapsed. Undoing the decisions that have been reached pursuant to the University's established procedures and after full and fair consideration would be far more harmful to the University than whatever harm may inure to Plaintiff by allowing the University's carefully considered decisions to stand. Undoing the University's decisions would also unreasonably and unjustifiably undermine the University's legitimate interest in investigating and resolving

allegations of sexual assault that it is required by federal and state law to address as part of its educational mission.

Indeed, similar cases involving expulsion of students recognize the institutional need for and public interest in the autonomy of higher education internal proceedings and the threat to such autonomy posed by preliminary equitable relief in circumstances involving sexual misconduct investigations. *See King,* 2014 WL 4197507, *14; *Ritter*, 2016 WL 2659620, *3 (W.D. Okla. May 6, 2016). As one court noted:

> [The University] has an interest in enforcing its own rules of conduct pursuant to its own procedures.  If the Court grants an injunction and [the student] is ultimately unsuccessful in this case, [the University] will have been erroneously denied that right. . . .Universities have a difficult job when it comes to dealing with allegations of sexual misconduct, and they should be permitted to do that job without unnecessary court intervention.  [The University] is harmed simply by having its actions second-guessed by a court after such an abbreviated process which by its nature requires the Court to work within time constraints and without a full record because the parties have not had the benefit of discovery.
>
>           *               *               *
>
> The public – and specifically the [University] community – has an interest in seeing [the University's] policies applied fairly to both complainants and respondents in disciplinary actions.  If an injunction is granted and [the student] ultimately loses, that interest will be thwarted to the same extent that [the University's] own interest would be.

*King,* 2014 WL 4197507, *14. Although such institutional and public interest harms are occasionally found to be outweighed by a student's harm from imminent expulsion, this is particularly the case where a school's application of its internal process is judged to have been flawed in significant ways. Here, as noted, there is no evidence to suggest, and Plaintiff does not allege, that the University did not properly follow or apply its Protocol in Plaintiff's case. Plaintiff's claim is rather that the University's Protocol is inherently flawed because it is based on an "investigator model," rather than a "hearing model" of adjudicating sexual misconduct claims, and because it does not include all the protections guaranteed in a criminal trial. As noted, however, the law is clear that such "investigator models" can easily satisfy due process requirements, and

that a "formal hearing" is not required, much less a full-blown criminal hearing, in in the student discipline context.

Indeed, allowing Plaintiff's request for judicial intervention to mandate the University undo its prior process and afford Plaintiff a second chance to challenge the same allegations against him in a hearing not called for under the University's Protocol and not required by law would invite *all* respondents either currently involved in a sexual misconduct proceeding or previously found responsible and sanctioned for a violation of the University's Policy to seek the same judicial intervention. There is no legal justification for this Court to intervene in such a manner. As the Seventh Circuit noted in vacating the grant of a preliminary injunction in a case involving a one-year expulsion of a student by a school board:

> [W]e think the Board is correct in characterizing the injunction as undermining the authority of the Board to take disciplinary action for what it believed to be a serious threat to school property . . . . Under the district court's analysis, a school often would be powerless to expel a student able to mount a nonfrivolous legal challenge to the expulsion, unless the school could prove that the student's continued attendance actually presents a current threat of tangible injury.

*See Boucher v. School Bd. of School Dist. of Greenfield*, 134 F.3d 821, 826-27 (7th Cir. 1998).

Thus, in addition to the lack of any irreparable harm at issue here, the balance of harms that preliminary injunctive relief would cause to the University and applicable public interests require denial of Plaintiff's request.

## CONCLUSION

Binding authority prohibits the injunctive relief that Plaintiff seeks, and strongly indicates that Plaintiff cannot prevail on any substantive legal claim he seeks to allege. Moreover, the undisputed facts in this case lead to only one conclusion, that Plaintiff received all process he was due under the University's Protocol and was properly suspended after the University determined

pursuant to that Protocol that he was responsible for an incident of sexual assault. Permitting

Plaintiff to avoid his disciplinary consequence by granting a preliminary injunction would

seriously undermine the University's ability to maintain discipline and enforce its policies

prohibiting sexual misconduct and, in turn, would cause grave harm to the University and the

public at large.  For the reasons stated and authorities cited above, the University requests that this

Court therefore deny Plaintiff's motion for a preliminary injunction.


                                        Respectfully submitted,

                                        BOARD     OF    TRUSTEES    OF    THE
                                        UNIVERSITY OF ILLINOIS,

                                        By:_____/s/Peter G. Land_____
                                                 One of Defendant's Attorneys

Peter G. Land
pgl@franczek.com
Gwendolyn B. Morales
gbm@franczek.com
Franczek Radelet P.C.
300 South Wacker Drive, Suite 3400
Chicago, Illinois 60606
(312) 986-0300

Dated: October 10, 2017

2067608.1

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he caused a copy of the foregoing

**DEFENDANT BOARD OF TRUSTES OF THE UNIVERSITY OF ILLINOIS'**

**OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** to be

filed with the Clerk of the Court using the CM/ECF system, which will send electronic notification

to the following counsel of record this 10th day of October, 2017:

> Mark D. Roth
> Ken Hurst
> Roth Fioretti, LLC
> 311 South Wacker Drive, Suite 2470
> Chicago, IL 60606
> Phone: (312) 922-6262
> Fax:    (312) 922-7747
> mark@rothfioretti.com
> ken@rothfioretti.com
> Counsel for Plaintiff

/s/ Peter G. Land