E-FILED
Wednesday, 14 March, 2018  11:42:14 AM
Clerk, U.S. District Court, ILCD

## N THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS - URBANA

JOHN DOE,                               )
                                        )
            Plaintiff,                  )
                                        )          Case No. 17-CV-02180
        v.                              )
                                        )          Honorable Colin S. Bruce
BOARD OF TRUSTEES OF THE                )          Magistrate Eric I. Long
UNIVERSITY OF ILLINOIS,                 )
                                        )
            Defendant.                  )          JURY DEMANDED
                                        )

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

NOW COMES Plaintiff, John Doe, by his attorneys, Mark Roth and Kenneth Hurst of Roth

Fioretti, LLC, moves this Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, to

grant summary judgment in favor Plaintiff on the Amended Complaint for Injunctive and Other

Relief and Jury Demand. In support of his motion, the Plaintiff states the following:

## INTRODUCTION

A fundamental right of every person in the United States of America is the right to Due

Process. The Fourteenth Amendment guarantees one's rights to life, liberty, and property. This

guarantee is a protection from the government to prevent takings of our life, liberty, and property

in accordance with due process. However, the government in the form of public schools have

elevated themselves beyond students' fundamental rights via the schools' established policies and

procedures. For years, public universities fought to deny students a stand-alone property interest

in their education. The public schools succeeded. Students were denied their due process rights

and claims before their merits were even addressed. Recently, the Seventh Circuit has recognized

a that "a student can prove that he has a property interest in a continued education if he can establish

that he had a legally protected entitlement to his continued education at the university". See [DKT

1

#34]. See also, <u>Charleston v. Bd. of Trs. of the Univ. of Ill. at Chi.</u>, 741 F.3d 769, 773 (7th Cir.

2013). Therefore, when a university threatens to dismiss or expel a student, that student is entitled

to the protections of due process. The question before the Court now is "what process is due".

<u>Goss v. Lopez</u>, 419 U.S. 565, 577 (1975). The Seventh Circuit has provided this answer, "an

entitlement to a hearing". <u>Willliams v. Wendler</u>, 530 F.3d 584, 585 (7th Cir. 2008).

 However, when the Defendant, Board of Trustees of the University of Illinois ("Board" or

"University"), dismissed Plaintiff, John Doe, from the University of Illinois, the University took

Plaintiff's right to a continued education without due process. The undisputed facts demonstrate

that the University denied Plaintiff's request to attend his entitled hearing. In fact, the University's

policies and procedures do not allow students to attend their entitled hearing to testify before the

adjudicated Subcommittee. This is a clear violation of Plaintiff's due process rights.

 Plaintiff was accepted to enroll at the University for the class of 2019. Plaintiff's due

process rights in a continued education, learning, and studying at the University as well as a liberty

interest in a good name and reputation were guaranteed by the documents provided to Plaintiff

upon his acceptance to the University. The University made available its policies and procedures

on student misconduct. The policies provided that Plaintiff would "have at least the rights and

responsibilities common to all citizens." Further, the University's Student Disciplinary

Procedures, states that "the university disciplinary system shall be separate from, but coexistent

with, general systems established by society to deal with the conduct of citizens of society."

Thereafter, Plaintiff paid his tuition and attended the University accumulating a GPA of 3.69 while

being involved with extracurriculars and employment. A contract was formed between Plaintiff

and the University not to dismiss Plaintiff except for good cause. However, Plaintiff was dismissed

from the University in violation of his due process rights after an investigation and adjudication

by the Subcommittee on Sexual Misconduct ("Subcommittee") of a complaint filed against Plaintiff in December 2016, by Jane Roe ("Roe").

During the early morning hours of December 4, 2016, Plaintiff engaged in consensual activity with a female University student Roe at his apartment. However, on December 13, 2016, Plaintiff received an email from the University alleging violations of its Student Code for alleged sexual assault against Roe. The University's investigative process was insufficient to provide Plaintiff with due process protections under the context of allegations of sexual assault and threaten dismissal, while only Plaintiff and Roe were witnesses to what occurred on December 4, 2016.

It was not until January 19, 2017, forty-six days after the alleged assault that Plaintiff was interviewed and notified of Roe's allegations. Plaintiff was unable to properly prepare to respond to the Investigator's questions or provide proper corroborating witnesses before the meeting. Using notes from Plaintiff's interview, as well as further information gathered during the investigation, an Initial Investigative Report was prepared by the University investigator. Plaintiff was allowed to view the report on February 27, 2017. While reviewing the Initial Investigative Report, Plaintiff discovered errors that included, but not limited to, typing errors, content errors, and some misunderstandings between Plaintiff and the Investigator. Plaintiff corrected and made comments to approximately sixty-one (61) lines in the initial report.

On March 8, 2017, Plaintiff was allowed to review a revised Investigative Report before sending the investigative report to the Subcommittee for adjudication. The Revised Report contained some of the exact same errors corrected in the Initial Report. Moreover, the Revised Report contains new errors that were not contained in the previous Initial Report. Therefore, the Revised Report continued not to represent Plaintiff's true testimony. Plaintiff was not provided an meaningful opportunity to be heard.

Except for emails from the University to view the interview notes and investigative reports, Plaintiff was left in the dark as to what was occurring in the investigative process. The procedures under Section 4 specifically provide for "Panel Adjudication". The notice specifically stated in part, "Your case has been scheduled to appear before the Subcommittee on Sexual Misconduct. Your <u>hearing</u> is scheduled for March 28, 2017…" (Emphasis added). The notice did not provide the time or place of the hearing. Further, Plaintiff had requested the University investigator if he could attend the hearing and the investigator responded, "no honey, you just wait at home for the result email which will be sent within twenty-four hours of the hearing." Plaintiff was not allowed to provide testimony or evidence at the hearing and there was no opportunity to cross-examine his accusers. Plaintiff was denied his entitlement to a hearing.

On March, 28, 2017, four days prior to Sexual Assault Awareness Month ("SAAM"), the Subcommittee made findings of fact and found Plaintiff to be responsible for all alleged violations against him. The Subcommittee made findings of credibility despite the fact that no witnesses were allowed to be present at the hearing. These findings were made purely through hearsay. Further, the Subcommittee found that Plaintiff had committed premeditated sexual assault against Roe, because she had consumed alcohol that night and was therefore incapacitated and could not consent. Based upon these findings the Subcommittee concluded that Plaintiff had violated the Student Code and dismissed him from the University for two and a half years.

Although the Subcommittee reached its decision on March 28, 2017, Plaintiff was allowed to remain on campus to attend classes, interact with students, and proceed with campus life. Plaintiff appealed his decisions and provided new information, evidence, documents, and contested errors in the investigative reports. However, the University affirmed its decision and Plaintiff was effectively dismissed from the University on April 25, 2017.

Plaintiff was denied his due process rights from the context, particular situation, and severity of the deprivation which indicate Plaintiff was entitled to a hearing before the Subcommittee. Although Plaintiff was allowed to speak with a University investigator, the investigator did not convey his true testimony in the investigative reports or to the Subcommittee. The hearsay Final Investigative Report was thereafter sent to the Subcommittee for adjudication without Plaintiff's ability to review that report. With the Final Investigative Report in hand, the Subcommittee was also unduly influenced by the incoming SAAM and 2011 "Dear Colleague Letter" issued by the Federal Office for Civil Rights. The letter caused "schools to brand more students as 'rapist' based on the excessively low 'preponderance' burden of proof, permitting a form of double jeopardy, and perhaps more importantly, deprived the accused person (overwhelmingly males) of all elements of due process, including the right to an attorney, the right of cross-examination, and the standard of evidence appropriate to the consequence of being found 'guilty'."

The Plaintiff avers that he is entitled to summary judgment as to his declaratory and injunctive relief as a matter of law. Plaintiff seeks injunctive relief providing Plaintiff was a hearing conforming with his due process and equal protection rights and a judicial declarations that: (i) the outcome and findings made by Defendant be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's suspension from University be removed from his education file; (v) any record of the complaint against Plaintiff be permanently destroyed; (vi) Plaintiff be readmitted to the University for the Fall 2017 semester; (vii) Plaintiff be allowed to complete his Spring 2017 classes; and (viii) Defendant's rules, regulations, and guidelines are unconstitutional.

## UNDISPUTED MATERIAL FACTS

1.      Plaintiff, John Doe, is a natural person who resides in the state of California. See Affidavit of Plaintiff Doe, attached hereto as Exhibit D, at ¶ 1.

2.      Defendant, Board of Trustees of the University of Illinois ("Board" and "University"), is a body corporate and politic having power, *inter alia*, to plead and be impleaded, to make and establish by-laws, and to alter or repeal the same as they shall deem necessary, for the management or government, in all its various departments and relations, of the University of Illinois, for the organization and endowment. *See,* 110 ILCS 305/1. The Board is sued in each and every cause of action, in any and all capacities. See Defendant's Answer to Amended Complaint, attached hereto as Exhibit A, at ¶ 2, 83.

3.      Plaintiff applied and was accepted to enroll at the University for the class of 2019. See Defendant's Answer to Amended Complaint, attached hereto as Exhibit A, at ¶ 17. See also Exhibit D, at ¶ 2.

4.      The University's Student Code, which includes the University's Sexual Misconduct Policy, and the University's Student Disciplinary Procedures, was made available to Plaintiff on the University's website. See Exhibit A, at ¶ 2, 84. Plaintiff had access to these documents before and after he applied to and was accepted by the University. Id. Defendant admits that the attached is a true and correct copy of the selected portions of the Student Code, attached hereto as Exhibit B. See Exhibit A, at ¶ 31. Defendant admits that the attached is a true and correct copy of the Appendix D of the Student Disciplinary Procedures, attached hereto as Exhibit C. See Exhibit A, at ¶ 40. Defendant admits that the attached is a true and correct copy of the Code Section 1-104 Privacy, attached hereto as Exhibit E. See Exhibit A, at ¶ 87. Defendant admits that the attached

is a true and correct copy of Section 1.01-1.04 of the Student Disciplinary Procedures, attached

hereto as Exhibit F. See Exhibit A, at ¶ 88.

5.      The Preface of the Student Code states that "[u]nless otherwise noted, the rules

stated in the Student Code apply to all undergraduate, graduate, and professional students enrolled

at the University of Illinois at Urbana-Champaign." See Exhibit A, at ¶ 31.

6.   The Code provides the following Preamble, §1-101:

   a.   A student at the University of Illinois at the Urbana-Champaign campus
        is a member of a University community of which all members *have at
        least the rights and responsibilities common to all citizens*, free from
        institutional censorship; *affiliation with the University as a student does
        not diminish the rights or responsibilities held by a student* or any other
        community member as a citizen of larger communities of the state, the
        nation, and the world. (Emphasis added).

   b.   Any rules or regulations considered necessary to govern the interaction
        of the members of the University community are intended to reflect
        values that community members must share in common if the purpose
        of the community to advance education and to enhance the educational
        development of students is to be fulfilled. These values include the
        *freedom to learn*, free and open expression within limits that do not
        interfere with the rights of others, free and disinterested inquiry,
        intellectual honesty, sustained and independent search for truth, the
        exercise of critical judgment, respect for the dignity of others, and
        personal and institutional openness to constructive change. *The
        following enumeration of rights shall not be construed to deny or
        disparage other rights retained by these individuals in their capacity as
        members of the campus community or as citizens of the community at
        large*. (Emphasis added).

See Exhibit A, at ¶ 85.

7.      The Student Code provided for the Board's basis for discipline, source, and

jurisdiction. See Exhibit A, at ¶ 31.  See also, Exhibit B, at Section 1-301. These regulations are

formulated by a variety of sources, included, but not limited to the Board. Id. The Student Code

further details "that the basis for discipline at this campus be clearly defined". See Exhibit A, at ¶

33. See also Exhibit B, at Section 1-301(b).

8.     The Student Disciplinary Procedures set forth the procedures for addressing violations of the Student Code and Appendix D to those procedures sets forth procedures for investigating and resolving cases that involve an accusation of sexual misconduct, including sexual assault, against a student. See Exhibit A, at ¶ 34, 84.

9.     The Student Code provides the University's Sexual Misconduct Policy and provides definitions of "sexual misconduct", "sexual assault", and "consent". See Exhibit A, at ¶ 35, 36. See also Exhibit B, at Section 1-111. The University's Sexual Misconduct Policy does not contain a separate, stand-alone definition of the term "incapacitated". See Exhibit A, at ¶ 37.

10.    When a student violates the Student Code, the Office for Student Conflict Resolution ("OSCR") has the responsibility of administering the "Student Disciplinary Procedures" as authored and authorized by the Senate Committee on Student Discipline ("SCSD"). See Exhibit A, at ¶ 39. The Board provided this aforementioned authority to SCSD. Id.

11.    The Student Disciplinary Procedures administered by the OSCR are available online at http://conflictresolution.illinois.edu/policies/student-discipline/. See Exhibit A, at ¶ 40. See also Exhibit C. The OSCR addresses "all behavioral violations" of the Student Code committed by individuals. See Exhibit A, at ¶ 41.

12.    "Appendix D" to the Student Disciplinary Procedures is the Student Conduct Protocol for Allegations of Sexual Misconduct, Including Sexual Harassment, Sexual Assault, Sexual Exploitation, Stalking, Dating Violence, and Domestic Violence; and that Appendix D sets forth the procedures for all cases that include an accusation of sexual misconduct, including sexual assault, against a student. See Exhibit A, at ¶ 42. See also Exhibit C.

13.    Section 1 of Appendix D provides for definitions for various terms within Appendix D. See Exhibit A, at ¶ 43. See also Exhibit C. Section 2 provides for the investigation process and

procedures. See <u>Exhibit A</u>, at ¶ 44-51. See also <u>Exhibit C</u>. Section 3 provides for the "Investigative Report". See <u>Exhibit A</u>, at ¶ 52-58. See also <u>Exhibit C</u>. Section 4 provides for "Panel Adjudication". See <u>Exhibit A</u>, at ¶ 59-70. See also <u>Exhibit C</u>.  Section 5 provides for "Appeal Procedures". See <u>Exhibit A</u>, at ¶ 71-80. See also <u>Exhibit C</u>. Section 6 provides for "Petitions to the Subcommittee on Sexual Misconduct".  See <u>Exhibit A</u>, at ¶ 81. See also <u>Exhibit C</u>. Section 7 provides for "Role of the Title IX Coordinator in the Student Discipline System". See <u>Exhibit A</u>, at ¶ 82. See also <u>Exhibit C</u>.

14.     The Code provides the following Privacy Rights, §1-104, in relevant part: "(a) Members of the University community have the same rights of privacy as other citizens and surrender none of those rights by becoming members of the academic community…". See <u>Exhibit A</u>, at ¶ 87. See also <u>Exhibit E</u>.

15.     The Student Disciplinary Procedures Section 1.01 – History, provides and represents in relevant part, "The Trustees asserted their belief in the concept that the university disciplinary system shall be separate from, but coexistent with, general systems established by society to deal with the conduct of citizens of society." See <u>Exhibit A</u>, at ¶ 88. See also <u>Exhibit F</u>.

16.     The Student Disciplinary Procedures Section 1.02 – Philosophy, provides and represents in relevant part, "The community supports each member's right to study and work in a quiet, respectful, non-violent atmosphere that is conducive to the pursuit and acquisition of knowledge". See <u>Exhibit A</u>, at ¶ 89. See also <u>Exhibit F</u>.

17.     The Title IX Coordinator reviews all sexual assault cases upon their completion to determine whether the university needs to take additional action that was not available through the disciplinary process. See <u>Exhibit C</u>, at pg. 8.

18.     In reliance on these policies, practices and understandings regarding the Student Code, Plaintiff accepted the University's offer and paid the required deposit. See Exhibit D, at ¶ 4.

19.     At all relevant times, Plaintiff was a full-time, tuition-paying, undergraduate student at the University. See Exhibit D, at ¶ 5. See also Exhibit A, at ¶ 16.

20.     While enrolled at the University, Plaintiff received scholarships, federal Pell grants, and University grants. See Exhibit A, at ¶ 19. Plaintiff was a member of the Alpha Phi Omega national coeducational service organization, Minority Business Student Association, the Taiwan Intercultural Association, and the Students Today Leaders Forever nonprofit organization. See Exhibit D, at ¶ 6. Plaintiff was also employed at Ozu Ramen Restaurant. Id.

21.     During the spring semester of 2017, Plaintiff, a sophomore undergraduate, was enrolled in five University classes, ACCY 301, ACCY 302, SPED 117, FIN 300, and ACES 161, which amounted to twelve credit hours and a GPA of 3.69. See Exhibit A, at ¶ 18, 23. See also Exhibit D, at ¶ 7. Final examination for Spring 2017 semester were held from May 5-12, 2017. Id.

22.     Before the instant dispute, Plaintiff possessed no student disciplinary record. See Exhibit A, at ¶ 20. See also Exhibit D, at ¶ 8.

23.     On December 13, 2016, at 4:36 p.m., Plaintiff received an email from January Boten, Assistant Dean, and Investigator from the University. The email was titled, "UIUC Disciplinary Update: Charge Notice – IMPORTANT" ("December 13 Email"). See Exhibit A, at ¶ 95. See also Exhibit D, at ¶ 9.

24.     Upon initially reading the December 13 Email at approximately 7:00 p.m., and without reading a majority of the email's content, Plaintiff text messaged a small snapshot of the

December 13 Email to Jane. See <u>Exhibit D</u>, at ¶ 10. Plaintiff was shocked and surprised by the email. <u>Id</u>.

25.     Then Plaintiff continued to read the December 13 Email and came upon the second half of the email. See <u>Exhibit D</u>, at ¶ 11. Plaintiff read the no-contact provision and immediately sent a text to Jane approximately one to two minutes after his first text message. <u>Id</u>. He informed Jane that he was not supposed to contact her. <u>Id</u>. Plaintiff never contacted Jane, in any form, after the aforementioned. <u>Id</u>.

26.     The December 13 Email informed Plaintiff that the OSCR "received information in which it is alleged that on December 4, 2016, you were involved in an incident which may violate" the Code. See <u>Exhibit D</u>, at ¶ 12. See also <u>Exhibit A</u>, at ¶ 98. The email further informed Plaintiff of the approximate time, date, place, and type of incident. <u>Id</u>.

27.     The December 13 Email informed Plaintiff of the following charges: Student Code/1-302.b.1 as defined by § 1-111(c)(2)(a), and Student Code/1-302.b.1 as defined by § 1-111(c)(2)(b)." See <u>Exhibit D</u>, at ¶ 13. See also <u>Exhibit A</u>, at ¶ 99.

28.     The December 13 Email noticed Plaintiff to call the Assistant Dean "during normal business hours and no later than January 27, 2017, to arrange an appointment" with her. See <u>Exhibit D</u>, at ¶ 14. See also <u>Exhibit A</u>, at ¶ 101.

29.     Plaintiff received a subsequent email on December 14, 2016. The email was titled, "UIUC Disciplinary Update: Charge Notice – IMPORTANT" ("December 14 Email"). See <u>Exhibit D</u>, at ¶ 15. See also <u>Exhibit A</u>, at ¶ 102.

30.     The December 14 Email noticed Plaintiff to call the Assistant Dean to arrange an immediate appointment at 300 Student Services Building, 610 E. Plaintiff Street, Champaign, IL.

During the appointment, discussions would be made regarding the nature of the alleged incident and the appropriate University response. See <u>Exhibit D</u>, at ¶ 16. See also <u>Exhibit A</u>, at ¶ 103.

31.     The December 14 Email noticed an additional charge of, "Student Code/1-302.o.1." See <u>Exhibit D</u>, at ¶ 17. See also <u>Exhibit A</u>, at ¶ 104.

32.     The remaining parts of the December 14 Email are substantially similar to the December 13 Email. See <u>Exhibit A</u>, at ¶ 105.

33.     Soon after the December 14 Email, Plaintiff contacted the Investigator to setup an appointment. See <u>Exhibit D</u>, at ¶ 18. See also <u>Exhibit A</u>, at ¶ 106. Plaintiff arrived at the appointment at the Assistant Dean/Investigator's office. <u>Id</u>.

34.     At all times Plaintiff denied the University's allegations of sexual assault of Jane Roe. See <u>Exhibit D</u>, at ¶ 19.

35.     During December 2016, at the appointment, the Investigator addressed the no contact policy issue with Plaintiff. See <u>Exhibit D</u>, at ¶ 20. See also <u>Exhibit A</u>, at ¶ 107. Plaintiff informed the Investigator as to what occurred on December 13, 2016. <u>Id</u>. After informing the Investigator of his hastiness, the Investigator did not request the text messages at issue. <u>Id</u>. Further, Plaintiff was told virtually nothing about the accusations Jane had made so that he could prepare a defense and suggest sources of information for Investigators to pursue. See <u>Exhibit D</u>, at ¶ 20. Rather, the Investigator informed Plaintiff that they would resume discussions, however, as soon as possible. <u>Id</u>.

36.     By not immediately investigating the accusations of sexual assault, Plaintiff did not believe that the University considered Roe's false accusations seriously. See <u>Exhibit D</u>, at ¶ 21.

37.     During the first few weeks of January 2017, Plaintiff called the Investigator to set an appointment. See <u>Exhibit D</u>, at ¶ 22. See also <u>Exhibit A</u>, at ¶ 108. The Investigator informed

Plaintiff of the next available date of January 19, 2017. <u>Id</u>. The Investigator told Plaintiff to come

to her office and prepare to tell his side of the story. See <u>Exhibit D</u>, at ¶ 22. The Investigator further

asked if Plaintiff had told anyone about his story. <u>Id</u>. Plaintiff responded "No." <u>Id</u>. The Investigator

told Plaintiff not to tell anyone, however she did not provide a reason. <u>Id</u>.

38.     On January 19, 2017, Plaintiff was first interviewed regarding the allegations of

December 4, 2016. See <u>Exhibit D</u>, at ¶ 23. See also <u>Exhibit A</u>, at ¶ 109. During this interview, the

Investigator, asked Plaintiff questions regarding what occurred. <u>Id</u>. Another individual was present

taking notes of the interview. <u>Id</u>. Using, in part, the notes of the other person in the room, the

Investigator created the Initial Investigative Report. <u>Id</u>. That same day, subsequent to meeting with

the Investigator, an email was sent to Plaintiff regarding the interview content. <u>Id</u>. Plaintiff

reviewed the interview content and made approximately 19 comments and corrections. <u>Id</u>.

39.     Further on February 27, 2017, Plaintiff met with the Investigator to view the Initial

Investigative Report. See <u>Exhibit D</u>, at ¶ 24. See also <u>Exhibit A</u>, at ¶ 109. While reviewing the

Initial Investigative Report, Plaintiff discovered errors that included, but not limited to, typing

errors, content errors, and some misunderstandings between Plaintiff and the Investigator. See

<u>Exhibit D</u>, at ¶ 24. Plaintiff corrected and made comments to approximately sixty-one (61) lines

in the initial report. See <u>Exhibit D</u>, at ¶ 24. See also <u>Exhibit A</u>, at ¶ 109. The report caused grave

concern and confusion for Plaintiff. See <u>Exhibit D</u>, at ¶ 24. The hearsay report was not sufficient

to provide an accurate representation of Plaintiff's true testimony. <u>Id</u>.

40.     On February 27, 2017, Plaintiff was allowed to view the complainant's initial report

and the other witnesses' reports.  See <u>Exhibit D</u>, at ¶ 25. See also <u>Exhibit A</u>, at ¶ 111.

41.     On March 8, 2017, Plaintiff was allowed to review a revised Investigative Report

before sending the Investigative Report to the Subcommittee. See <u>Exhibit D</u>, at ¶ 26. See also

Exhibit A, at ¶ 112. Again, Plaintiff discovered errors that included, but not limited to, typing errors, content errors, and some misunderstandings between Plaintiff and the Investigator. See Exhibit D, at ¶ 26. Plaintiff provided his revisions to the Revised Report which he made approximately thirty-eight (38) comments and corrections. See Exhibit D, at ¶ 26. See also Exhibit A, at ¶ 112. Therefore, the Revised Report continued not to represent Plaintiff's true testimony. See Exhibit D, at ¶ 26.

42.     The Revised Report contained some of the exact same errors corrected in the Initial Report. See Exhibit D, at ¶ 27. For instance, Plaintiff again corrected, *inter alia*, that he never said Roe was "very drunk" to a friend, that Roe offered to sleep together on the way home, that it was cold outside so they agreed to stop at Plaintiff's apartment for a bathroom break, that Roe told him not to mention anything that happened that night, that Roe listened to other's opinions and "stories" that happened that night when no one else witnessed what happened, that Plaintiff never penetrated Roe, that Roe said that she was "so wet", that Roe never said "No", and that Roe gave him oral sex for a substantial time. See Exhibit D, at ¶ 27.

43.     Jane Roe and Plaintiff were the only witnesses to what occurred on the early morning hours of December 4, 2016. See Exhibit D, at ¶ 28.

44.     Including other new errors, such as a female student was not at the bar that night nor was she at the apartment so she could not have been a witness, as well as another student witness that was not present that night, that Roe was on top of Plaintiff giving him oral sex, that he never kissed Roe without her consent, that Roe asked Plaintiff if he "likes her" and if he thought she was pretty, that Roe never spoke to the police when they arrived at Plaintiff's apartment that night, that Roe didn't refuse kissing, but kissed Plaintiff back. See Exhibit D, at ¶ 29.

45.    Plaintiff did not view Final Investigative Report that was sent to the Panel for adjudication. See Exhibit D, at ¶ 30. See also Exhibit A, at ¶ 113.

46.    "Appendix D" provisions of the "Student Disciplinary Procedures" does not allow for students to appear before the adjudicative Subcommittee. See Exhibit A, at ¶ 113. When Plaintiff requested whether he could attend the hearing, the Investigator responded, "no honey, you just wait at home for the result email which will be sent within twenty-four hours of the hearing." See Exhibit D, at ¶ 31.

47.    Pursuant to the University's procedures Plaintiff was not allowed to review the Final Investigative Report before it was provided to the Subcommittee. See Exhibit A, at ¶ 116. Plaintiff did not view the Final Investigative Report before it was provided to the Subcommittee. See Exhibit D, at ¶ 30.

48.    During the interview process, the Investigators neglected Plaintiff's expression and emotions while he was being interviewed. See Exhibit D, at ¶ 32. Plaintiff felt as if he was speaking to a machine. Id. These expressions and emotions were never conveyed in the Investigative Report. Id.

49.    At no point in time, from the December 14 Email to March 28, 2017, did the Board provide Plaintiff with email updates regarding the investigation, other than emails regarding viewing the interview notes, initial and revised Investigative Report. See Exhibit D, at ¶ 33. Plaintiff was otherwise left in the dark throughout the investigation. Id.

50.    On March 16, 2017, ninety-three (93) days subsequent to the December 13, 2016 "Charge Notice," and forty-eight (48) days after the duration contained in Section 2g of "Appendix D," Plaintiff was provided inadequate notice of his hearing. See Exhibit D, at ¶ 34. See also Exhibit A, at ¶ 118.  The March 16, 2017, email was sent by January Boten, Assistant Dean/Investigator

at 11:58 p.m. Id. The email was titled "UIUC Disciplinary Update: Subcommittee Hearing Notice Announcement Notice – IMPORTANT" ("March 16 Email"). Id.

51.     The March 16 Email informed Plaintiff that his case was scheduled to appear before the Subcommittee on Sexual Misconduct. See Exhibit D, at ¶ 35. See also Exhibit A, at ¶ 120.

52.     The March 16 Email further informed Plaintiff that, "Your hearing is scheduled for March 28, 2017." See Exhibit D, at ¶ 36. See also Exhibit A, at ¶ 121. The notice did not provide a time or place of the hearing. See Exhibit D, at ¶ 36.

53.     Pursuant to the University's policies and procedures, no parties or witnesses appeared or testified in person before the Subcommittee on March 28, 2017. See Exhibit A, at ¶ 122. Plaintiff was not allowed to attend his hearing to provide testimony or cross-examine witnesses. See Exhibit D, at ¶ 37.

54.     The March 16 Email informed Plaintiff that he "should receive a detailed decision letter from the advisor of the Subcommittee by the end of the business day following the hearing," and that both Plaintiff and Roe would have the opportunity to appeal the Subcommittee's decision. See Exhibit D, at ¶ 38. See also Exhibit A, at ¶ 123.

55.     April is designated as Sexual Assault Awareness Month (SAAM). The goal of SAAM is to raise public awareness about sexual violence and to educate communities and individuals on how to prevent sexual violence. See Exhibit A, at ¶ 124. The University and the community annually plan a host of events. Id. The University plans concerts, drives, talks, workshops, campaigns, meetings, walks, and more. Id.

56.     The Subcommittee met on March 28, 2017, to consider the charges against Plaintiff, and that April 1, 2017, the beginning of the nationally designated SAAM, is four days after March 28, 2017. See Exhibit A, at ¶ 125.

57. On March 28, 2017, Plaintiff received an email from the Executive Director, Justin M. Brown. The email was titled "UIUC Disciplinary Update: Subcommittee Decision Notification" ("March 28 Email"). See Exhibit D, at ¶ 40. See also Exhibit A, at ¶ 127.

58. On March 28, 2017, the Subcommittee on Sexual Misconduct met regarding the charges against Plaintiff, and made the findings including the following, which were communicated to Plaintiff in the March 28 email:

> On December 3, 2016 Plaintiff met Roe and her friend at a local bar. Roe had already been drinking when she met up with Plaintiff, and she continued to drink in Plaintiff's presence. Later that evening, Roe's friend was planning to walk Roe home, but Plaintiff convinced them to let Plaintiff walk her home by saying that Roe was Plaintiff's best friend's girlfriend and that Plaintiff wouldn't do anything to her. Plaintiff then took Roe back to Plaintiff's apartment, where Plaintiff had oral and vaginal sex with her. Roe was incapacitated at the time of the sexual activity and so could not consent. After Plaintiff received the charge letter and no contact directive from Dean Boten on January 13, Plaintiff took a screen shot and sent it in a text to Roe.

See Exhibit D, at ¶ 41. See also Exhibit A, at ¶ 128.

59. After the finding of "Later that evening", no further finding of alcohol consumption was made. See Exhibit D, at ¶ 42.

60. Based on the findings the Subcommittee determined that Plaintiff violated all alleged Codes from the December 14 Email. See Exhibit D, at ¶ 43. See also Exhibit A, at ¶ 129.

61. The Subcommittee further provided its rationale for the decision. See Exhibit D, at ¶ 44. See also Exhibit A, at ¶ 130. The rationale further included:

> Regarding penetration, the respondent claimed that he did not penetrate the complainant, but we do not find this statement to be credible. The complainant stated that she was penetrated in two difference positions, and BK stated that the respondent told him that he had had sex with the complainant.

See Exhibit D, at ¶ 44. See also Exhibit A, at ¶ 131.

62. The Subcommittee assigned the following sanctions:

a.      Dismissal. Start Date: Tuesday, March 28, 2017. Dismissal records are maintained indefinitely and are noted on Plaintiff's transcript. Plaintiff is prohibited from attending or receiving a degree from the University until Plaintiff successfully petitions the Subcommittee to pursue readmission. To be eligible for a petition hearing, Plaintiff must complete the following:

i.      Petition Letter, Academic/Work History, Mandated Service of 250 hours, and a Research Paper of 3,000 words.

b.      Trespass Notification to be excluded from the property.

c.      No Contact Directive with Jane until Plaintiff's degree is conferred.

d.      Plaintiff may request a petition hearing in Spring 2019 for possible readmission in Fall 2019.

e.      The Subcommittee found that the sexual assault was premeditated and because the case also includes a violation of the no contact directive, the Subcommittee issued a 2.5-year dismissal. The SCSD provided guidance to the Subcommittee to consider a two-year dismissal.

See Exhibit D, at ¶ 45. See also Exhibit A, at ¶ 132.

63.      The March 28 Email further provided that Plaintiff may appeal to the SCSD no later than 5 p.m. on April 4, 2017. See Exhibit D, at ¶ 46. See also Exhibit A, at ¶ 133.

64.      Plaintiff appealed the Subcommittee decision by the required date of April 4, 2017. See Exhibit D, at ¶ 47. See also Exhibit A, at ¶ 134. Plaintiff also typed an Appeal Report that provided new information that witnesses' reports were incorrect. See Exhibit D, at ¶ X. Plaintiff's Appeal Report indicated multiple errors with the purported facts, statements that were made by others, and statements made by Plaintiff. See Exhibit D, at ¶ 47. For instance, Plaintiff provided new documented evidence that an adverse witnesses statements were inaccurate. See Exhibit D, at ¶ 47. Specifically the finding that, "BK stated that the respondent told him that he had had sex with the complainant", which Plaintiff provided text messages demonstrating that Plaintiff "told me you guys like almost had sex". See Exhibit D, at ¶ 47. However, the report indicated that BK said Plaintiff had said Roe and Plaintiff had sex. See Exhibit D, at ¶ 47. The inaccurate statement by BK regarding Roe being drunk was also a basis for the Board's finding that Jane was incapacitated. See Exhibit D, at ¶ 47. Plaintiff also provided new documented text message evidence

demonstrating his hastiness in texting Jane and immediately correcting his action. See Exhibit D, at ¶ 47.

65.     Plaintiff's hasty contact was not willful, and Plaintiff never contacted Jane after the incident. See Exhibit D, at ¶ 48.

66.     After the March 28, 2017, findings of Plaintiffs "premeditated" sexual assault, Plaintiff was allowed to be on campus, go to classes, and interact with students. See Exhibit D, at ¶ 49. See also Exhibit A, at ¶ 136. Plaintiff was part of the University community and no further allegations or issues occurred while Plaintiff continued campus life. See Exhibit D, at ¶ 49.

67.     On April 25, 2017, the University sent Plaintiff an email titled, "UIUC Disciplinary Update – Appeal Decision Letter." After providing new information and corrections in his Appeal Report, the SCSD found that none of the criteria for the appeal were substantially met. The SCSD reaffirmed the March 28, 2017, decision. See Exhibit D, at ¶ 50. See also Exhibit A, at ¶ 136.

68.     Plaintiff was not allowed to present his testimony or evidence directly to the Panel. See Exhibit D, at ¶ 51. Plaintiff was not allowed to be represented by an attorney before the Panel. See Exhibit D, at ¶ 51.

69.     Plaintiff was dismissed from the University effective April 25, 2017, based on its determination that Plaintiff violated the University's sexual misconduct policy. See Exhibit A, at ¶ 1. See also Exhibit D, at ¶ 52.

70.     Plaintiff did not complete his Spring 2017 classes upon being dismissed from the University effective April 25, 2017, based on the University's determination. See Exhibit D, at ¶ 53. See also Exhibit A, at ¶ 29.

71.     Plaintiff is unable to transfer be accepted to a comparable undergraduate institution because of the erroneous disciplinary finding. See Exhibit D, at ¶ 54. Plaintiff has attempted to

utilize the services of The Common Application, a website that assist potential students with their college applications and financial aid. See www.commonapp.org. Plaintiff has selected multiple comparable universities for his applications. See <u>Exhibit D</u>, at ¶ 54.  However, Plaintiff must disclose his disciplinary history and whether he has ever been found responsible for a disciplinary violation at an educational institution that Plaintiff has attended. See <u>Exhibit D</u>, at ¶ 54.  Therefore Plaintiff must disclose his disciplinary history further damaging my reputation and good name. <u>Id</u>.

72.     Plaintiff's reputation, good name, and integrity has been severely and negatively affected by the Board's violation of Plaintiff's Due Process rights. See <u>Exhibit D</u>, at ¶ 55. For instance, Roe's friend, who is also within Plaintiff's circle of friends, is present when everyone gets together.  <u>Id</u>. On one occasion, Plaintiff overheard Roe's friend telling Plaintiff's friends that Plaintiff is untrustworthy and lies about everything. <u>Id</u>. Further Roe's friend spoke to her roommate regarding the dismissal. <u>Id</u>. Roe's friend's roommate spoke to Plaintiff's good male friend who told several of Plaintiff's close Taiwanese friend why Plaintiff was no longer at the University. <u>Id</u>. This false decision continues to affect Plaintiff's reputation and good name. <u>Id</u>. Plaintiff feels trapped in his social life and fears of speaking to any of his circle of friends. <u>Id</u>.

73.     Moreover, another female friend of Plaintiff knows about the case unintentionally jokes about the dismissal. See <u>Exhibit D</u>, at ¶ 56.

74.     Further, since the Board's decision, Plaintiff has been inactive on his social media account, and keeps distant with his friends to avoid talking about the dismissal from the University. See <u>Exhibit D</u>, at ¶ 57. Plaintiff is afraid to make new friend because he is afraid they may ask him about his schooling. <u>Id</u>. After the dismissal, Plaintiff is afraid to develop new relationships with females. <u>Id</u>. Plaintiff is constantly afraid that he will unintentionally do or say something wrong and therefore avoids developing new relationships. <u>Id</u>.

75.     Before the dismissal, Plaintiff would call both of his grandmothers on a regular basis. See Exhibit D, at ¶ 58. One is 92 years old and the other one is 82 years old. Id. However, since the dismissal, Plaintiff does not want to disappoint them and fears they may ask him about how he is doing in school. Id.

76.     Plaintiff feels he no longer has an open identity, hiding away from friends and family in fear they may ask him questions about his schooling.  See Exhibit D, at ¶ 59. Further Plaintiff is not responding email and text messages from people asking him where he has been and why Plaintiff is not in school. Id.

## ARGUMENT

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003). The party opposing summary judgment must set forth specific facts showing there is a general issue of material fact for trial. Celotex, 477 U.S. 324. To withstand a motion for summary judgment, the party opposing summary judgment must substantiate their allegations with specific facts that demonstrate a genuine issue of material fact. Id. Neither "mere existence of some factual dispute between the parties" nor the existence of "some metaphysical doubt as to the material facts" will defeat a motion for summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Michas v. Health Cost Controls of Illinois, Inc., 209 F.3d 687, 692 (7th Cir. 2000). In other words, a mere scintilla of evidence is insufficient to avoid summary judgment.

Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. Nelson v. Miller, 570 F.3d 868, 875 (7th Cir. 2009).

## LEGAL DISCUSSION

I.   **Plaintiff Possesses A Cognizable Property and Liberty Interest, In A Legally Protected Entitlement, To His Continued Education At The University Under The Fourteenth Amendment**

The Fourteenth Amendment to the United States Constitution provides that no state shall deprive any person of life, liberty, or property without the due process of law. See McCalvin v. Fairman, 603 F. Supp. 342, 344 (C.D. Ill. 1985). "We undertake a two-part analysis in procedural due-process cases: first, we determine whether the plaintiff was deprived of a protected interest; if so, we determine what process was due under the circumstances". Hess v. Bd. of Trs. of S. Ill. Univ., 839 F.3d 668 (7th Cir. 2016) (citing See Charleston v. Bd. of Trs. of the Univ. of Ill. at Chi., 741 F.3d 769, 772 (7th Cir. 2013) See also McCalvin, 603 F. Supp. at 344 (citing See Shango v. Jurich, 681 F.2d 1091, 1097 (7th Cir. 1982)). Plaintiff was denied his right to due process when he was dismissed from the University effective April 25, 2017, based on the University's determination without the process required by law. See Statement of Undisputed Material Facts (hereinafter "SMF") ¶ 69.

Plaintiff has a property interest in a continued education at the University as he has a legally protected entitlement to his continued education at the University. As this Court acknowledged in its ruling on Defendant's motion to dismiss, "a student can prove that he has a property interest in a continued education if he can establish that he had a legally protected entitlement to his continued education at the university". See [DKT #34]. See also, Charleston, 741 F.3d at 773. This can be established by pleading, with specificity, the existence of an express or implied contract. Id. "The

catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant [may] become part of the contract". <u>Ross v. Creighton University</u>, 957 F.2d 410, 416 (7th Cir. 1992); see also <u>Bissessur v. Indiana University Board of Trustees</u>, 581 F.3d 599, 602 (7th Cir. 2009). See also <u>Galdikas v. Fagan</u>, 342 F.3d 684, 692 (7th Cir. 2003) (citing <u>Wilson v. Illinois Benedectine Coll.</u>, 112 Ill. App. 3d 932 (Ill. App. Ct. 1983) (stating that a university and its students have a contractual relationship and the terms of the contract are set forth in the university's catalogs)). The plaintiff "could point to an agreement between himself and the school that he would be <u>dismissed only for good cause</u>". <u>Charleston</u>, 741 F.3d at 773. (Emphasis added).

Plaintiff has a legally protected entitlement to his education at the University via a contract with the University that he would be dismissed only for good cause and that his rights as a citizen will not by disparaged or denied. Plaintiff applied and was accepted to enroll at the University. SMF ¶ 4. The University's Student Code, which includes the University's Sexual Misconduct Policy, and the University's Student Disciplinary Procedures, were made available to Plaintiff on the University's website. See SMF ¶ 4. Plaintiff had access to these documents before and after he applied to and was accepted by the University. See SMF ¶ 4.

The University, via its documents made available to Plaintiff, made several representations in forming the contract with Plaintiff. The Student Code would apply to Plaintiff as an undergraduate at the University. See SMF ¶ 5. The Student Code provided for the Board's basis for student discipline, source, and jurisdiction. See SMF ¶ 7. Further, these regulations are formulated by a variety of sources, including, but not limited to, the Board. See SMF ¶ 7. The Student Code provides the University's Sexual Misconduct Policy. See SMF ¶ 9. The Student Disciplinary Procedures set forth the procedures for addressing violations of the Student Code and Appendix D to those procedures sets forth procedures for investigating and resolving cases that

involve an accusation of sexual misconduct, including sexual assault, against a student. See SMF ¶ 11, 12. Therefore, under the University's policies and procedures, Plaintiff would not be dismissed arbitrarily, but for good cause after an investigation and determination by the University's Subcommittee.

The University further represented to the Plaintiff through the Student Code that as a "student at the University of Illinois at the Urbana-Champaign campus is a member of a University community of which all members *have at least the rights and responsibilities common to all citizens*, free from institutional censorship; *affiliation with the University as a student does not diminish the rights or responsibilities held by a student* or any other community member as a citizen of larger communities of the state, the nation, and the world." See SMF ¶ 6. Moreover, the "*following enumeration of rights shall not be construed to deny or disparage other rights retained by these individuals in their capacity as members of the campus community or as citizens of the community at large.*" See SMF ¶ 6. To have rights common to all citizens as a citizen of the state and nation is the right to Due Process under the Illinois and U.S. Constitution when deprived of a protected interest. See <u>McCalvin v. Fairman</u>, 603 F. Supp. 342, 344 (C.D. Ill. 1985). The Student Code specifically states that the University's Student Code "shall not be construed to deny or disparage" Plaintiff's rights retained in his capacity as members of the campus community or as citizens of the community at large.

The Student Code and Disciplinary Procedures also provided for Plaintiff's Privacy Rights and right to study. See SMF ¶ 14. Moreover, the Student Disciplinary Procedures provided that the Board, "asserted their belief in the concept that the university disciplinary system shall be separate from, but coexistent with, general systems established by society to deal with the conduct of citizens of society." See SMF ¶ 15.

As a result of the aforementioned, the University represented that it would place substantive limits on its ability to suspend or dismiss Plaintiff by adopting policies and procedures and by not denying or disparaging Plaintiff's rights retained as a citizen of the nation. The Plaintiff would only be suspended or dismissed for good cause.

In reliance on these policies, practices, and understandings regarding the Student Code, Plaintiff accepted the University's offer and paid the required deposit and tuition. See SMF ¶ 18. By doing so, Plaintiff entered into a relationship and contract with the University that entitled him to be enrolled thereafter so long as he paid the required fees, remained in good standing academically as he pursued the academic course work needed to earn a degree, otherwise met the requirements for graduation, and complied with the University's conduct rules and policy.

In other words, it is undisputed that Plaintiff was entitled to continued enrollment absent good cause for suspension or dismissal. Based on the undisputed evidence, there was mutual understanding and assent, and therefore Plaintiff has a protected property interest in his continued enrollment and education at the University. Therefore, there is no dispute that Plaintiff had a legitimate entitlement to a continued education, one that was part of a contractual agreement between Plaintiff and Defendant.

## II. The University Failed To Provide Plaintiff With All Of The Process Required By Law

The University is a public school and is considered a state actor under the Fourteenth Amendment. Due Process is therefore required in a disciplinary process where the University's disciplinary process threatens to deprive Plaintiff of his legitimate entitlement of his property interest in a continued education. As established above, Plaintiff has a protected property interest in his continued education. Further, the Defendant deprived Plaintiff of his property interest on April 25, 2017, when he was dismissed from the University for two and a half years. See SMF ¶

62. The undisputed facts also establish a violation of Plaintiff's due process rights when he was not provided a meaningful opportunity to be heard and was denied his right to his entitled hearing before the University's adjudicative Subcommittee.

"A student's interest in pursuing an education, while not a fundamental right, see San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 36 L. Ed. 2d 16, 93 S. Ct. 1278 (1973), is included within the Fourteenth Amendment's protection of liberty and property." Foo v. Trustees of Indiana University, 88 F. Supp. 2d 937, 947 (S.D. Ind. 1999) (citing See, e.g., Goss v. Lopez, 419 U.S. 565, 574-75, 42 L. Ed. 2d 725, 95 S. Ct. 729 (1975); Dunn v. Fairfield Community High Sch. Dist. No. 225, 158 F.3d 962, 964 (7th Cir. 1998)). Therefore, a student facing expulsion or suspension from a public educational institution is entitled to the protections of due process." Foo, 88 F. Supp. 2d at 947 (citing See Goss, 419 U.S. at 575-76).

An institution's internal rules do not set the standard for whether the due process required by the federal Constitution has been provided. Grant v. Trustees of Indiana University, 870 F.3d 562, 571 (7th Cir. 2017).

Once it is determined that due process applies, the question becomes "what process is due." Goss, 419 U.S. at 577. "To comport with due process, expulsion procedures must provide the student with a meaningful opportunity to be heard". Remer v. Burlington Area Sch. Dist., 286 F.3d 1007, 1010 (7th Cir. 2002) (citing Linwood v. Bd. of Educ., 463 F.2d 763, 769-70 (7th Cir. 1972)). Due process is a flexible concept that "'calls for such procedural protections as the particular situation demands.'" Pugel v. Board of Trustees of the University of Illinois, 378 F.3d 659, 663 (7th Cir. 2004) (citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). "The severity of the deprivation suggests the appropriateness of 'more formal procedures.'" Pugel, 378 F.3d at 664 (citing Goss, 419 U.S. at 584). "Indeed, more extensive procedures in the context of a university

dismissal comport with the Supreme Court's own admonition in <u>Goss</u> that due process requirements depend upon context". <u>Id</u>.  In fact, the Seventh Circuit has commented on what is required in a meaningful opportunity to be heard. An entitlement to a hearing.

In <u>Williams v. Wendler</u>, the plaintiff students were suspended by the Southern Illinois University ("SIU"), a state university; one for two years and the other two for three years for hazing another student. 530 F.3d 584, 585 (7th Cir. 2008). The three suspended students filed suit alleging a due process claim for a deprivation of their property right in a college education. <u>Id</u>. at 589. The due process claim was dismissed under Rule 12(b)(6). <u>Id</u>. at 586. The Seventh Circuit Court in <u>Williams</u> then discussed the same implications the Seventh Circuit reasoned in <u>Charleston</u>. See <u>Id</u>. What is required is an entitlement not to be suspended without good cause. <u>Id</u>. Plaintiffs in <u>Williams</u> specifically denied that they need to establish an entitlement. <u>Id</u>. at 590. The Seventh Circuit Court concluded that plaintiffs "denied themselves out of court". <u>Id</u>. However, the Seventh Circuit Court provided guidance on what the entitlement would provide a state college student:

> "Suppose a student had a contract with the college in which he promised to pay tuition, in an amount specified by the college, on the first day of each quarter, and in exchange the college promised not to suspend him unless he hazed another student. The contract would create an entitlement, so that if the college suspended him for hazing and he denied it <u>he would be entitled to a hearing</u>".

<u>Id</u>. at 589 (Emphasis added). See also <u>Coronado</u>, 537 F.3d at 793-94 (College student allowed to testify at expulsion hearing for misconduct); <u>Osteen v. Henley</u>, 13 F.3d 221, 224 (7th Cir. 1993) (College student attended hearing represented by a student advocate who provided testimony on behalf of the accused of misconduct). The United States Supreme Court has recognized the increased risk of erroneous fact-finding in disciplinary proceedings justifies courts' scrutiny of school disciplinary proceedings under the procedural due process standards. <u>Goss</u>, 419 U.S. at 580.

At all times, Plaintiff in the present case denied the sexual assault allegations and further was denied his entitlement to a hearing before the adjudicative Subcommittee. See SMF ¶ 34. Although Plaintiff seeks such procedural protections such as cross-examination and representation, he was not even provided his most basic right of an entitlement to a hearing for his severe sanctions in order to present his actual testimony to the Subcommittee. Without presenting his testimony in person to the Subcommittee, Plaintiff was denied his right to a meaningful opportunity to be heard. Plaintiff's denial of a meaningful opportunity to be heard derives from the context, the particular situation, and the severity of the deprivation. See Pugel, 378 F.3d at 663-64.

On December 13, 2016, Plaintiff was notified by the University of allegations that he sexually assaulted another student in violation of the Student Code. See SMF ¶ 23, 26-28. The University noticed that the allegations occurred in the early morning hours of December 4, 2016, in his apartment. There were only two witnesses to what occurred in the early morning hours in Plaintiff's apartment, Plaintiff and Roe. See SMF ¶ 43. The December 13, 2016, University email further threatened Plaintiff with dismissal. See SMF ¶ 12. Therefore, under the context of sexual misconduct and dismissal, the misconduct must be adduced and competing version of events evaluated. Immediately, under the initial facts, a credibility determination would be required to be made by the Subcommittee. Under the University's rules, it is the Subcommittee that determines the facts and credibility of the witnesses.  See SMF ¶ 13. However, unlike a trial court that views the witness' presenting their testimony to determine their credibility, it is the Subcommittee who functions like an appellate court reviewing documents (the Final Investigative Report) that finds the facts and makes a credibility determination without the presence of the witnesses. See United States v. Herrero, 893 F.2d 1512, 1516 (7th Cir. 1990) (It is the trier of fact's role as the arbiter of

credibility). In fact, by the University's admission and Student Disciplinary Procedures, students are not allowed an appearance before the adjudicative Subcommittee. See SMF ¶ 46. Moreover, Plaintiff requested whether he could attend the hearing and the Investigator responded that he would have to wait at home for the results which will be sent within twenty-four hours of the hearing. See SMF ¶ 46. The University denied Plaintiff his entitlement to a hearing. Moreover, the Subcommittee would make a finding of responsibility upon a preponderance of the evidence standard which is too low to safeguard an accused students' due process rights. See SMF ¶ 13, at Section 4(d). Finally, the Title IX Coordinator reviews all sexual assault cases upon their completion to determine whether the university needs to take additional action that was not available through the disciplinary process. See SMF ¶ 17. This is concerning where the Title IX Coordinator may take additional action without the protections of due process or an entitlement to a hearing before the Subcommittee in the first instance. Under the context of the undisputed facts, Plaintiff was denied due process and a meaningful opportunity to be heard. See Pugel, 378 F.3d at 664.

Initially, during December 2016, at the appointment, the Investigator only addressed the no-contact policy issue with Plaintiff. See SMF ¶ 35. Plaintiff informed the Investigator what had occurred, however, the Investigator did not collect the text message evidence that supported Plaintiff's position. See SMF ¶ 35. Plaintiff was told virtually nothing about the accusations Jane had made so that he could prepare a defense and suggest sources of information for Investigators to pursue. See SMF ¶ 35. By the University not immediately investigating the accusations of sexual assault, Plaintiff did not believe that the University considered Roe's false accusations seriously. See SMF ¶ 36. The University indicated under its policies that an investigation duration would be approximately four-five days after the Charge Notice. See SMF ¶ 50.

It was not until January 2017, the next semester that the Investigator would first meet with Plaintiff to tell his side of the events. See SMF ¶ 38. The Investigator told Plaintiff not to tell anyone his side of the story, but did not provide a reason. See SMF ¶ 37. Moreover, Plaintiff was not informed of Roe's accusations and was unable to properly prepare to respond to the Investigator's questions or provide proper corroborating witnesses before the meeting. More than a month later, on January 19, 2017, Plaintiff was first interviewed regarding the allegations of December 4, 2016. See SMF ¶ 38. During this interview, the Investigator asked Plaintiff questions regarding what occurred. Id. Another individual was present taking notes of the interview. Id. Using, in part, the notes of the other person in the room, the Investigator created the Initial Investigative Report. Id.

On February 27, 2017, Plaintiff met with the Investigator to view the Initial Investigative Report. See SMF ¶ 39. While reviewing the Initial Investigative Report, Plaintiff discovered errors that included, but not limited to, typing errors, content errors, and some misunderstandings between Plaintiff and the Investigator. See SMF ¶ 39. Plaintiff corrected and made comments to approximately sixty-one (61) lines in the initial report. See SMF ¶ 39. The report caused grave concern and confusion for Plaintiff. See SMF ¶ 39. The hearsay report was not sufficient to provide an accurate representation of Plaintiff's true testimony. Id.

On March 8, 2017, Plaintiff was allowed to review a revised Investigative Report before sending the Investigative Report to the Subcommittee. See SMF ¶ 41. Again, Plaintiff discovered errors that included, but not limited to, typing errors, content errors, and some misunderstandings between Plaintiff and the Investigator. See SMF ¶ 41. Plaintiff provided his revisions to the Revised Report which he made approximately thirty-eight (38) comments and corrections. See

SMF ¶ 41. Therefore, the Revised Report continued not to represent Plaintiff's true testimony. See SMF ¶ 41.

Importantly, the Revised Report contained some of the exact same errors corrected in the Initial Report. See SMF ¶ 42. Moreover, the Revised Report contains new errors that were not contained in the previous Initial Report. See SMF ¶ 44.

After numerous corrections were made on both reports by the Investigator, the hearsay Final Investigator Report was sent to the Committee for adjudication without an opportunity for Plaintiff to review the Final Investigator Report. See SMF ¶ 45, 47. With the numerous errors contained in the reports, Plaintiff's true testimony would not be heard by the Subcommittee who makes the determinations of fact, credibility, and responsibility. Further, at no point in time, from the December 14 Email to March 28, 2017, did the Board provide Plaintiff with email updates regarding the investigation, other than emails regarding viewing the interview notes, initial and revised Investigative Report. See SMF ¶ 49. Under the particular situation, Plaintiff was denied a meaningful opportunity to be heard. See Pugel, 378 F.3d at 663.

On March 16, 2017, ninety-three (93) days subsequent to the December 13, 2016 "Charge Notice," and forty-eight (48) days after the duration contained in Section 2g of "Appendix D," Plaintiff was provided inadequate notice of his hearing. See SMF ¶ 50. The March 16 Email informed Plaintiff that his case was scheduled to appear before the Subcommittee on Sexual Misconduct. See SMF ¶ 51. The March 16 Email further informed Plaintiff that, "Your hearing is scheduled for March 28, 2017." See SMF ¶ 52. The notice did not provide a time or place of the hearing. See SMF ¶ 52. Therefore, Plaintiff's notice of his hearing to adjudicate his alleged violations were insufficient under due process.

Pursuant to the University's policies and procedures, no parties or witnesses appeared or testified in person before the Subcommittee on March 28, 2017. See SMF ¶ 53. Plaintiff was not allowed to attend his hearing to provide testimony or cross-examine witnesses. See SMF ¶ 53. The Subcommittee receives its information from the hearsay Final Investigative Report and from the Investigators who also do not have first-hand knowledge of the events. See SMF ¶ 13, at Section 4(b-d).

The Subcommittee met on March 28, 2017, to consider the charges against Plaintiff, and that April 1, 2017, the beginning of the nationally designated SAAM, is four days after March 28, 2017. See SMF ¶ 56. The Subcommittee was unduly influenced by SAAM.

On March 28, 2017, the Subcommittee on Sexual Misconduct met regarding the charges against Plaintiff, and made the findings including the following, which were communicated to Plaintiff in the March 28 email:

> On December 3, 2016 Plaintiff met Roe and her friend at a local bar. Roe had already been drinking when she met up with Plaintiff, and she continued to drink in Plaintiff's presence. Later that evening, Roe's friend was planning to walk Roe home, but Plaintiff convinced them to let Plaintiff walk her home by saying that Roe was Plaintiff's best friend's girlfriend and that Plaintiff wouldn't do anything to her. Plaintiff then took Roe back to Plaintiff's apartment, where Plaintiff had oral and vaginal sex with her. Roe was incapacitated at the time of the sexual activity and so could not consent. After Plaintiff received the charge letter and no contact directive from Dean Boten on January 13, Plaintiff took a screen shot and sent it in a text to Roe.

See SMF ¶ 58. The University's Sexual Misconduct Policy does not contain a separate, stand-alone definition of the term "incapacitated". See SMF ¶ 9. The Student Code further details "that the basis for discipline at this campus be clearly defined". See SMF ¶ 7. Roe's friend was planning to walk Roe home, but Plaintiff convinced them to let Plaintiff walk her home. See SMF ¶ 58. After the finding of "Later that evening", no further finding of alcohol consumption was made. See SMF ¶ 59.

Based on the findings the Subcommittee determined that Plaintiff violated all alleged Codes from the December 14 Email. See SMF ¶ 60. The Subcommittee issued a sanction of a 2.5-year dismissal of Plaintiff. See SMF ¶ 62. The Subcommittee further provided its rationale for the decision.  See SMF ¶ 61. The rationale further included:

> Regarding penetration, the respondent claimed that he did not penetrate the complainant, but we do not find this statement to be credible. The complainant stated that she was penetrated in two difference positions, and BK stated that the respondent told him that he had had sex with the complainant.

See SMF ¶ 61. Therefore, the Subcommittee did, in fact, make credibility determinations outside the presence of any witness testimony. Moreover, had Plaintiff been allowed to cross-examine BK, the Subcommittee would have discovered BK stated that Plaintiff told BK they <u>almost</u> had sex. See SMF ¶ 64. Plaintiff provided this proof during his appeal, but was denied his right to be present before the Subcommittee during his hearing to present evidence and cross-exam witnesses against him. See <u>Doe v. Pennsylvania State University</u>, 2017 WL 3581672, *7 (M.D.Penn. Aug. 18, 2017) (When the outcome of a disciplinary decision is dependent on credibility-based determinations, the accused's right to some form of cross examination is enhanced); see also <u>Dillon v. Pulaski County Special School District</u>, 468 F. Supp. 54, 58 (E.D. Ark. 1978) (Holding that due process "demanded" the opportunity for cross-examination <u>where witness testimony was essential</u> to the committee's findings).

Moreover, had Plaintiff been present, Plaintiff would be able to testify regarding what discipline is warranted by the identified Code violations. Plaintiff should have been given the opportunity to present a mitigative argument regarding his violation of misconduct and the no-contact directive. See Betts v. Bd. of Educ. of Chi., 466 F.2d 629, 633 (7th Cir. 1972) ("Due process may also contemplate affording the plaintiff an opportunity to be heard on the question of what discipline is warranted by the identified offense. School authorities were plainly required to

33

give the plaintiff and her parent some opportunity to present a mitigative argument."). The half-year violation for violating the no-contact directive was clearly and overly harsh for his inadvertent actions.

Plaintiff appealed the Subcommittee decision by the required date of April 4, 2017. See SMF ¶ 64. Included in Plaintiff's appeal were new documented evidence that an adverse witnesses' statements were inaccurate. See SMF ¶ 64. Further, Plaintiff also typed an Appeal Report that provided new information that witnesses' reports were incorrect. See SMF ¶ 64. Moreover, the inaccurate statement by BK regarding Roe being drunk was also a basis for the Board's finding that Jane was incapacitated. See SMF ¶ 64.  All of these failures of a meaningful opportunity to be heard could have been prevented had Plaintiff been allowed to attend the hearing against him on the University's charges.

After the March 28, 2017, findings of Plaintiffs "premeditated" sexual assault, Plaintiff was allowed to be on campus, go to classes, and interact with students. See SMF ¶ 66. Plaintiff was part of the University community, and no further allegations or issues occurred while Plaintiff continued campus life. See SMF ¶ 66. This is in line with Plaintiff's prior good status before the alleged violations in which Plaintiff possessed no student disciplinary record. See SMF ¶ 22.

After providing new information and corrections in his Appeal Report, the SCSD found on April 25, 2017, that none of the criteria for the appeal were substantially met. The SCSD reaffirmed the March 28, 2017, decision. See SMF ¶ 67. Plaintiff was dismissed from the University effective April 25, 2017, based on its determination that Plaintiff violated the University's sexual misconduct policy and no contact directive. See SMF ¶ 69. The severity of the deprivation indicates Plaintiff was entitled to a hearing before the Subcommittee. See Pugel, 378 F.3d at 664.

Importantly, Plaintiff's entitlement to a hearing aligns with the Supreme Court's due process balancing test in Mathews v. Eldridge. 424 U.S. 319, 335 (1976). In Mathews, the Supreme Court held that the sufficiency of the procedures utilized by a government actor, such as an administrative body, should be assessed under a three-part test. Id. The balancing test examines (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. Id.

As previously established, Plaintiff's private interest affected by the official action is substantial. Plaintiff's property right in education is vital, and without sufficient education Plaintiff will be unable to earn an adequate livelihood, to enjoy life to the fullest, or to fulfill his responsibilities and duties as a good citizen. Further, Plaintiff's liberty interest in his "good name, reputation, honor, and integrity is at stake because of what the government is doing to him". Goss, 419 U.S. at 574-75. His standing with his peers, teachers, and family are damaged, and the University's records further damage his liberty interest. See SMF ¶ 72-76. See also Smyth v. Lubbers, 398 F. Supp. 777, 796 (W.D. Mich. 1975) (Congress recognized the extreme importance of a student's "record" by closely regulating the circumstances under which student records may be released by school authorities. Family Educational Rights and Privacy Act of 1974, as amended, 20 USCA Sec. 1232g). Plaintiff is unable to transfer to a comparable undergraduate institution because of the erroneous disciplinary finding and misconduct on his record. See SMF ¶ 71. Therefore, under the first part of Mathews weighs heavily in favor of Plaintiff and against the University.

Further established by the aforementioned is the undisputed risk of an erroneous deprivation of Plaintiff's interest through the procedures used and codified by the University. Under the context, particular situation, and severity of deprivation, the procedures used and codified by the University created unnecessary risks of erroneous deprivation that occurred as evidence by the undisputed facts.  A <u>simple</u> attendance of the hearing before the Subcommittee to testify and cross-exam witnesses against the Plaintiff is an additional and substitute procedural safeguards of a student's due process rights under the context, severity of deprivation, and the particular situation. Therefore the probable value of the procedural safeguard of attendance of the hearing before the Subcommittee to testify and cross-exam witnesses against the Plaintiff, weighs heavily in favor of Plaintiff.

The simplicity of the attendance of Plaintiff to testify before the Subcommittee and ability to cross-exam witnesses also lend favorably for Plaintiff under the final element of fiscal and administrative burdens that the additional or substitute procedural requirement would entail. In fact, having Plaintiff present and cross-examination of witnesses eliminate the long drawn out investigator process of the Investigator having to collect information on multiple occasions, and rewriting and obtaining corrections to at least three separate Reports. The room for error cannot be understated. This eliminates a substantial costs for the University. Further, the University admits that it already retains all Subcommittee members with appropriate annual training, developed in consultation with the University's Title IX Coordinator, on sexual assault. See SMF ¶ 13, at Section 4(a). Therefore the University already expends the necessary funds for training of the Subcommittee on an annual basis.  As a result, the additional fiscal or administrative burdens, if any, weigh in favor of Plaintiff.

Therefore, the undisputed evidence demonstrates that Plaintiff was denied a meaningful opportunity to be heard when Plaintiff was denied his entitlement to a hearing before the Subcommittee without an opportunity to cross-exam the witnesses against him who the Subcommittee relied upon to find violations and a deprivation of his property interest in a continued education at the University.

**CONCLUSION**

WHEREFORE, Plaintiff, John Doe, respectfully request that this Court grant Plaintiff's Motion for Summary Judgment against the Defendant, Board of Trustees of the University of Illinois. Plaintiff further requests that this Court grant Plaintiff:

(i)      A permanent injunction fully reinstating Plaintiff to the University, allowing him to enroll in classes, and allowing him to take the final examinations to complete his sophomore semester, as he would have had he not been unjustly barred from the University;

(ii)     Injunctive relief requiring the University to hold a proper hearing, with notice, allowing Plaintiff to be present at the hearing, to be represented by counsel, to present witnesses and other evidence, to cross-examine his accuser and to cross-examine any and all witnesses;

(iii)    On the second cause of action for declaratory judgment against the Defendant, a judicial declaration that (i) the outcome and findings made by Defendant be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's suspension from University be removed from his education file; (v) any record of the complaint against Plaintiff be permanently destroyed; (vi) Plaintiff be readmitted to the University for the Fall 2017 semester; (vii) Plaintiff be allowed to complete his Spring 2017 classes; and (viii) Defendant's rules, regulations, and guidelines are unconstitutional as applied;

(iv)     An award of Plaintiff's attorney's fees and costs; and

(v)     Awarding Plaintiff such other and further relief as the Court deems just, equitable

and proper.


/s/ Mark D. Roth _____
Mark D. Roth
Ken Hurst
Roth Fioretti, LLC
311 South Wacker Drive, Suite 2470
Chicago, Illinois 60606
PH: (312) 922-6262
FX: (312) 922-7747
mark@rothfioreti.com
ken@rothfioretti.com
Counsel for Plaintiff


## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2018, a copy of the foregoing **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** was filed electronically. Notice of this filing will be sent to all counsel registered with the Court by operation of the Court's electronic filing system.

/s/Ken Hurst_____